Nossaman LLP
Janice Mock (pro hac vice)
jmock@nossaman.com
Allan H. Ickowitz (pro hac vice)
aickowitz@nossaman.com
S. Ashar Ahmed (pro hac vice)
aahmed@nossaman.com
Catherine F. Ngo (pro hac vice)
cngo@nossaman.com
50 California Street, 34th Floor
San Francisco, CA 94111
Telephone: 415.398.3600
Facsimile: 415.398.2438

The Cooper Castle Law Firm LLP
Aaron M. Waite (NV 7947)
awaite@ccfirm.com
5275 S. Durango Dr.
Las Vegas, NV 89113
Telephone: 702.435.4175
Facsimile: 702.877.7424

Attorneys for Creditor
FEDERAL DEPOSIT INSURANCE CORPORATION,
as Receiver for LA JOLLA BANK, FSB

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| IN RE DANIEL GEORGE JOHN TARKANIAN AND AMY MICHELLE TARKANIAN,<br><br>Debtors. | Case No: 13-20495-mkn<br>Chapter 7<br><br>**OBJECTION TO CLAIMS OF EXEMPTION**<br><br>Date:        March 26, 2014<br>Time:        2:30 P.M.<br>Courtroom: 2 (Third Floor)<br><br>Before Chief Judge Mike K. Nakagawa<br>300 Las Vegas Boulevard South<br>Las Vegas, Nevada |

284698_2

-1-

OBJECTION TO CLAIMS OF EXEMPTION

1   Creditor Federal Deposit Insurance Corporation as Receiver for La Jolla Bank, FSB

2   ("FDIC-R"), hereby objects pursuant to Bankruptcy Rule 4003(b)(1) and Local Rule 4003(b) to

3   Daniel George John Tarkanian's ("Danny") and Amy Michelle Tarkanian's (collectively,

4   "Debtors") claim of homestead exemption.  By this Objection, FDIC-R respectfully requests that

5   this Court deny Debtors' requested homestead exemption because any equity Debtors have in the

6   homestead is a direct result of fraudulent transfers following the entry of a $16.9 million

7   judgment against them in favor of the FDIC-R.

8   This Objection is based on the attached memorandum of points and authorities, the

9   Declaration of Janice Mock ("Mock Decl.") filed concurrently herewith, together with all

10  attached exhibits and any oral arguments this Court may hear at the time of hearing.  Pursuant to

11  Local Rule 9014(g) attached hereto as **Attachment A** is a Proposed Order.

12  ## MEMORANDUM OF POINTS AND AUTHORITIES

13  **I.    STATEMENT OF FACTS**

14  Debtors currently reside at 3008 Campbell Circle, Las Vegas, Nevada, a 6-bedroom, 5-

15  bath, 4,234 square foot house (the "Campbell Property").[1]  They originally purchased the

16  Campbell Property on June 10, 2005, then transferred ownership of the property from themselves

17  into the "Daniel and Amy Tarkanian Revocable Family Trust" on May 8, 2006.[2]  Mock Decl., ¶

18  2, Exh. A.  Upon information and belief, Debtors began residing at the Campbell Property from

19  the original purchase date, but never declared it as their homestead.

20  In May 2010, the Debtors were sued on personal guarantees they had provided to La Jolla

21  Bank in support of a commercial loan of approximately $14 million dollars – guarantees upon

22  which the bank relied in making the loan to a business enterprise in which the Debtors held an

23

24

---

25  [1] Basic details about the property are available through the Chicago Title Company.  Mock Decl.,
    ¶ 2, Exh. A at 2.
26  [2] The Campbell Property is held in a revocable trust, which is funded by the grantors for the
    benefit of themselves.  *See* NRS § 166.010 *et seq.*; *In re Shuman*, 78 B.R. 254, 257 (9th Cir.
27  1987).  Thus, the Campbell Property is treated for the purposes of this action as property of the
    grantors.  *See* NRS § 21.080(2).
28  284698_2                                    -2-

---
OBJECTION TO CLAIMS OF EXEMPTION

1  interest.[3]  *See* Mock Decl. ¶ 3, Exh. B.  Summary judgment was granted in favor of FDIC-R, and

2  on May 22, 2012, a $16,995,005.17 Judgment was issued against the Debtors by the United

3  States District Court for the Southern District of California (the "Judgment").[4]  Mock Decl. ¶ 3,

4  Exh. B.

5          On April 19, 2013, the FDIC-R registered a certified copy of its $16,995,005.17

6  Judgment with the United States District Court for the State of Nevada.   Mock Decl., ¶ 4, Exh.

7  C.  But it was not until *after* the Judgment was entered against the Debtors that they decided to

8  declare the Campbell Property as their homestead.  On February 6, 2013 – almost eight years

9  after purchasing the property and while saddled with the Judgment – they recorded a Declaration

10  of Homestead to exempt the property from attachment by the FDIC-R.  Mock Decl., ¶ 5, Exhs. D

11  and K.

