TIMOTHY S. CORY, ESQ.
Nevada Bar #001972
DUANE H. GILLMAN, ESQ.
Utah Bar #1194 (*pro hac vice*)                ECF FILED: 4/28/2014
DURHAM JONES & PINEGAR
10785 W. Twain, Suite 200
Las Vegas, Nevada 89135
(702) 870-6060
(702) 870-6090 (fax)
dgillman@djplaw.com
Attorneys for Debtor

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

| | |
|---|---|
| In re ) | |
| ) | BK S-13-20495-MKN |
| DANIEL GEORGE JOHN TARKANIAN ) | Chapter 7 |
| and ) | |
| AMY MICHELLE TARKANIAN, ) | |
| ) | |
| Debtors. ) | |

## DEBTOR'S TRIAL BRIEF ON FDIC-R'S OBJECTION TO CLAIMS OF EXEMPTION

Daniel George John Tarkanian ("Danny"), by and through his counsel, the law firm of

Durham Jones and Pinegar, hereby submits his Trial Brief for the contested hearing scheduled for

May 1, 2014, before Chief Judge Mike K. Nakagawa, on the Objection to Claims of Exemption

("Objection to Exemption") (Dkt. 40) filed by Creditor Federal Deposit Insurance Corporation as

Receiver for La Jolla Bank, FSB ("FDIC-R"):

## STATEMENT OF FACTS

The FDIC-R is a judgment creditor of the Debtors. While attempting to collect its judgment

against the Debtors and others, the FDIC-R learned the Debtors made approximately $400,000.00 in

SLC_207156.3

1

principal reduction payments on their home mortgage (the "Transfers"). The Transfers began eighteen months prior to the Debtors' bankruptcy filing but after a judgment was entered in favor of the FDIC-R and against the Debtors', Danny's parents, Danny's sister and her husband, and others in the United States District Court for the Southern District of California ("the California Judgment"). Without knowing the reasons for the Transfers but only the fact and timing of the Transfers, the FDIC-R speculated and then imposed its own self-centered motives upon the Debtors and concluded that the Transfers were "complex financial transactions" that were "carefully orchestrated" to prevent the FDIC-R from collecting its judgment. The FDIC-R's mistaken conclusions prompted the Objection to Exemption.

It is anticipated that the testimony and evidence to be presented at the hearing on this matter will establish the following facts:

A.    **The Tarkanian Family**

1.    Debtors Daniel ("Danny") George John Tarkanian and Amy Michelle Tarkanian ("Debtors") filed for relief pursuant to Chapter 7 of the Bankruptcy Code on December 19, 2013 (the "Petition Date").

2.    Danny is the oldest son in a family of Armenian heritage. Danny's grandmother was forced to flee from Armenia during the Armenian Genocide in 1915 by the Turks. The members of the Tarkanian family are well-aware of the circumstances surrounding her rushed escape from Armenia to America. Of particular significance in the story is the fact that as she fled from her home, Danny's grandmother witnessed her oldest brother and then her father being beheaded, which the Turks did to sever the family connection between the father and eldest son.

3.    The story of Danny's grandmother has had a significant impact on the members of the

SLC_207156.3                                    2

Tarkanian family and has had a particular impact on the family's view of Danny as the oldest son in his family. As the oldest son, the members of the Tarkanian family look to Danny as the one who is charged with caring for and protecting the family, especially his parents.

4.      The health of Danny's father ("Jerry") has been failing quite rapidly over the past several years because of a serious injury he sustained in 2009. In March of 2012, he had a heart attack and aspirated causing his lungs to collapse.

5.      Danny's mother has also been in poor health and cannot care physically for her husband as she has been suffering from Lupus for a number of years, and more recently she has been battling cancer.

6.      The Debtors' residence, located at 3008 Campbell Circle, Las Vegas, Nevada, is located just behind Danny's parents' home. Although the Debtors' and Danny's parents' backyards do not abut, Danny's parents purchased a walkway from their neighbor so that Danny and his family could walk directly from their backyard to Danny's parents' home. This living arrangement provides Danny and his family the opportunity to quickly respond to Danny's parents' medical and other needs. In fact, Danny checks on his parents at their home virtually every day and on some occasions multiple times a day. Danny, his wife and their four children are also able to stay in close contact with Danny's parents because of the proximity of their homes, which brings great joy to Danny's parents and important emotional bonding for Danny's children.

