Nossaman LLP
Janice Mock (pro hac vice)
jmock@nossaman.com
Allan H. Ickowitz (pro hac vice)
aickowitz@nossaman.com
S. Ashar Ahmed (pro hac vice)
aahmed@nossaman.com
Catherine F. Ngo (pro hac vice)
cngo@nossaman.com
50 California Street, 34th Floor
San Francisco, CA 94111
Telephone: 415.398.3600
Facsimile: 415.398.2438

The Cooper Castle Law Firm LLP
Aaron M. Waite (NV 7947)
awaite@ccfirm.com
5275 S. Durango Dr.
Las Vegas, NV 89113
Telephone: 702.435.4175
Facsimile: 702.877.7424

Attorneys for Creditor
FEDERAL DEPOSIT INSURANCE CORPORATION,
as Receiver for LA JOLLA BANK, FSB

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| IN RE DANIEL GEORGE JOHN TARKANIAN AND AMY MICHELLE TARKANIAN,<br><br>Debtors. | Case No: 13-20495-mkn<br>Chapter 7<br><br>**CREDITOR'S TRIAL BRIEF RE: OBJECTION TO HOMESTEAD EXEMPTION**<br><br>Date: May 1, 2014<br>Time: 9:30 a.m.<br>Courtroom: 2 (Third Floor)<br><br>Before Chief Judge Mike K. Nakagawa<br>300 Las Vegas Boulevard South<br>Las Vegas, Nevada |

285821_5

Case No. 13-20495-mkn

CREDITOR'S TRIAL BRIEF RE: OBJECTION TO HOMESTEAD EXEMPTION

Creditor Federal Deposit Insurance Corporation as Receiver for La Jolla Bank, FSB ("Creditor") objects to Daniel George John Tarkanian's ("Danny") and Amy Michelle Tarkanian's (together "Debtors") claimed homestead exemption because any equity they have in their home was fraudulently procured to "hinder, delay, and defraud" Creditor from collecting on its $17 million judgment against them. Creditor also objects to the claimed exemption because, even if the Court finds that Debtors have a valid exemption, such exemption should be reduced by the amount of nonexempt assets used by Debtors to increase the equity in the property in violation of 11 U.S.C § 522(o).

## I. INTRODUCTION

Debtors had no homestead at all before a $17 million judgment was entered against them for failing to make good on a personal guarantee to La Jolla Bank after the primary borrower defaulted on a multi-million dollar loan. Once faced with a massive judgment they admittedly had no intention or ability to pay, they immediately began shuffling assets to prevent the Creditor from recovering. Debtor Daniel Tarkanian has sole control of the cash and borrowing power of every one of his family's companies, and he used that control to hinder, delay, and defraud Creditor by placing a very large receivable beyond the Creditor's reach. The evidence will show that he did so by funneling $400,000 of that receivable to his mortgage holder, *after which* he then filed a disclosure claiming the property as his homestead. The excuse he now provides – that he made the payment only because of his father's failing health – is simply that; an after-the-fact, contrived excuse. Upon a review of the evidence presented, Creditor is confident the Court will find that the objection to the Debtors' homestead exemption should be sustained.

## II. BRIEF STATEMENT OF FACTS

As discussed in Creditor's Objection to Claims of Exemption ("Objection") [Dkt. No. 40], in May 2010, Debtors were sued on personal guarantees they had provided to La Jolla Bank to support a loan of over $14 million dollars to one of their family companies, Vegas Diamond Properties. Objection at 2: 20-3:1. Creditor was granted summary judgment against Debtors on April 17, 2012, and a $16,995,005.17 Judgment was issued against them on May 22, 2013 (the "Judgment"). Objection at 3:1-4; Request for Judicial Notice ("RFJN"), Exhs. 1 & 2.

After summary judgment was granted and while the $17 million Judgment was pending against

them, Debtors engaged in a carefully orchestrated set of transactions to funnel $400,000 of non-exempt assets to pay down their home mortgage.[1] These transfers began about six weeks after the Judgment was entered against them. Debtors drew down hundreds of thousands of dollars from Danny Tarkanian's parents' life insurance policies, then transferred that money, and more, through various family business bank accounts that were all under his control. Objection at 4:1-7; 7:6-9. The funds were then funneled to Debtors' themselves and turned into "cash" in the form of cashier's checks totaling $400,000, which were then mailed to Bank of America to pay down their home mortgage. Objection at 4:23-5:2, 5:7-10. The evidence will show that up until that point, the Debtors had not paid one penny in principal on their mortgage. Thus, they created "equity" where none previously existed;[2] and the transactions effectively set the stage for them to claim a homestead exemption to protect their home and sequester from creditor's reach otherwise non-exempt assets.