12          Meanwhile, before they filed the homestead exemption and while the massive Judgment

13  against them was pending, Debtors engaged in a series of complex financial transactions whereby

14  they obtained funds sufficient to allow them to make approximately $400,000 in excess principal

15  payments on the Campbell Property mortgage.  This carefully orchestrated pay down not only

16  increased their equity in the property, it effectively protected $400,000 in assets from attachment

17  by the FDIC-R.  Now that they are in bankruptcy, the Debtors allege that the Campbell Property

18  should be exempt from the bankruptcy estate as their homestead under Nevada law (which

19  provides a homestead exemption of up to $550,000 in value).  *See* Nevada Revised Statutes

20  ("NRS") § 21.090(1)(l); 115.010(2).  The specifics of the multiple financial transactions are

21  briefly described below:

22

23  ────────────────────

24  [3] Debtors were involved in a real estate development known as Vegas Diamond Properties, LLC.

25  La Jolla Bank made the loan, guaranteed by the Debtors and others, to Vegas Diamond
   Properties.

26  [4] The Judgment was never stayed because Defendants failed to timely post a supersedeas bond.
   Only a supersedeas bond can stay collection efforts.  *U.S. v. O'Callaghan*, 805 F.Supp.2d 1321,

27  1324 (M.D.Fl. 2011) (citing *Moore v. Townsend*, 577 F.2d 424, 427 (7th Cir.1978)) ("A
   supersedeas bond serves to fully secure a judgment during an appeal and to compensate the

28  judgment creditor in the event of loss caused by the stay.").  *See* Fed. R. Civ. P. 62(d).

284698_2                                           -3-

- Debtor Danny Tarkanian testified at a judgment debtor examination on June 5, 2013, that he drew down hundreds of thousands of dollars from the cash value of two of his parents' life insurance policies held in the name of the Jerry and Lois Tarkanian 1992 Irrevocable Trust (the "Trust"), of which Danny was the Trustee. Mock Decl., ¶ 6, Exh. E (Daniel Tarkanian Examination ("D. Tarkanian Exam") at 35:19-36:3; 36:17-37:3; 39:3-21; 40:21-41:10; 42:13-25; 43:16-44:17; 45:2-6; 51:15-52:10); *see also* Mock Decl., ¶ 7, Exh. F.

- On July 9, 2012, Debtor Danny Tarkanian deposited $220,000.00 from those policy proceeds into the Trust's bank account (the "Trust account"). Mock Decl., ¶ 8, Exh. G.

- On July 10, 2012, the very next day, Debtor Danny Tarkanian did three things: He withdrew $220,000.00 from the Trust account and deposited it into the business account of JAMD, LLC,[5] a partnership in which Danny Tarkanian holds an ownership interest and is the signatory on the company bank account. Mock Decl., ¶¶ 8, 9, Exh. G and H. He then immediately wrote himself a check from the JAMD, LLC account in the amount of $250,000, purportedly to "repay a loan" he made to JAMD (though he never produced any supporting documents or promissory notes to prove the loan was bona fide). Mock Decl., ¶¶ 6, 9, Exhs. E (D. Tarkanian Exam at 60:16-23; 81:5-17; 81:23-82:15; 82:17-83:4) and H.

- On July 12, 2012, $303,755.83 was deposited into the Debtors' personal checking account and, on that very same day, $300,000.00 was withdrawn from that account. Mock Decl., ¶ 10, Exh. I.

- On July 16, 2012, just four days after $300,000 was withdrawn from Debtors' personal account, lender Bank of America posted a $300,000.00 excess principal

---

[5] The deposit amount was actually $225,000. Mock Decl., ¶ 8, Exh. G.

payment on Debtors' mortgage for the Campbell Property. [6] Mock Decl., ¶ 11, Exh. J.