7.      The walkway between the Debtors' home and the home of Danny's parents has become a cherished part of their family heritage. Over the years, the walls lining the walkway have been decorated with Danny's children's artwork, handprints, and family messages. The growth of the Tarkanian children has been marked in paint on the walls of the walkway.

8.      As his parents have aged and their health has deteriorated, Danny has had multiple discussions with his parents and siblings regarding the need to care for their parents. Danny has fulfilled his role as the oldest son of his parents' four children and his parents and siblings have increasingly looked to him for leadership and support, which he has welcomed. Danny living in such close proximity to his ailing parents has given his entire family great peace of mind.

**B.      Jerry's Heart Attack and the Transfers**

9.      When Danny's father suffered a heart attack in late March 2012, Danny and his wife realized they needed to take steps to remain in their residence in order to care for his parents. At that time, however, the value of the home had dropped substantially in value like nearly every other home in Las Vegas during the Great Recession, and the Debtors' home was underwater. The Debtors owed approximately $648,701.92, and the Clark County Assessor's office valued the home at $342,369.00 for the 2011-2012 tax year.

10.     Danny had purchased the residence in about June 2005, and he financed the purchase with an Adjustable Rate Mortgage Loan ("ARM Loan"). Danny was deeply concerned that interest rates would rise in the future and, in turn, the monthly payments on his ARM Loan would increase to a point that he could no longer afford the home.

11.     As described in more detail below, Danny made the Transfers to pay down the principal of the mortgage on the Debtors' home. The principal reductions totaled approximately $400,000.00 but, because the home was underwater, only created equity totaling approximately $93,000.00. The Debtors knew when they made the Transfers that the increased equity in the home would be a small fraction of what they were paying.

12.     Instead, the amount paid on the mortgage was calculated to provide an estimated

SLC_207156.3                                                  4

80/20 loan to value ratio on the residence so that the Debtors could refinance the home and remain there to care for Danny's parents.

13.    It was due to the circumstances of Jerry's heart attack, his responsibilities as the eldest son, the proximity of the Debtors' home to Danny's parent and for the other reasons identified above that the Debtors made the Transfers. The purpose was to preserve their home and preserve the family and was not to hinder, delay or defraud the Debtors' creditors. The FDIC-R incorrectly concluded the Transfers were triggered by the entry of the California Judgment on May 22, 2012. Instead, they were triggered by Jerry's heart attack.

C.    **Loan Repayments from JAMD and Loan from the Tarkanian Irrevocable Trust to JAMD**

14.    Nearly eighteen months prior to the filing of the instant bankruptcy, Danny caused the Transfer to be made with money derived from different sources, virtually none of which would have been available to Debtors' creditors. The Transfers reduced the principal of the Debtors' mortgage by $398,701.92 after the following payments: (1) $300,000.00 on July 12, 2012, (2) $50,000.00 on August 3, 2012, and (3) $48,701.92 on September 22, 2012.

15.    Attached hereto as Exhibit 1 is a demonstrative exhibit showing the sources of the funds for the three payments that comprise the Transfers.

16.    The source of the $300,000.00 principal reduction payment on July 12, 2012, was a loan repayment in the amount of $250,000.00 from JAMD, LLC ("JAMD") and a loan repayment in the amount of $53,755.83 from Danny's Congressional campaign.

17.    JAMD is a Nevada limited liability corporation in good standing with the Secretary of State. It developed the Tarkanian Professional Center located on the Northeast corner of Warm Springs and Cimarron Road in Las Vegas, Nevada.

18.     The Debtors received the money for the Transfers from JAMD because it owed Danny outstanding balances on various loans Danny had previously made to JAMD to meet construction costs of JAMD over time.  These types of loans and repayments with JAMD were also common for other members of the Tarkanian family.  It was the ordinary course of conduct for members of the Tarkanian family, including Danny, to loan money to JAMD as needed for construction costs and to repay those funds when needed by the family member.

19.     As evidence of the this ordinary course, JAMD borrowed $220,000.00 from the Jerry and Lois Tarkanian Irrevocable Trust ("Tarkanian Irrevocable Trust"), which amount represents two loans of $110,000.00 each from a life insurance policy in the name of Jerry Tarkanian and another policy in the name of Lois Tarkanian.  To reach the $250,000.00 repayment, JAMD used $30,000.00 from the operating income of the Tarkanian Professional Center and loans from others to JAMD to make the repayment.