      Debtors submit two disparate explanations for the enormous paydown on their mortgage just weeks after the Judgment was entered against them: (i) They made these principal payments to keep the house which was close to Danny Tarkanian's ailing father, and (ii) they feared losing their home due to their inability to meet their monthly mortgage payment. Opp.[3] at 3:20-23, 8:3-5.[4] The evidence to be presented at the hearing will not support those explanations. Indeed, it will contradict them in all relevant respects.

---

[1] The details of the transactions that resulted in the $400,000 payments are outlined in the Objection ([Dkt. No 40], at 4:1-5:13) and will be further explained at the hearing on this matter.

[2] In Debtor's schedule of assets, Schedule C, "Property Claimed as Exempt," [Dkt. No. 12] Debtors listed the Campbell Property as having a value of $450,000. As a result of the $400,000 in principal payments, at the time Debtors filed for bankruptcy they claimed an exemption of $202,000. [Dkt. No. 12] Thus, had Debtors not made the $400,000 principal payments, at the time of bankruptcy they would have been underwater on their home and they would have had no equity in the property.

[3] "Opp." herein refers to the Debtors' Opposition to Objection to Claims of Exemption filed March 12, 2014. [Dkt. No. 69.]

[4] Page numbers referred to here are the ones marked by the Court's docket entry system.

## III. ARGUMENT

### A. Creditor Will Prove The Elements Of Fraud Under Nevada Law; Debtors' Homestead Exemption Claim Should Be Disallowed.

Debtors have claimed a homestead exemption pursuant to the provisions of the Nevada Revised Statutes ("NRS"). When an exemption is made pursuant to state law, state law defines the scope of an exemption and the requirements to qualify for an exemption. *See Law v. Siegel*, --- U.S. ---, 134 S.Ct. 1188, 1196-97 (2014). Under Nevada law, if a creditor establishes that a debtor's interest in his or her homestead is based on fraud, a court may not grant that debtor's requested homestead exemption. *Maki v. Chong*, 119 Nev. 390, 391 (2003). Here, Debtors' did just that – they created an equity interest in their homestead with a series of fraudulent transfers that were intended to deprive Creditor from collecting on its Judgment. Thus, Debtors' homestead exemption should be disallowed.

To establish the transfer was fraudulent, a creditor must show (1) the debtor made a transfer; (2) "with the actual intent to hinder, delay, or defraud the creditor"; (3) the creditor's claim arose before or after the transfer; and (4) the transfer occurred within the four years prior to the creditor's challenge of the transfer. *See* NRS § 112.180(1).

Debtors admit they made the $400,000 transfers in July and August 2012 while Creditor had a $17 million Judgment pending against them. *See* Opp. at 2:24-3:1, 6:6-7. Therefore, the only element to be resolved here is whether they acted with the intent to "hinder, delay, or defraud" the Creditor.

Because no debtor will *admit* to acting with the "actual intent to hinder, delay, or defraud" a creditor, such intent may be established by showing the existence of one or more of the following nonexclusive "badges of fraud":

 (a) The transfer or obligation was to an insider;
 (b) The debtor retained possession or control of the property transferred after the transfer;
 (c) The transfer or obligation was concealed or not disclosed;
 (d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
 (e) The transfer was of substantially all the debtor's assets;
 (f) The debtor absconded;
 (g) The debtor removed or concealed assets;

(h) The value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

NRS § 112.180(2).

Though the evidence will support more than one of these "badges of fraud," the most significant of them are the <u>timing</u> of the suspected transactions and whether the debtor <u>retained ownership</u> of the assets notwithstanding the transactions. *See In re Stanton*, 457 B.R. 80, 95 (D. Nev. Bankr. 2011)[5] (analyzing the Uniform Fraudulent Transfer Act); *In re Nat'l Audit Defense Network*, 367 B.R. at 221 ("*Frontier Bank v. Brown[]*, 371 F.3d 1056, 1059 (9th Cir. 2004) (the 'primary focus of Section 548 is on the net effect of the transaction on the debtor's estate and the funds available to the unsecured creditors.')"). These badges, and others, are present here.