- On August 2, 2012 and August 22, 2012, Danny wrote himself two more checks from the JAMD, LLC account in the amount of $50,000.00 each, again, to purportedly "repay loans" for which he never produced any promissory notes or other credible proof of such loans. Mock Decl., ¶ 9, Exh. H.
- On August 30, 2012 and September 13, 2012, Bank of America posted two more excess principal payments in the amounts of $50,000.00 and $48,701.92, respectively, against Debtors' Campbell Property mortgage. Mock Decl., ¶ 11, Exh. J.
- The total sum of the excess principal payments that Debtors made within a 30-day period was $398,701.92. *None of these payments were regular mortgage payments*. *See* Mock Decl., ¶ 11, Exh. J.
- On February 6, 2013, Debtors filed a Declaration of Homestead for the Campbell Property. Mock Decl., ¶ 5, Exh. D.

After being pursued by FDIC-R in an attempt to satisfy its Judgment, Debtors finally filed a Chapter 7 bankruptcy petition on December 19, 2013. Subsequently, on January 3, 2014, Debtors filed their schedule of assets, including Schedule C, "Property Claimed as Exempt." [Dkt. No. 12.] Debtors listed the Campbell Property as their homestead, attributing to it a value of $450,000. Due to the $398,701.92 transfers described above, at the time Debtors filed for bankruptcy, they only owed approximately $248,000 on the mortgage. Mock Decl., ¶ 11, Exh. J. Thus, Debtors have claimed an exemption for their home of $202,000 -- $450,000 less the remainder of their outstanding mortgage. [*See* Dkt. No. 12.]

---

[6] The typical monthly payment was approximately $2,095.00. Mock Decl. ¶ 11, Exh. J.

284698_2    -5-

OBJECTION TO CLAIMS OF EXEMPTION

## II. LEGAL ARGUMENT

### A. Debtors are Not Entitled to a Homestead Exemption Because Their Home Equity is the Direct Result of Their Fraudulent Transfer of Assets.

Debtors claim an exemption for the Campbell Property in the amount of $202,000.00 pursuant to NRS 21.090(1)(l) and 115.050. But they are not entitled to the homestead exemption because they engaged in fraudulent conduct to deprive the FDIC-R from collecting on its Judgment, and to try and shield otherwise non-exempt assets from attachment at a time that they could not satisfy their outstanding debts. Any equity Debtors' enjoy in the Campbell Property is the direct result of the wrongful transfers they made following entry of the Judgment.

#### 1. Debtors' Transfers were Fraudulent.

A fraudulent transfer is a transfer made by a debtor with "actual intent to hinder, delay, or defraud a present or future creditor." 11 U.S.C. § 548(a)(1); NRS § 112.180(1); *In re Nat'l Audit Defense Network*, 367 B.R. 207, 218-19 (D. Nev. 2007).

Fraudulent intent is established by circumstantial evidence showing "badges of fraud" – "recurring actions that historically have been associated with actual intent to hinder, delay, or defraud creditors." *In re Nat'l Audit Defense Network*, 367 B.R. 207, 218-19 (D. Nev. 2007). Nevada recognizes the following pertinent badges of fraud: "the debtor retained possession or control of the property transferred after the transfer;" "the debtor removed or concealed assets;" "the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;" and "the transfer occurred shortly before or shortly after a substantial debt was incurred." NRS § 112.180(2). All of these elements are present in this case.

Here, Debtors made the $398,701.92 in irregular principal payments on the Campbell Property after the Judgment of $16,995,005.17 was entered against them. Debtors knew that their assets were subject to collection by the FDIC-R as a result of the Judgment. Yet, following the entry of the Judgment, Danny Tarkanian proceeded to drain the cash value from his parents' life insurance policies and use that money for his own benefit. *See* Mock Decl., ¶¶ 6, 7, Exhs. E (D. Tarkanian Exam at 39:3-21; 42:13-25; 43:16-44:17; 45:2-6; 51:15-52:10; 81:5-17; 81:23-82:15; 82:17-83:4) and F. Indeed, rather than simply taking the cash and depositing it directly

284698_2                                                    -6-

1  into his bank account, he orchestrated a complex transaction in which he made it appear that his

2  parents' irrevocable Trust was "loaning" money to a business enterprise, which enterprise then

3  gave the money to Danny under the guise of a loan repayment.  *See* Mock Decl., ¶¶ 6, 8, 9, Exhs.