20.     The primary asset of the Tarkanian Irrevocable Trust has always been life insurance policies on Danny's parents' lives.  In the past, the Tarkanian Irrevocable Trust had loaned money to JAMD to meet construction costs of JAMD and so that JAMD could repay borrowed funds from other family members.

21.     The source of the $50,000.00 principal reduction payment on August 3, 2012, was a $50,000.00 loan repayment from JAMD to Danny.  JAMD, in turn, borrowed $50,000.00 from the Tarkanian Basketball Academy in order to make the loan repayment to Danny.

22.     The source of the $50,000.00 principal reduction payment on September 22, 2012, was a $50,000.00 loan repayment from JAMD to Danny.  JAMD used $50,000.00 from the operating income of the Tarkanian Professional Center and loans from others to JAMD to make the loan

1 | repayment.

2 |      23.     Therefore, the FDIC-R incorrectly concluded the payments from JAMD were

3 | "complex financial transactions" that were "carefully orchestrated" by the Debtors to keep money out

4 | of the hands of their creditors. In fact, it was not until April 17, 2013, more than nine months after

5 | the first and largest Transfer was made, that the FDIC-R even registered its judgment in Nevada.

6 | **ARGUMENT**

7 |      The evidence in this case will show that by making large payments on his mortgage in 2012,

8 | Danny Tarkanian was acting out of a sense of loyalty to his family and in fulfillment of his duties and

9 | responsibilities as the oldest son and not to hinder, delay, or defraud his creditors. The impact of the

10 | Armenian genocide is still felt in the Tarkanian family, and the often repeated story of Danny's

11 | grandmother's flight from Armenia still overshadows the decisions that the family makes. Danny's

12 | actions were taken out of respect for and loyalty to his responsibilities in the family order, a family

13 | that has survived significant hardship and persecution. Danny's actions show that he was acting out

14 | of a deep-seated need to secure his ability to provide care for his parents and preserve his family.

15 | The payments by the Debtors to reduce the principal of their mortgage were not made with the intent

16 | to hinder, delay or defraud their creditors, including the FDIC-R. Therefore, 11 U.S.C. § 522(o) does

17 | not operate to reduce the Debtors' claim of exemption.

18 | **I.     11 U.S.C. § 522(O) DOES NOT OPERATE TO REDUCE THE DEBTORS' CLAIM OF EXEMPTION**

19 |

20 |      The evidence will show that 522(o) does not operate to reduce the Debtors' homestead

21 | exemption in this case. Under 11 U.S.C. § 522(o) a debtor's homestead exemption is reduced when a

22 | transaction is accompanied by each of the following elements: (a) an increase in the value of the

23 | debtor's homestead; (b) the increase was attributable to the disposition of nonexempt assets; (c) the

24 |

disposition of the nonexempt assets was made with the intent to hinder, delay, or defraud a creditor; and (d) the disposition occurred during the ten-year period ending on the date the debtor's bankruptcy petition was filed. *In re Stanton*, 457 B.R. 80, 91 (Bankr. D. Nev. 2011). The homestead exemption claimed by Debtors in this case is unaffected by the provisions of § 522(o) because the evidence will show that Danny had no intent to hinder, delay, or defraud a creditor. The evidence will also show that the assets that were transferred by Danny were exempt.

**A.    The Purpose of the Transfers Was to Preserve Debtors' Home Near Danny's Ailing Parents and Not to Hinder, Delay or Defraud Any Creditors.**

A debtor's homestead exemption will only be reduced by § 522(o) when the debtor had the intent to hinder, delay or defraud a creditor. It is the creditor's burden of proof to show actual intent, but the FDIC-R cannot show that the transfers were made with actual intent to hinder, delay, or defraud FDIC-R. Instead, the evidence will demonstrate that the Transfers were made for the purpose of preserving the Debtors' ability to continue living adjacent to Danny's ailing parents and attend to their medical and other needs.