### 1. The Transfers Occurred After Debtors Were Found Liable On Their Guarantees And Judgment Was Entered Against Them.

The timing of Debtors' multifarious transactions is particularly telling as to their fraudulent intent. *See In re Stanton*, 457 B.R. at 95-96. At the time the transactions occurred, Debtors had *zero* equity in their home, which had not been declared as their homestead; thus making a homestead exemption unavailable to them. *See* NRS § 115.010(2); *Savage v. Pierson*, 123 Nev. 86, 91 (2007) (A homestead exemption under Nevada Law extends only to the amount of equity a debtor holds in the property.). The evidence will show that Debtors did, however, claim to own a $648,000 receivable from a family business known as JAMD LLC. To avoid losing their home <u>and</u> the receivable as a result of the Judgment, Debtors conducted a series of transactions to protect *both* of those assets from collection.

---

[5] The fraudulent transfer analysis in *In re Stanton* is based on the Uniform Fraudulent Transfer Act on which Nevada based its fraudulent transfer statute, NRS § 112.140 *et seq. See In re Nat'l Audit Defense Network*, 367 B.R. 207, 220 (D. Nev. Bankr. 2007). Therefore, the analysis in *In re Stanton* is informative as to what actions constitute badges of fraud under Nevada law.

Objection at 6:22-7:9. Now, faced with an objection to their claimed homestead exemption in this bankruptcy case, Debtors have provided their purely subjective statements that the sole purpose of the transactions was to keep their home near Danny Tarkanian's ailing parents and they explain that they made the transfers because they were worried they would not be able to pay their mortgage payment and thus wanted to refinance their home. In order to disprove their assertions regarding their alleged subjective intent, the Creditor must rely on the circumstances that render the Debtors' "story" patently implausible, which is precisely what the evidence at the hearing will do.

Courts have long held that suspicious transactions occurring shortly after a debtor incurs a substantial debt implicate the well-known "badges of fraud." For example, in *In re Stanton*, a Nevada bankruptcy case presenting facts substantially the same as those in the case at bar, the debtor began to cash out investments to pay debts to other creditors and make gifts to her family soon after a judgment had been entered against her. *In re Stanton,* 457 B.R. at 94-96. There, as here, the transactions took place while the debtor knew about the outstanding judgment against her. *Id.* at 94-95. Judge Markell held that those transactions constituted "hoary badges of fraud, engaged in by debtors from time immemorial." *Id.* at 94. The court was not persuaded by the debtor's claims that she liquidated her assets because of the poor economy and her belief that paying off her mortgage was prudent. *Id.* at 95. Rather, the court held that "[t]he timing and amount of the transactions—all corresponding to classic badges of fraud—provide a basis to find, and the court does find, that [the debtor] knew what she was doing, knew the effect it would have on [the creditor], and intended those consequences." *Id.* at 96.

As in *In re Stanton*, the circumstances and timing of Debtors' transfers speak directly to their intent. There is simply no objectively legitimate explanation for the timing of the transfers. The evidence at the hearing will establish that Debtors' took action to avoid Creditor's collection on the Judgment.

  **2. Debtor Retained Control Of The Transferred Property Before, During, and After The Transfers.**

The evidence at trial will further implicate the "badges of fraud" because Debtor Danny Tarkanian had control over all funds involved in the transfers, which transfers resulted in an "increase [in the Debtors'] wealth at the expense of the creditor['s] recover[y]." *In re Nat'l Audit Defense*

*Network*, 367 B.R. at 221 (recognizing an increase in the debtor's wealth to the detriment of the creditor as a "badge of fraud").

The evidence at trial will show that Debtor Danny Tarkanian had exclusive decision-making authority and unfettered control over all the family trusts and businesses implicated by the transfers, including their bank accounts. As described in the Objection, Danny Tarkanian used his power to transfer and retain ownership of approximately $400,000 of otherwise nonexempt assets. The facts in this case mimic those of *In re Nat'l Audit Defense Network*, where the court held that actions by corporate managers to make monetary transfers to entities they controlled, thereby increasing their wealth, constituted "badges of fraud." *Id.* at 221. The transfers here were no different.