4  E (D. Tarkanian Exam at 39:3-21; 42:13-25; 43:16-44:17; 45:2-6; 51:15-52:10; 81:5-17; 81:23-

5  82:15; 82:17-83:4), G, and H.   Following the transfers, the money was then used by the Debtors

6  to make excess principal payments on their home mortgage.  *See* Mock Decl., ¶ 11, Exh. J.  It is

7  significant that Danny Tarkanian was the signatory on all of the bank accounts utilized in the

8  transactions.  *See* Mock Decl., ¶¶ 6, 7, 8, 9, Exhs. E (D. Tarkanian Exam at 35:19-36:3; 36:17-

9  37:3; 51:15-52:10; 60:16-23; 82:17-83:4), F, G, and I.

10      As soon as Debtors received the $400,000 in assets, those funds were subject to execution

11  by the FDIC-R.  Yet, Debtors knowingly and hastily sequestered those funds beyond FDIC-R's

12  reach by using them to make excess mortgage payments on the Campbell Property.  Debtors'

13  transfers reveal badges of fraud because they were made through a series of complex transactions

14  using accounts that Danny Tarkanian managed and controlled.  The transfers also occurred

15  during the short window between the entry of the Judgment and the date the Debtors filed for

16  bankruptcy.  Moreover, and most importantly, Debtors retained ownership of the property and

17  the effect of the transfers was to "increase the [Debtors'] wealth at the expense of the creditor[]'s

18  recover[y]."  *In re Nat'l Audit Defense Network*, 367 B.R. at 221; *see, e.g., Frontier Bank v.*

19  *Brown*, 371 F.3d 1056, 1059 (9th Cir.2004) (the "primary focus of Section 548 is on the net

20  effect of the transaction on the debtor's estate and the funds available to the unsecured

21  creditors.").

22      The fact that the transfers resulted in $398,701.92 of irregular principal payments on

23  Debtors' home loan shortly after entry of the Judgment, but before Debtors filed for bankruptcy,

24  was no accident.  Rather, the chain of events constitutes numerous "badges of fraud" of a

25  fraudulent transfer.

26

27

28

OBJECTION TO CLAIMS OF EXEMPTION

### 2.    The Homestead Exemption is Not Available to Debtors Because Their Home Equity is Based on Fraud.

"The homestead exemption does not apply to transactions involving fraud or similar tortious conduct." *Maki v. Chong*, 119 Nev. 390, 391 (2003).  The $202,000 Debtors scheduled as a homestead exemption is directly traceable to fraudulent transfers.  Therefore, they are not entitled to the protection of the homestead exemption under Nevada law.

In *Maki*, the Supreme Court addressed whether a homestead exemption could stand where the debtor purchased her homestead using fraudulently obtained funds.  The court noted that "[t]here is a time-honored principle that states that he who keeps property that he knows belongs to another must restore that property." *Maki*, 119 Nev. at 393.  The court declared that "[t]he homestead exemption statute cannot be used as an instrument of fraud and imposition." *Id.* at 394 (internal citations and quotations omitted).   Based on this principle, the court concluded:

> An individual using fraudulently obtained funds to purchase real property should not be protected by the homestead exemption because the exemption's purpose is to provide protection to individuals who file the homestead exemption in good faith.

*Id.*

Similarly, the homestead exemption sought by Debtors would permit them to protect assets they fraudulently transferred to make excess principal payments on their home loan.  As discussed in detail above, Debtors conducted a series of cash transfers, whereby they moved cash from Danny Tarkanian's parents' life insurance policies, to the parents' irrevocable Trust, to JAMD, LLC, to Debtors' personal checking account, and finally to Bank of America to pay down their home loan.  These transfers totaled $398,701.92. *See* Mock Decl., ¶ 11, Exh. J.  Thus, Debtors' homestead exemption of $202,000.00 is based solely on equity created by the fraudulent transfers.  Had Debtors not conducted the series of transfers described herein, they would have had **no** claim under the homestead exemption.  Therefore, Debtors should not be able to benefit from their fraudulent movement of funds by being permitted to claim the benefit of the homestead exemption. *See Maki*, 119 Nev. at 394.

1

2    **III.    CONCLUSION**

3         Based on the foregoing, the FDIC-R respectfully requests that the Court sustain FDIC-R's

4    objection to the homestead exemption claimed by Debtors, and deny any such exemption in

5    Debtors' Chapter 7 bankruptcy case.

6

7    Dated:    February 21, 2014                    Janice Mock
                                                    Nossaman LLP
8

9

10                                          By: _____
                                                    Janice Mock
11
                                            Attorneys for Creditor FEDERAL DEPOSIT
12                                          INSURANCE CORPORATION, as Receiver for LA
                                            JOLLA BANK, FSB
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

284698_2                                -9-

OBJECTION TO CLAIMS OF EXEMPTION