*1.    **Health problems have threatened Danny's parents.***

The evidence will show that Danny's parents have struggled with significant health issues in recent years. Evidence of these health issues, including the medical records that are contained in Danny's Exhibit O,[1] is relevant and admissible to provide evidence of Danny's actual intent in making the Transfers. As courts have held, "[e]vidence is considered relevant if it has '*any* tendency

---

[1] Any instances of hearsay that may be present in these medical records do not prevent the admission and consideration of the medical records because the records are admissible under the hearsay exceptions found in Rule 803(6) of the Federal Rules of Evidence for records of regularly conducted business activity and Rule 803(4) for statements made for the purpose of medical diagnosis or treatment. *See, e.g., U.S. v. Hall*, 419 F.3d 980, 987 (2005) (medical records kept in the ordinary course of business were "classic exceptions to the hearsay rule" along with statements made for the purpose of diagnosis or treatment).

to make a [material] fact more or less probable that it would be without evidence.'" *In re Castillo*, 2012 WL 3641510 (B.A.P. 9th Cir. Aug. 24, 2012) (quoting Fed. R. Evid. 401) (holding that the trial court erred in excluding evidence on relevancy grounds since the evidence related to intent). Thus, with respect to intent, the "fact finder must consider the totality of the circumstances surrounding a transfer, including any evidence negating intent [and should] take into account all indicia negativating as well as suggesting fraud." *In re Jackson*, 318 B.R. 5, 14 (Bankr. D. N.H. 2004) (holding that certain transfers were made for the legitimate purpose of estate planning, as dictated by the Debtor's medical condition); *see also In re Zeigler*, 320 B.R. 362, 375 (Bankr. N.D. Ill. 2005) (accepting testimony of the Debtors' declining health as evidence of intent with respect to transfers made to pay off a mortgage on the Debtors' home).

Consideration of this evidence will show that the health of Danny's father has been rapidly declining in the past several years. Approximately three months prior to the first Transfer, Danny's father suffered a heart-attack, his lungs aspirated, and they collapsed. Danny's mother has been suffering from Lupus for a number of years, and she cannot care for Danny's father. More recently, she has been battling cancer. Even prior to the heart attack of Danny's father, his parent's failing health was evidenced by their decision to spend approximately $242,000.00 to repair and retrofit their home to accommodate the accessibility needs of Danny's father. These health problems have been a source of significant concern for the Tarkanian family, and, as the oldest son, the burden of providing care for his parents falls on Danny's shoulders before anyone else in his family.

### 2. *Danny's intent was to secure his ability to provide care for his parents.*

Fortunately, Danny and his wife live near his parents, and they are able to care for and quickly respond to their needs. The Debtors do not live on the same street as Danny's parents, but their

backyards nearly abut.  To facilitate easy and quick access between the homes, Danny's parents

purchased a walkway from their neighbor so that Danny and his family could have direct access to

his parents' home.  This walkway and its walls have become a cherished family treasure where the

names, handprints, and height of Debtor's children have been recorded over the years that they have

lived in the home.  The walkway also allows the Tarkanian family the comfort of knowing that

Danny can quickly respond to his parents' medical and other needs without walking around the entire

block or using a car.  In fact, the Debtors visit Danny's parents at their home virtually every day and

multiple times a day on some occasions.

Danny has had multiple discussions with his parents and siblings regarding the need to care

for his parents.  As the oldest son of his parents' four children, his parents and siblings have

increasingly looked to him for leadership and support.  The Debtors' close proximity to his parents

gives his parents and siblings great peace of mind.  Given these facts, his proximity to his parents

after his father's heart attack, Danny and his wife recognized the importance of remaining in their

residence in order to care for Danny's parents and that they needed to take appropriate steps to help

fulfill his responsibilities to his parents and siblings.

At the time of Jerry's heart attack, the Debtors owed approximately $648,701.92 on their

home, and the property was valued at $342,369.00 by the Clark County Assessor's office.  The

Debtors' home loan was an ARM Loan.  Danny was deeply concerned that interest rates would rise

in the future and, in turn, the monthly payments on the ARM Loan could increase beyond his ability

to continue making monthly payments.  If the Debtors lost their home to foreclosure, they would be

unable to provide immediate care for Danny's parents.

For this reason, Danny made the Transfers, causing approximately $398,701.92 to be paid

toward the principal of the loan on the Debtors' residence in the following amounts: (1) $300,000.00 on July 16, 2012, (2) $50,000.00 on August 30, 2012, and (3) $48,701.92 on September 13, 2012. The amount Danny paid was calculated to provide an estimated 80/20 loan to value ratio on the residence so that they could refinance the home and remain there to care for Danny's parents.[2]

The funds for the Transfers were obtained through the repayment of loans from JAMD, an entity owned by the Tarkanian family and through which the family developed the Tarkanian Professional Center. These transactions were standard, common occurrences resulting from the Tarkanian family's efforts to support the Tarkanian Professional Center, and the circumstances of the Transfers do not demonstrate any intent to hinder, delay or defraud any creditor of Danny.