Moreover, Debtors will admit at trial that they had no intention whatsoever of satisfying the Judgment. And the evidence will further show that any equity in their homestead was procured with an "intent to hinder, delay, or defraud" their creditors. Accordingly, pursuant to Nevada law, after considering the evidence presented in this matter, the Court will have ample basis to disallow Debtors' homestead exemption in its entirety. *See Maki v. Chong*, 119 Nev. at 391 (Debtor was not entitled to a homestead exemption where her interest in her home was solely based on fraudulently obtained funds.).

**B.  Even If The Court Finds Debtors To Have A Valid Homestead Exemption, That Exemption Should Be Reduced In Full Pursuant To 11 U.S.C. § 522(o).**

Section 522 of the Bankruptcy Code governs what property may be exempt in a bankruptcy proceeding. Section 522(o) mandates that the court shall reduce the value of a homestead exemption if the creditor shows: (1) an increase in the value of the debtors' homestead; (2) that the increase was "attributable" to the disposition of nonexempt assets; (3) that the disposition of nonexempt assets was made with the intent to hinder, delay, or defraud the creditor; and (4) that the disposition occurred during the ten-year period ending on the date the debtor filed their bankruptcy petition. *In re Stanton*, 457 B.R. at 91. These elements are met here.

Debtors do not dispute that they increased the value of their homestead due to their 2012 $400,000 principal payments to their mortgage holder, well within the ten-year period before they filed for bankruptcy. Opp. at 2:24-3:1. And as discussed above, the evidence will show that the transfers were made with the intent to "hinder, delay, or defraud" Creditor. *See supra*, at III.A.

With respect to Section 522(o) in particular, the evidence will also show that the $400,000 used by Debtors to increase their home equity was an otherwise nonexempt asset that was available to Creditor to partially satisfy the Judgment.

### 1. The $400,000 Used To Pay The Mortgage Holder Was A Nonexempt Asset.

Although Debtors dispute this element of Section 522(o), they have already conceded that the money came from either "loan repayments from JAMD" or money that "Danny had access to."[6] Opp. at 4:2-4, 5:5-8. As argued in Creditor's Reply in Support of Objection to Claims of Exemption [Dkt. No. 75] ("Reply"), these assets are not exempt. Reply at 1:15-3:21.

Debtors may only claim exemptions provided by statute. *Siegel*, 134 S.Ct. at 1196 (11 U.S.C. § 522 "exhaustively specifies the criteria that will render property exempt."). Debtors have elected exemptions under Nevada Law pursuant to 11 U.S.C. § 522(b)(3). But Nevada law does not establish any exemption for loan repayments. *See* NRS § 21.090(1). Therefore, all loan repayments received by Danny Tarkanian and turned over to his mortgage holder – totaling at least $350,000 – were non-exempt assets that were subject to attachment to satisfy the Judgment. There is also no exemption provided under Nevada law for the additional $50,000 that Danny Tarkanian admits, without explanation, that he "had access to." Opp. at 4:2.

The evidence will also show that the purported "loans" owed to Danny Tarkanian from his family business, JAMD LLC, are unsubstantiated and the monies could well have been salary or some other form of compensation. Debtors did not produce in support of their Opposition, nor have they ever produced, any alleged promissory notes or loan documents related to such "loans." The evidence will show that Danny Tarkanian alone decides when and if any "loans" are made to himself or other family member or entities, and that those "loan" transactions are neither documented nor audited.

Debtors assert that $220,000 of the $400,000 transfer is exempt because the funds emanated from life insurance policies held in the "name of Danny's parents and held by the [Jerry and Lois] Tarkanian Irrevocable Trust." *See* Opp. at 12:11-15. This argument is without merit, because both state

---

[6] Debtors provide no basis whatsoever for why $50,000 of the $400,000 is exempt, which is facially insufficient because a debtor may only claim exemptions pursuant to statute. *See Siegel*, 134 S.Ct. at 1196.

and federal law exemptions apply only to property of the *debtor*, not property belonging to third parties. *See, e.g.*, 11 U.S.C. § 522(d)(7) (considering as exempt only an "unmatured life insurance contract *owned by the debtor.*"); NRS § 21.080(1) ("All goods, chattels, money and other property, real and personal, *of the judgment debtor*, or any interest therein *of the judgment debtor* not exempt by law, and all property and rights of property seized and held under attachment in the action, are liable to execution.")  As Debtors concede, the life insurance policies did not belong to them, but rather, to Jerry and Lois Tarkanian. Opp. at 12:14-15.  Thus, the entire amount implicated in the $400,000 transfers was non-exempt cash.