The repayments that Danny received from JAMD were typical for the company. Danny previously received repayment of $120,000.00 in one payment in 2008 and $175,000.00 in one repayment in 2010. It was not unusual or indicative of intent to hinder, delay, or defraud, that JAMD obtained money from the cash value of insurance policies in the name of the Debtors' parents. The $175,000.00 payment from JAMD to Danny in 2010 to pay off a debt from his campaign for the Senate was made possible by a loan from the cash value of a life insurance policy. These transactions are not unique to Danny. The $242,000.00 to renovate Danny's parents' house was also a repayment of a loan from Danny's parents to JAMD, and some of the money to repay the loan was obtained through a loan on the cash value of a life insurance in the name of the Debtors' parents. Therefore, the circumstances surrounding the Transfers were consistent with previous transfers. These facts support the conclusion that the Transfers were made with the actual intent of ensuring Danny's ability to provide care to his parents. The Transfers were not made with any intent to hinder, delay or

---

[2] The Debtors attempted to refinance their home in 2012 and 2013 but were turned down.

1    defraud FDIC-R or other creditors.

2        **B.    The Payments on the Loan Did Not Increase Equity on a One-to-One Basis.**

3        The fact that Danny did not intend to hinder, delay, or defraud any creditor is further

4    evidenced by the fact that the transfers made were for hundreds of thousands of dollars more than the

5    amount that the equity in the Debtors' home increased.  This resulting disparity in value, versus the

6    amount paid to obtain it, distinguishes the circumstances in this case from other cases where courts

7    have found an intent to hinder, delay, or defraud creditors.  The Transfers here are unlike those in

8    other cases, including *Stanton*, which parallel the more common, recognizable scenario where intent

9    to hinder, delay, or defraud a creditor is demonstrated by a debtor's effort to take a non-exempt asset

10   and convert it to an exempt asset valued at the same amount.

11       The facts in this case stand apart and do not show the requisite intent because, Danny paid

12   nearly $400,000.00 toward the mortgage on the Debtors' home, but the resulting equity after the

13   Transfers was only $93,597.00.  Danny's lack of intent to hinder, delay, or defraud the FDIC-R or

14   other creditors is further supported by the fact that the liquidity of the money after the Transfers was

15   less than it was before the Transfers.  If Danny's intent had been to preserve these assets to prevent

16   creditors from obtaining them, he could have chosen a method that would not result in him losing

17   over 75% of the value of the assets.  This imbalance in the cost and benefit of the transaction

18   demonstrates that Danny made the Transfers with the intent to remain in his home, not for the

19   purpose of preserving his assets by hindering, delaying, or defrauding a creditor, as contemplated by

20   11 U.S.C. § 552(o).

21       **C.    The Badges of Fraud Identified by the FDIC-R Do Not Show that Danny**
               **Intended to Hinder, Delay, or Defraud a Creditor.**
22
         Because actual intent may be difficult to discern in some cases, courts have relied upon
23

24   SLC_207156.3                                    12

potential evidence of intent referred to as "badges of fraud." *Stanton*, 457 B.R. at 93. Relying upon distinguishable authority, the FDIC-R has overstated the impact that these badges of fraud may have in connection with the evidence in this case. The FDIC-R cites *In re National Audit Defense Network*, 367 B.R. 207 (Bankr. D. Nev. 2007), and states that Nevada recognizes four badges of fraud without acknowledging those badges of fraud that do not apply to the facts of this case. In fact, the courts in *Stanton* and *National Audit Defense Network*, both recognized eleven potential badges of fraud, and of these eleven only a small number would potentially apply to the facts here. *See Stanton*, 457 B.R. at 93, *National Audit Defense Network*, 367 B.R. at 218-29. Additionally, in listing the eleven "badges of fraud" that "make[] a transaction suspicious" the *Stanton* court explained that these badges "call[] for an explanation." 457 B.R. at 93. Even though some of the "badges of fraud" may be implicated by the facts of this case, they are simply "indicia," and, "[b]ecause they are only evidence of the likelihood of fraud, badges of fraud are not given equal weight; and sometimes the circumstances indicate they should be given no weight at all." *Id.* at 92-93.