### 2. Debtors' Made The Transfers With The Intent To Hinder, Delay, Or Defraud Creditor.

The requirements for establishing actual intent to "hinder, delay, or defraud" under Section 522(o) are substantially identical to those under Nevada law. *See In re Stanton*, 457 B.R. at 92 (holding that because the language in Section 522(o) is essentially the same as that in the federal fraudulent conveyance statute, 11 U.S.C. § 548(a)(1), courts rely on cases citing Section 548(a)(1) to analyze the meaning of "intent to hinder, delay or defraud a creditor" as used in Section 522(o).). Under Section 548(a)(1), as with Nevada law, a creditor may establish intent by proving the existence of one or more "badges of fraud." *See id.* at 92-93.

We will not repeat here the above analysis concerning Debtors' intent to "hinder, delay, or defraud" the Creditor. *See, supra,* at III.A. In short, Debtors took $400,000 in non-exempt assets and poured those funds into a property in which they previously had zero equity and which they believed would become part of a fully exempt community asset once they declared it as their homestead. They did this just weeks after a $17 million judgment had been levied against them, through a complex series of transactions involving various family businesses and a trust, a variety of bank accounts, and unconventional cash transactions. The timing and the methodology used to accomplish this goal constitute the well-known "badges of fraud." *See In re Stanton*, 457 B.R. at 94-96; *In re Thaw*, 496 B.R. 842, 851-52 (E.D. Tex. Bankr. 2013) (The court held that debtor's conduct constituted badges of fraud where debtor and his wife decided to build their "dream house" even though the debtor was the subject of ongoing litigation; where they proceeded to make monthly payments that were, on average, twice that

required by their purchase agreement; and where the debtor used money to finance their new home from various family company bank accounts to which the debtor had "unfettered" access); *In re Maronde*, 332 B.R. 593, 600-01 (D. Minn. Bankr. 2005) (Debtor, after finding himself in financial trouble, opened a number of credit cards and made balance transfers from several of the cards' equity lines of credit to pay down his mortgage. The court held that the debtor's homestead exemption should be reduced by the amount attributable to his fraudulent conduct.). As such, should the Court conclude that the Debtors do have a bona fide homestead exemption, that exemption should be reduced by the amount of $400,000.

## IV. CONCLUSION

Creditor respectfully requests that this Court enter an order finding that (1) the elements of fraud are met under Nevada state law such that the Debtors' claim of a homestead exemption should be disallowed; and (2) even if Debtors have a valid exemption, which they do not, pursuant to Section 522(o) the Court should reduce Debtors' homestead exemption by the amount of $400,000 equaling the nonexempt assets used to increase the equity in their home.

Dated:   April 28, 2014

Janice Mock
Nossaman LLP

By: _____
       Janice Mock

Attorneys for Creditor FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for LA JOLLA BANK, FSB

# CERTIFICATE OF SERVICE

On April 28, 2014, I caused to be served the following document:

**CREDITOR'S TRIAL BRIEF RE: OBJECTION TO HOMESTEAD EXEMPTION**

I served the above-named document by the following means to the persons listed below:

**Via ECF System:**

Timothy S. Cory, Esq.
Duane Gillman, Esq.
tcory@djplaw.com
dgillman@djplaw.com
Durham, Jones & Pinegar
10785 West Twain Avenue, Suite 200
Las Vegas Office, Nevada 89135
*Counsel for Debtor Daniel Tarkanian*

Zachariah Larson, Esq.
Matthew C. Zirzow, Esq.
zlarson@lzlawnv.com and
mzirzow@lzlawnv.com
Larson & Zirzow, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
*Counsel for Debtor Amy Tarkanian*

Jason A. Imes, Esq.
jimes@s-mlaw.com
Schwartzer & McPherson Law Firm
2850 S. Jones Blvd., Suite 1
Las Vegas, Nevada 89146
*Counsel for Trustee*

I declare under penalty of perjury that the foregoing is true and correct.

                                                      */s/ Joy Morla*
                                       An employee of NOSSAMAN LLP