In other cases, courts have held that evidence establishing only a few of the badges of fraud is insufficient to find intent to hinder, delay, or defraud. *See, e.g.*, *In re Chin*, 492 B.R. 117, 131 (Bankr. E.D.N.Y. 2013). Likewise, in the instant case, many of the badges of fraud are missing. The Debtors did not retain possession or control of the property and instead gave it to their lender, the Transfers were not concealed, the Transfers were not substantially all the Debtors' assets because the FDIC-R could not have reached them as a judgment creditor, the Debtors did not abscond, the Debtors did not conceal any assets or the Transfers, the value of the equity in their home was only about a quarter of the value of the Transfers, the Debtors did not become insolvent as result of the

Transfers, and the Transfers were not essential assets of a business. *Compare Stanton*, 457 B.R. at 93. In fact, the only badges of fraud which might exist here would likely be present in every case involving permissible pre-bankruptcy transactions. Therefore, review of the potential badges of fraud does not show that Danny possessed the intent required by § 522(o).

Moreover, in this case, the evidence provides a consistent explanation for the badges of fraud and illuminates what Danny's actual intent was in making the Transfers, unlike the *Stanton* case where the explanation of the badges of fraud was found wanting. *See Stanton*, 457 B.R. at 93 (noting badges of fraud call for an explanation). A pattern of borrowing money from the life insurance policies to meet financial demands and provide assistance for Danny's parents was established long before the facts involving this case arose. Money was borrowed from the policies to make it possible for JAMD to repay loans and allow Danny's parents to renovate their house to make it handicap accessible for seniors. On separate occasions, other family members also loaned money to JAMD, and JAMD used money from other loans and operating income to repay loans in lump sums. Money was borrowed from the policies to allow JAMD to repay loans to Danny and facilitate payments toward the Debtors' mortgage. As before, this was done to protect the home so that the Debtors, living only steps away, could continue to care for Danny's parents. In short, the Transfers were logical, justifiable and sensible under the Debtors' and Danny's parents' circumstances. They were not made with actual intent to hinder, delay or defraud FDIC-R or other creditors.

### D. The Increase in the Homestead Exemption Is Not Attributable to the Disposition of Nonexempt Assets.

Additionally, the FDIC-R Objection to Exemption should be overruled because the existence of equity in the Debtor's home is not the result of the disposition of nonexempt assets or funds that could have been reached by creditors. The FDIC-R objects to the Debtor's Homestead Exemption of

approximately $93,000.00, which is the product of transfers totaling approximately $400,000.00. Therefore, the existence of the exemption is based upon the FDIC-R successfully challenging the appropriateness of all transfers that brought the home out of negative equity ($307,000.00), plus the transfers that established equity in the home ($93,000.00). In other words, the Objection to Exemption should be overruled unless the FDIC-R can establish that more than $307,000.00 in transfers were attributable to nonexempt assets. It cannot.

The original source of the money paid to the Debtor's lender was $220,000.00 loaned from life insurance policies in the name of Danny's parents and held by the Tarkanian Irrevocable Trust. Tarkanian Dec. at ¶ 16. The Debtors did not own the insurance policies, and, even if they did own the policies, they are exempt from execution. Nevada Rev. Statute 21.090(1)(k) ("The following property is exempt from execution . . . [a]ll money, benefits, privileges or immunities accruing or in any manner growing out of any life insurance."); *see also* Reply in Support of Objection to Claims of Exemption, p. 2 ("Parental life insurance policies are not, and never were, part of their estate."). The $220,000.00 was a loan to JAMD, not the repayment of a loan, and creditors could not have demanded that the Tarkanian Irrevocable Trust make such a loan. Likewise, creditors could not have demanded the $50,000.00 loan from the Tarkanian Basketball Academy. Therefore, the $93,000.00 of equity in the home was not attributable to the disposition of nonexempt assets, and the FDIC-R cannot establish a second element of 11 U.S.C. § 522(o).

## II.    DANNY COMMITTED NO FRAUD OR TORT

The FDIC-R's reliance on *Maki v. Chong*, 75 P.3d 376 (Nev. 2003), is unavailing because there is no evidence that Danny engaged in any fraud or tortious conduct. The facts in *Maki* are distinguishable from this case for at least three reasons. First, *Maki* is not a bankruptcy case.

SLC_207156.3

15

1  Second, the judgment creditor in *Maki* had already obtained a default judgment for claims of breach

2  of contract, fraud, and conversion. *Id.* at 378. Third, the court in *Maki* decided the limits of

3  Nevada's homestead exemption, as opposed to limits on the homestead exemption under the

4  Bankruptcy Code. *Id.* at 378-79. Accordingly, *Maki* is immaterial to the Debtors' case or the FDIC-

5  R's objection.

6       However, even if the holding in *Maki* was applicable in this case—which it is not—Danny's

7  ability to claim a homestead exemption would not be affected because there is no evidence that

8  Danny committed "fraud or similar tortious conduct." *See Id.* at 379. The FDIC-R makes several

9  references to "fraud" or "fraudulent" actions without acknowledging that there is no evidence to

10  show that fraud has been found or could be found in this case. Under Nevada law, fraud requires

11  proof of the following elements: "(1) a false representation made by the defendant; (2) defendant's

12  knowledge or belief that its representation was false or that defendant has an insufficient basis of

13  information for making the representation; (3) defendant intended to induce plaintiff to act or refrain

14  from acting upon the misrepresentation; and (4) damage to the plaintiff as a result of relying on the

15  misrepresentation." *In re Nordeen*, 495 B.R. 468, 483 (B.A.P. 9th Cir. 2013) (quoting *Barmettler v.*

16  *Reno Air, Inc.*, 114 Nev. 441, 446–47, 956 P.2d 1382, 1386 (Nev.1998)). The elements of common

17  law fraud under federal law are similar. *Id.* at 484. The FDIC-R has not presented evidence—and

18  cannot—to show that there is evidence to support these elements. Likewise, the FDIC-R has not

19  alleged that Danny engaged in any other actions that would constitute "similar tortious conduct."

20  Without evidence to show that Danny has committed fraud or similar tortious conduct, the holding in

21  *Maki* has no relevance to the outcome of this case.

22

23

24  SLC_207156.3                                    16

III.    **THE DECLARATION OF HOMESTEAD PRIOR TO THEIR PETITION FOR RELIEF ENTITLES THE DEBTORS TO THE FULL BENEFITS OF THE EXEMPTION**

The Debtors' Declaration of Homestead, recorded on February 6, 2013, prior to any execution sale by either a creditor or a trustee, entitles them to the full benefits of the exemption.  Under Nevada law, a homestead is exempt from a forced execution sale up to $550,000.00 of equity in a debtor's home.  NRS 115.010.  A debtor obtains the protections of the homestead exemption by recording a homestead declaration.  NRS 115.020.  The homestead declaration is valid against creditors provided it is recorded prior to an execution sale by a creditor or trustee.  *In re Stanton*, 457 B.R. 80, 88 (Bankr. D. Nev. 2011).  Therefore, the Declaration of Homestead recorded by the Debtors prior to a forced execution sale and prior to their December 19, 2013 petition for relief entitles them to the full benefits of the exemption.

In *Stanton*, a creditor made a similar argument where the debtor filed a homestead declaration *after* the petition date.  *Id.* at 87-88.  After finding that the debtor resided in Nevada for the requisite 730 days, the *Stanton* court correctly noted that "a homestead exemption can be filed at any time prior to sale at execution and be effective to protect the debtor's interest in the property homestead." *Id.* at 88.  In the context of cases proceeding in the bankruptcy court, post-petition homestead declarations are effective "after the filing of the bankruptcy case but before sale of the property is effective." *Id.* (*citing Myers v. Matley*, 318 U.S. 622, 628-29 (1943).  Accordingly, the Debtors Declaration of Homestead is valid against FDIC-R and the Trustee.

## CONCLUSION

WHEREFORE, for these reasons, any others to be presented at oral argument, and any reason this Court finds just and proper, the Debtor, Danny Tarkanian, requests that this Court overrule the

1  FDIC-R's objection to the Debtor's homestead exemption.

2         DATED this 28th day of April, 2014.

3                                        DURHAM JONES & PINEGAR

4

5                              By:

6                                        DUANE H. GILLMAN, ESQ.
                                         10785 W. Twain Avenue, Suite 200
7                                        Las Vegas, NV 89135
                                         Attorneys for Debtor

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24  SLC_207156.3                            18

# EXHIBIT 1

**Detailed Transaction History of Bank of American Mortgage Principal Reductions**

| First Principal Reduction of Bank of America Mortgage | Date | Amount | Exhibit |
|---|---|---|---|
| Jerry and Lois Tarkanian Irrevocable Trust | | | |
| Request for Loan on Cash Value of Lois Tarkanian Policy | 6/3/2012 | $110,000.00 | 1 |
| Request for Loan on Cash Value of Jerry Tarkanian Policy | 6/3/2012 | $110,000.00 | 1 |
| | | | |
| Irrevocable Trust Bank Account | | | |
| Deposit | 7/9/2012 | $220,000.00 | 2 |
| Withdrawal | 7/10/2012 | $220,000.00 | 2 |
| | | | |
| Deposits Into Debtor's Account | | | |
| JAMD Loan Repayment to Debtor | 7/12/2012 | $250,000.00 | 3 |
| -    $220,000.00 loan from Irrevocable Trust | | | |
| -    $30,000.00 from JAMD Operating Account | | | |
| Loan Repayment from Congressional Campaign | 7/11/2012 | $50,000.00 | 3 |
| -    Actual Check for $53,755.83 | | | |
| | | | |
| Debtor's Payment to Mortgage Company | 7/12/2012 | $300,000.00 | 7, 8 |

| Second Principal Reduction of Bank of America Mortgage | Date | Amount | Exhibit |
|---|---|---|---|
| Tarkanian Basketball Academy Loan to JAMD | 7/27/2012 | $50,000.00 | 4 |
| | | | |
| Deposit Into Debtor's Account | | | |
| JAMD Loan Repayment to Debtor | 8/3/2012 | $50,000.00 | 5 |
| | | | |
| Debtor's Payment to Mortgage Company | 8/3/2012 | $50,000.00 | 7, 8 |

| Third Principal Reduction of Bank of America Mortgage | Date | Amount | Exhibit |
|---|---|---|---|
| Deposit Into Debtor's Account | | | |
| JAMD Loan Repayment to Debtor | 8/22/2012 | $50,000.00 | 6 |
| | | | |
| Debtor's Payment to Mortgage Company | 8/22/2012 | $48,701.92 | 7, 8 |
| -    $1,298.08 of Check for $50,000.00 Applied to Accrued Interest | | | |

| TOTAL PRINCIPAL REDUCTIONS | | $398,701.92 | |
|---|---|---|---|

| | Home Value | Mortgage Balance | Equity |
|---|---|---|---|
| Before $398,701.92 Prinicipal Reduction | $342,369.00 | $647,999.99 | -$305,630.99 |
| After $398,701.92 Prinicipal Reduction | $342,369.00 | $248,772.33 | $93,596.67 |

| Ratio of Reduction Payments to Equity Increase as a Percentage ($93,596.67 ÷ $398,701.92) | 23.48% |
|---|---|

## CERTIFICATE OF SERVICE

I hereby certify that I am an employee of Durham Jones & Pinegar and that on the 28th day of April, 2014, I caused to be served a true and correct copy of **DEBTOR'S TRIAL BRIEF ON FDIC-R'S OBJECTION TO CLAIMS OF EXEMPTION** in the following manner:

[X]    a.    **Electronic Service**

Under Administrative Order 02-1 (Rev. 8-31-04) of the United States Bankruptcy Court for the District of Nevada, the above-referenced documents were electronically filed and served through the Notice of Electronic Filing automatically generated by that Court's facilities on the dates of filing.

- JANICE MOCK    jmock@nossaman.com
- MATTHEW C. ZIRZOW    mzirzow@lzlawnv.com

[X]    b.    **United States Mail**

By depositing a copy of the above-referenced document for mailing in the United States Mail, first class postage prepaid, at Las Vegas, Nevada, to the parties listed below, at their last known mailing addresses, on the date above written.

JANICE MOCK
NOSSAMAN LLP
50 CALIFORNIA STREET, 34TH FLOOR
SAN FRANCISCO, CA 94111

MATTHEW C. ZIRZOW
LARSON & ZIRZOW
810 S. CASINO CENTER BLVD., #101
LAS VEGAS, NV 89101

[ ]    c.    **Facsimile Transmission**

By facsimile to the facsimile numbers indicated, to those persons listed below, on the date above written. No error was reported by the facsimile machine that I used.

1     [ ]    **d.**    **Personal Service**

[ ]    For a party represented by an attorney, delivery was made by handing the documents to the attorney or by leaving the documents at the attorney's office with a clerk or other person in charge, or if no one is in charge by leaving the documents in a conspicuous place in the office, on the date written above.

[ ]    For a party, delivery was made by handing the documents to the party or by leaving the documents at the person's dwelling house or usual place of abode with someone of suitable age and discretion residing there, on the date written above.

**I declare under penalty of perjury that the foregoing is true and correct.**

Dated this 28th day of April, 2014.

*/s/ Valerie Worrall*
An employee of Durham Jones & Pinegar