

_____
Honorable Mike K. Nakagawa
United States Bankruptcy Judge

**Entered on Docket**
**June 30, 2014**

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

* * * * * *

In re:                                    )    Case No.: 13-20495-MKN
                                          )    Chapter 7
DANIEL GEORGE JOHN TARKANIAN              )
and AMY MICHELLE TARKANIAN,               )
                                          )    Date:   May 20, 2014
                    Debtors.              )    Time:   9:30 a.m.
_____)

**MEMORANDUM DECISION ON OBJECTION TO CLAIMS OF EXEMPTION[1]**

On May 20, 2014, the court heard the Objection to Claims of Exemption brought on

behalf of Federal Deposit Insurance Corporation as Receiver for La Jolla Bank, FSB ("FDIC").

The appearances of counsel were noted on the record.  After oral arguments were presented, the

matter was taken under submission.

**BACKGROUND**

On December 19, 2013, Daniel Tarkanian and Amy Tarkanian ("Debtors") filed a

voluntary Chapter 7 petition.  (ECF No. 1).  The case was assigned for administration to William

A. Leonard ("Trustee") and a meeting of creditors was scheduled to be held on January 22, 2014.

(ECF No. 4).  On January 3, 2014, Debtors filed their schedules of assets and liabilities and other

information required by Section 521(a)(1).  (ECF No. 12).

_____

[1]  In this Memorandum Decision, all references to "ECF No." are to the numbers
assigned to the documents filed in the above-captioned bankruptcy case as they appear on the
docket maintained by the clerk of the court.  All references to "Section" are to the provisions of
the Bankruptcy Code, 11 U.S.C. §§ 101-1532.  All references to "NRS" are to provisions of the
Nevada Revised Statutes.  All references to "FRBP" are to the Federal Rules of Bankruptcy
Procedure.  All references to "FRE" are to the Federal Rules of Evidence.

On their real property Schedule "A," Debtors listed a property located at 3008 Campbell Circle in Las Vegas, Nevada ("Residence"). Debtors state that the current value of the Residence is $450,000 and that there is a claim secured by the Residence in the amount of $248,000. On their secured creditor Schedule "D," Debtors identify Bank of America as having a claim in the amount of $248,000 secured by the Residence. On their Schedule "C," Debtors claim a homestead exemption in the Residence in the amount of $202,000 pursuant to NRS 21.090(1)(l) and NRS 115.050. On their non-priority unsecured creditor Schedule "F," Debtors list the Federal Deposit Insurance Corporation ("FDIC") as receiver for La Jolla Bank, FSB, as having a claim of $16,995,005.17, based on a personal guaranty of business debt. On the same schedule, Debtors also list Nevada State Bank ("NSB") as having a claim in the amount of $14,800,000.00, based on a personal guaranty of business debt. Stancorp also is listed as having claim in the amount of $3,076,000 based on a personal guaranty of business debt. On their Schedule "H," Debtors list an entity identified as JAMD, LLC as a co-debtor with respect to both the NSB and the Stancorp obligations.

In Item 4 of their Statement of Financial Affairs ("SOFA"), Debtors disclosed a lawsuit by the FDIC against the Debtors, Jerry Tarkanian, Lois Tarkanian, George Tarkanian, Zafrir Diamant, Josephine Diamant, Douglas R. Johnson, and Debra Johnson, denominated Case No. 10-cv-0980-WQH (KSC), for which a judgment had been entered by the United States District Court for the Southern District of California. Debtors also disclose in Item 18 that they have an interest in or relationship to a variety of entities, including JAMD, LLC, Tark, LLC, Tarkanian Basketball Academy, Inc., Vegas Diamond Properties, LLC, and others.

On January 23, 2014, the Trustee reported that there are assets to administer after having completed the meeting of creditors. (ECF No. 16).[2]

On February 21, 2014, the Trustee filed an objection to the Debtors' claim of exemption with respect to their interest in JAMD, LLC and Tark, LLC. (ECF No. 38).

Also on February 21, 2014, the FDIC filed the instant objection to the Debtors' claim of

---

[2] On May 6, 2014, the Trustee issued a notice indicating a deadline of August 7, 2014, for parties in interest to file proofs of claim in the case. (ECF No. 142).

an exemption with respect to their Residence ("Homestead Objection").  (ECF No. 40).[3]  On March 12, 2014, Debtors filed their response ("Debtors' Response") to the Homestead Objection.  (ECF No. 69).  The response was accompanied by the declarations of Daniel Tarkanian ("Daniel Declaration") (ECF No. 70), Jodie Diamant ("Jodie Declaration") (ECF No. 71), and Lois Tarkanian ("Lois Declaration") (ECF No. 72).  On March 19, 2014, the FDIC filed its reply ("Reply").  (ECF No. 75).

On March 20, 2014, Debtors filed an amended Schedule "C" that eliminated any claim of exemption as to their interest in JAMD, LLC and Tark, LLC.  (ECF No. 79).  As a result, the Trustee withdrew his objection to those claims of exemption.  (ECF No. 80).

On March 26, 2014, an initial hearing on the Homestead Objection was conducted.  At the initial hearing, the court was advised that separate counsel had been retained by debtor Amy Tarkanian. An evidentiary hearing on the Homestead Objection was scheduled for May 1, 2014.

On April 14, 2014, a notice of appearance of separate counsel for Amy Tarkanian was filed.  (ECF No. 113).

On April 28, 2014, the FDIC filed its trial brief ("FDIC Brief") in support of the Homestead Objection (ECF No. 121) accompanied by a request for judicial notice ("RJN").  (ECF No. 122).  On the same date, a trial brief in response to the Homestead Objection was filed on behalf of Daniel Tarkanian ("Daniel Brief") (ECF No. 120) as well as a separate trial brief on behalf of Amy Tarkanian ("Amy Brief").  (ECF No. 125).[4]

On May 1, 2014, the evidentiary hearing on the Homestead Objection commenced. Because additional time was required to complete the witnesses' testimony, the hearing was

---

[3]  On March 7, 2014, an order was entered approving a stipulation between the Trustee and the Debtors to extend until June 23, 2014, the deadline for which objections to discharge under Section 727 may be filed by the Trustee.  (ECF No. 68).  On March 17, 2014, an order was entered approving a stipulation between the FDIC and the Debtors to extend until June 23, 2014, the deadline for which objections to discharge under Section 727 or to dischargeability of debt under Section 523 may be filed by the FDIC.  (ECF No. 74).

[4]  In the brief filed on behalf of Amy Tarkanian, she maintains that she should be treated as an "innocent spouse" who can claim a homestead in the Residence irrespective of whether the Homestead Objection is meritorious as to Daniel Tarkanian.

1    continued to May 20, 2014.  After completion of the testimony, closing arguments were

2    presented and the matter was taken under submission.

3                          **APPLICABLE LEGAL STANDARDS**

4          Under FRBP 4003(b)(1), a party in interest must object, if at all, to a debtor's claim of

5    exemptions within 30 days after conclusion of the meeting of creditors.  Failure to timely object

6    bars any subsequent challenge to the validity of the claimed exemption, see Taylor v. Freeland &

7    Kronz, 503 U.S. 638, 642, 112 S.Ct. 1644, 1648 (1992)[5], except to the extent the debtor

8    subsequently seeks relief under Section 522(f).  See FED.R.BANKR.P. 4003(d).

9          Under FRBP 4003(c), the objecting party has the burden of proving that an exemption is

10   not properly claimed.  In Diener v. McBeth (In re Diener), 483 B.R. 196 (B.A.P. 9th Cir. 2012),

11   the appellate panel explained the allocations of the burdens of production and persuasion on an

12   exemption objection as follows:

13          A claimed exemption is "'presumptively valid.'" Tyner v.
           Nicholson (In re Nicholson), 435 B.R. 622, 630 (9th Cir. BAP
14         2010)(citing Carter v. Anderson (In re Carter), 182 F.3d 1027,
           1029n. 3 (9th Cir.1999)). "[I]f a party in interest timely objects,
15         'the objecting party has the burden of proving that the exemptions
           are not properly claimed.'" Id. (quoting Rule 4003(c)). Initially,
16         this means that the objecting party has the burden of production
           and the burden of persuasion. In re Carter, 182 F.3d at 1029 n. 3.
17         The objecting party must produce evidence to rebut the
           presumptively valid exemption. Id. Once rebutted, the burden of
18         production then shifts to the debtor to come forward with
           unequivocal evidence that the exemption is proper. Id. The burden
19         of persuasion, however, always remains with the objecting party.
           Id.

20
21   483 B.R. at 203.  The standard of proof is by a preponderance of the evidence.  See Leavitt v.

22   Alexander (In re Alexander), 472 B.R. 815, 821 (B.A.P. 9th Cir. 2012).

23                          **THE TIME LINE OF EVENTS**

24   | June 10, 2005 | Residence purchased by Daniel Tarkanian (Deed from prior owner to Daniel Tarkanian - Ex. "D") (Excerpts from Chicago Title Property Profile Report - Ex. "4") and financed through Adjustable Rate Note dated June 6, 2005 (Note - Ex. "I"); (same - Ex. "3") |
     |---|---|
25
26
27         [5]  The Court's subsequent decision in Schwab v. Reilly, 560 U.S. 770, 130 S.Ct. 2652
28   (2010), did not alter the requirement under FRBP 4003(b)(1) that objections challenging the
     validity or amount of claimed exemptions be filed timely.

                                        4

| | |
|---|---|
| December 16, 2005 | Daniel and Amy Tarkanian Revocable Family Trust ("Debtors' Family Trust") was formed (Declaration of Trust - Ex. "H") |
| May 8, 2006 | Residence transferred to Daniel Tarkanian and Amy Tarkanian, husband and wife, as community property (Deed from Daniel Tarkanian to Daniel and Amy Tarkanian - Ex. "F"); (Excerpts from Chicago Title Property Profile Report - Ex. "4") |
| May 8, 2006 | Residence transferred from Daniel Tarkanian and Amy Tarkanian to Debtors' Family Trust (Deed from Daniel and Amy Tarkanian to Debtors' Family Trust - Ex. "G"); (Excerpts from Chicago Title Property Profile Report - Ex. "4") |
| July 12, 2007 | La Jolla Bank, FSB, loaned $14,568,750 to Vegas Diamond Properties, LLC, which loan was personally guarantied by Debtors and family members (Judgment in Civil Action - Ex. "L"); (same - Ex. "1" to RJN) |
| Summer, 2009 | Jerry Tarkanian suffered fall in San Diego |
| May 6, 2010 | FDIC as receiver for La Jolla Bank removes a complaint for breach of personal guaranties from San Diego Superior Court to the United States District Court for Southern District of California ("FDIC Collection Action"). (Order entered April 17, 2012 in FDIC Collection Action - Ex. "2" to RJN) |
| July 1, 2010 | First interest rate change on residential mortgage (Bank of America statement re loan payments - Ex. "6") |
| November 21, 2011 | FDIC files motion for summary judgment on its claims in the FDIC Collection Action. (Statement Regarding Registration of Judgment filed in United States District Court for District of Nevada - Ex. "M") |
| March, 2011 | Jerry Tarkanian suffered heart attack |
| April 17, 2012 | Summary judgment granted in favor of FDIC on defendants' counterclaims in FDIC Collection Action. (Order entered April 17, 2012 in FDIC Collection Action - Ex. "2" to RJN). |
| May 4, 2012 | Summary judgment granted in favor of FDIC on its claims in the FDIC Collection Action. (Judgment in Civil Action - Ex. "L") |
| May 22, 2012 | Judgment entered against Debtors and family members in the amount of $16,995,005 ("FDIC Judgment") (Judgment in Civil Action - Ex. "L") (same - Ex. "19") |
| June 3, 2012 | Daniel Tarkanian requested loan on cash value of Lois Tarkanian's life insurance policy (Correspondence to Phoenix Home Life - Ex. 1 to Ex. "P"); (same - Ex. "25") |
| June 3, 2012 | Daniel Tarkanian requested loan on cash value of Jerry Tarkanian's life insurance policy (Correspondence to Phoenix Home Life - Ex. 1 to Ex. "P"); (same - Ex. "25") |
| July 2, 2012 | Daniel Tarkanian opened new bank account for Jerry and Lois Tarkanian Irrevocable Trust at Wells Fargo Bank (Consumer Account Application - Ex. "15") |

| July 3, 2012 | Phoenix Life Insurance Company issues two separate checks in the amount of $110,000 payable to the parents' irrevocable trust (Deposit and withdrawal slips and checks  - Ex. 2 to Ex. "P"); (same - Ex. "7") |
| July 9, 2012 | $220,000 deposited into new bank account for Jerry and Lois Tarkanian Irrevocable Trust (Deposit and withdrawal slips and checks - Ex. 2 to Ex. "P"); (same - Ex. "7") |
| July 10, 2012 | $220,000 withdrawn from Irrevocable Trust bank account and loaned to JAMD) (Deposit and withdrawal slips and check - Ex. 2 to Ex. "P") |
| July 11, 2012 | Tarkanian Congressional Campaign repaid $53,755.83 in loans from Daniel Tarkanian (Deposit and withdrawal slips and check copies - Ex. 3 to Ex. "P") |
| July 12, 2010 | JAMD repaid $250,000 in loans from Daniel Tarkanian (Deposit and withdrawal slips and check copies - Ex. 3 to Ex. "P") |
| July 12, 2012 | Debtors pay $300,000 to Bank of America (Cashier's checks - Ex. 7 to Ex. "P"); (same - Exs. "10" and "13") |
| July 27, 2012 | Tarkanian Basketball Academy loaned $50,000 to JAMD (Check and deposit slip - Ex. 4 to Ex. "P"); (Deposit and withdrawal slips and check - Ex. "11") |
| August 3, 2012 | JAMD repays $50,000 in loans from Debtors. (Deposit and withdrawal slips - Ex. 5 to Ex. "P") |
| August 3, 2012 | Debtors pay $50,000 to Bank of America  (Cashier's checks - Ex. 7 to Ex. "P"); (same - Ex. "13") |
| August 22, 2012 | JAMD repaid $50,000 in loans from Debtors. (Check - Ex. 6 to Ex. "P"); (Check and cashier's check - Ex. "12") |
| August 22, 2012 | Debtors paid $50,000 to Bank of America (Cashier's checks - Ex. 7 to Ex. "P"); (same - Ex. "13") |
| February 6, 2013 | Declaration of Homestead recorded (Recording cover page and declaration - Ex. "K"); (same - Ex. "5") |
| April 10, 2013 | Order entered approving stipulation in Zafi and Jodie Diamant bankruptcy proceeding, Case No. 12-23432-LBR, for limited relief from stay to permit registration and recording of FDIC Judgment (Statement Regarding Registration of Judgment filed in United States District Court for District of Nevada - Ex. "M")[6] |

---

[6] The docket for the Diamant proceeding reflects that a voluntary Chapter 7 petition was filed on December 6, 2012, and that a discharge was entered on March 26, 2013.  A voluntary Chapter 7 proceeding previously was filed on July 31, 2012, by George Tarkanian, denominated Case No. 12-18968-MKN, who also was named as a defendant in the FDIC Collection Action. On February 7, 2013, a discharge was entered in favor of George Tarkanian.  On April 3, 2013, a limited order terminating the automatic stay was entered in the George Tarkanian proceeding that allowed the FDIC Judgment to be registered and recorded.

| April 19, 2013 | FDIC commenceed Miscellaneous Matter No. 2:13-ms-00025 in United States District Court for District of Nevada, to register FDIC Judgment (Statement Regarding Registration of Judgment filed in United States District Court for District of Nevada - Ex. "M") |
| December 19, 2013 | Debtors filed joint Chapter 7 petition. |

### THE EVIDENTIARY RECORD

Forty-three exhibits were admitted into evidence. Six witnesses testified at the hearing and each was subject to cross-examination.

A.    **The Exhibits[7].**

In addition to the items referenced in the foregoing TIME LINE, the other exhibits admitted at the hearing included copies of the Daniel Declaration (Ex. "1"), the Jodie Declaration (Ex. "20"), an Adjustable Rate Note dated June 6, 2005 (Ex. "3"), a Bank of America loan history statement dated April 9, 2014 (Ex. "6"), a Personal Financial Statement of Daniel Tarkanian dated December 22, 2011 (Ex. "14"), an Affidavit of Financial Condition of Daniel Tarkanian dated December 22, 2011 (Ex. "16"), a Personal Financial Statement of Amy Tarkanian dated December 22, 2011 (Ex. "17"), an Affidavit of Financial Condition of Amy Tarkanian dated December 22, 2011 (Ex. "18"), an email message from NSB to Daniel Tarkanian dated October 16, 2012 (Ex. "22"), a check payable to John Hancock Freedom 529 dated April 29, 2012 (Ex. "23"), a check payable to Lois M. Tarkanian dated June 1, 2012 (Ex. "24"), copies of letters from Danny Tarkanian to Phoenix Home Life dated June 3, 2012, bearing the stamped endorsement guaranty of Wells Fargo Bank (Ex. "25"), a letter from NSB to Daniel Tarkanian dated December 11, 2012 (Ex. "26"), an email message from Daniel Tarkanian to NSB dated October 16, 2012 (Ex. "27"), an assessor's parcel map encompassing the Residence (Ex. "A"), photographs of a walkway between the Residence and the home of Jerry and Lois Tarkanian (Ex. "B"), and portions of Jerry Tarkanian's medical records from Dr. Stephen Miller (Ex. "O").

---

[7]  The exhibits offered by the FDIC were marked numerically, e.g., "Ex. "1," while the exhibits offered by the Debtors were marked alphabetically, e.g., "Ex. "A."

### B.      The Witnesses.

Live witness testimony was presented by James Main, Stephen Miller, Lois Tarkanian, Jodie Tarkanian Diamant, Amy Tarkanian, and Daniel Tarkanian.

### 1.      James Main ("Main").

Main is a certified public accountant who has been employed by Daniel Tarkanian since 2007 to prepare income tax returns for the Debtors, as well as the various entities managed by Daniel Tarkanian. Those entities include JAMD, LLC, Tark, LLC, certain trusts for which Daniel Tarkanian is the trustee, and Tarkanian Basketball Academy, LLC. In preparing the tax returns through 2012, Main was provided information from Daniel Tarkanian. Apparently the information was provided in the form of a spreadsheet setting forth loan activity. Main would compare the loan activity set forth in the spreadsheet against the bank statements, mortgage statements, and checkbooks for the entity. Where applicable, a property management report also would be reviewed. Any loan balances would be reflected in the tax return. Main testified that he followed the same process for each return that he prepared.

As to the Tarkanian Basketball Academy, Main testified that in 2009, he probably received a general ledger produced through common bookkeeping software known as Quickbooks in lieu of a spreadsheet. He would compare the information on the general ledger against the bank statements and checkbook for the entity. Sometime after 2009, Tarkanian Basketball Academy began using a different bookkeeping system, but Main continued to compare the results to bank statements and the checkbook to prepare the tax return. He testified that Tarkanian Basketball Academy began using Quickbooks again in 2012, and the same process was followed thereafter to prepare the tax return.

Main testified that no audits of the returns have ever been requested by the Internal Revenue Service. He has no recollection of discussions with Daniel Tarkanian other than those involving the preparation of the tax returns and did not hear Daniel Tarkanian express any concerns that the Residence would be subject to foreclosure. Main also has no knowledge of the specifics of any loan, never saw any documentation memorializing any loans between JAMD and Daniel Tarkanian, and has no knowledge regarding the financial performance of any of the

entities.  Main also has never audited to determine whether any loan payments were actually gifts, never audited the disposition of any cash withdrawals, never audited whether funds received from JAMD were compensation or loan repayments, and never asked about Daniel Tarkanian's intentions in making any transfers.  Main testified that a copy of the FDIC Judgment was not included in the documents provided by Daniel Tarkanian in preparing the Debtors' income tax return for 2012.  He also testified that he does not review bank statements in preparing personal income tax returns.

### 2.    Stephen Miller ("Miller").

Miller is a doctor of internal medicine who first started treating Jerry Tarkanian in 2009.  As of that time, Jerry Tarkanian had a history of prostate cancer for which he was treated in 2004.  In 2009, he was being treated for thyroid, back, blood pressure, high cholesterol, eye, and balance issues, and was pre-diabetic.  As of 2009, Jerry Tarkanian had required more than six stents to be put into his heart.

Miller testified that Jerry Tarkanian fell some time in 2009 while in San Diego.  Miller saw him in August 2009 in Las Vegas shortly after the incident.  He noticed a cognitive decline and believed Jerry Tarkanian to be in far worse condition than his previous visits.  Miller also saw Jerry Tarkanian throughout 2010.

In March 2010, Miller noted in his medical records that Jerry Tarkanian was "a walking time bomb."  He expressed that view to Jerry Tarkanian's family members, including Daniel Tarkanian.  Miller saw Jerry Tarkanian in June and October 2010, and he was still suffering from shortness of breath.  In December 2010, Miller thought Jerry Tarkanian had decreased considerably in his cognitive abilities.  Members of Jerry Tarkanian's family were present at each medical visit, with Daniel Tarkanian there most of the time.

By 2011, Miller thought that Jerry Tarkanian's overall health was continuing in a downward spiral.  He testified that Jerry Tarkanian suffered another fall in the middle of 2011 that injured his elbow.  Miller drained the elbow.

Miller testified that in March 2012, Jerry Tarkanian suffered a heart attack that required him to be hospitalized for three weeks.  As he is not a cardiologist nor did he have hospital

1   privileges, Miller visited Jerry Tarkanian in the hospital, but was not the treating physician.

2   Miller testified that Jerry Tarkanian thereafter started an accelerated decline in his overall health.

3   A family member would always accompany Jerry Tarkanian in subsequent office visits and in

4   telephone communications.

5       Miller testified that some time shortly after the March 2012 heart attack and his release

6   from the hospital, Jerry Tarkanian visited his office on a weekend, pushed in a wheelchair.

7   Miller believed that he was having complications from his medications and that he had torn the

8   Achilles tendon in one of his ankles.  Miller recalled that on July 27, 2012, Jerry Tarkanian

9   sought a medical clearance from him to obtain a driver's license, but Miller did not recommend

10  that a license be issued.  In September 2012, Jerry Tarkanian visited him again and Miller

11  thought his breathing was better.  He testified that Jerry Tarkanian was well enough to visit the

12  Cleveland Clinic for a general medical workup.

13      Miller testified that he believes there has been a marked decline in Jerry Tarkanian's

14  health since March 2012 based on a multitude of factors.  Those include his ability to walk, his

15  talking and breathing problems, and his hospitalization.  He characterized the hospitalization as

16  the "second bump in the road" with the first "bump in the road" being Jerry Tarkanian's fall in

17  2009.

18      Miller testified that he also treats Lois Tarkanian.  He testified that Lois Tarkanian has

19  numerous health problems, including an autoimmune disease, uterine cancer, and

20  dermatopolymyositis.

21          **3.    <u>Lois Tarkanian ("Lois").</u>**

22      Lois is the wife of Jerry Tarkanian, and the mother of Daniel Tarkanian, George

23  Tarkanian, Pamela Tarkanian, and Jodie Tarkanian Diamant.  She also is a current member of

24  the Las Vegas City Council.  She testified that in 1992, she and her husband set up an

25  irrevocable trust for the benefit of her children and grandchildren.  She does not know who is the

26  trustee of the trust, nor how much is in the bank account for the trust.  Lois does not know how

27  much money was in the account when the $17,000,000 judgment was entered against her and her

28  family members in May 2012.

Lois testified that she does not recall any conversations with Daniel Tarkanian about opening an account for the trust at Wells Fargo Bank. She testified that in her judgment debtor examination in June 2013, she did not know the source of the $220,000 deposit into the account nor why $220,000 was withdrawn from the account the following day. Lois did not personally withdraw any cash from her life insurance policies. She does not remember any conversations with Daniel Tarkanian about taking the cash value out of her life insurance policies, but thinks her husband, Jerry Tarkanian, probably did. She was not present for any such conversation nor does she have any specific knowledge that such a conversation actually took place.

Lois testified that Daniel Tarkanian had permission to use funds that are resources for business purposes and he would provide information on a paper or would come before the family as a group to vote on it. She did not believe that use of insurance policy funds would be a business use, but does not think she would have objected to it. Lois does not recall that Daniel Tarkanian ever told her that his residence was in foreclosure. She testified that Daniel Tarkanian received permission to transfer $220,000 out of the life insurance policies some time after the transfer already had been made. Lois also testified that she personally would not take money out of an insurance policy and was shocked to find out later that funds actually could be taken out of the insurance policy.

Lois testified that she and her husband had an enclosed walkway constructed between her home and Daniel Tarkanian's residence. Describing a picture of the walkway, she testified that the walls enclosing the walkway bear various paintings by the grandchildren, with names, ages, heights, and the like.

Lois testified that she has been married to Jerry Tarkanian for 58 years and that he is of Armenian ancestry. She testified that in Armenian families there is an extremely strong bond between the father and the eldest son. Lois testified that there is such a bond between Daniel Tarkanian and his father, Jerry Tarkanian.

Lois testified that she is not strong enough to lift her husband and that having Daniel Tarkanian nearby provides a feeling of security. She testified that her husband had another heart attack within the last three weeks and that she arrived at the house after the heart attack occurred.

1   After she arrived, 911 was called and Jerry Tarkanian was taken to the hospital by the fire

2   department.

3           Lois also testified that her son George Tarkanian is unavailable to assist in the care of

4   Jerry Tarkanian due to his own health issues.  Her daughter Pamela works full time and

5   sometimes comes over to take care of her father.

6                   **4.       Jodie Tarkanian Diamant ("Jodie").**

7           Jodie is one of Daniel Tarkanian's sisters and lives, with her husband and two children,

8   about a quarter mile away from her parents, Jerry and Lois Tarkanian.  Her older sister, Pamela,

9   also lives in Las Vegas, along with her four children, not far away.  Her brother George, along

10  with his wife and son, also lives in Las Vegas.

11          Jodie is a registered nurse who initially practiced for eight years, ceased practice after her

12  youngest daughter was born, and then resumed practice in 2013.  She visits her father, Jerry

13  Tarkanian, at least twice per week, and puts together his medications in a pill box.  Her brother

14  Daniel Tarkanian visits her father at least two days during the week and usually spends Sundays

15  at her father's home as well.  Because of Jodie's medical background, the family frequently asks

16  her questions about her father's medical care.  She testified that as the oldest son of the family,

17  Daniel Tarkanian is vocal in his opinions and the family looks to him for leadership.  Jodie also

18  testified that Daniel Tarkanian's opinion regarding their father is more valuable to her because

19  he sees his father more frequently due to his close proximity.  In addition, Daniel Tarkanian

20  spends far more time with their father than any of their siblings, even on the days when Jodie is

21  supposed to be there.  When phone calls late at night are not answered by their parents, Daniel

22  Tarkanian is available to go to their parents' house to check on them.  Jodie is aware that the

23  Debtors' residence is connected to her parents' home by a walkway and is comforted by her

24  brother's close proximity.  She testified that at some point in time she had told her brother the

25  same thing.

26          Jodie testified that as an example, a couple of weeks ago, her nephews were visiting Jerry

27  Tarkanian and saw him slumped over in his chair.  They were unable to reach Jodie and others

28  by telephone, so they went and got Daniel Tarkanian at the Residence.

1    She believes that Jerry Tarkanian has had nine or ten stents put in his heart, one over the

2 past summer. Jodie testified that her father had a serious fall in San Diego during the summer of

3 2009 where he broke his shoulder and also had to have a bone spur removed from his back. She

4 believes that her father was in the hospital and/or in rehabilitation for around six weeks. After

5 Jerry Tarkanian returned home, Jodie believes that both a physical therapist and an occupational

6 therapist came to the house, but does not recall if her father had nursing care on a daily basis.

7 She believes that a nurse visited perhaps once a week to determine whether physical and

8 occupational therapy continued to be necessary. Jodie described the fall in 2009 as the first

9 major incident with her father's health.

10    Jodie testified that she was present in March 2012 when Jerry Tarkanian suffered a heart

11 attack. While visiting a dermatologist, her father was having difficulty walking and breathing,

12 and so she took him to a cardiologist who practiced in the office across the hallway. Thereafter,

13 her father was taken to a local emergency room where she was informed that Jerry Tarkanian

14 was having a heart attack. After her father got out of the hospital, he was weaker, had difficulty

15 talking, difficulty swallowing, and difficulty walking.

16    Jodie also testified that the family has been trying to have meetings each month regarding

17 the health of the parents, but have not had a meeting for the past couple of months.  In addition

18 to Jerry Tarkanian's health problems, Lois Tarkanian has cancer, Lupus, and fibroids.

19    Jodie also testified that in March 2014, Jerry Tarkanian was able to attend games played

20 by the University of Nevada Las Vegas ("UNLV") basketball team prior to the start of the

21 NCAA basketball tournament.  He also went with Daniel Tarkanian to Dallas where the final

22 four teams in the tournament played for the national championship, but he did not attend any

23 games.

24    Jodie never had any conversation with the Debtors before they purchased the Residence

25 located near their parents, nor did she know anything about how the purchase was financed.  She

26 does not recall any conversation with the Debtors in 2012 about them being worried about losing

27 their home nor of any cost-cutting measures to make payments on their home.  She never

28 questioned any of the financial decisions that Daniel Tarkanian made on behalf of their parents.

Jodie testified that her husband had loaned $400,000 to JAMD out of a line of credit, in order to help construct a building on certain hospital property. She testified that she is a part owner of JAMD and that her husband was repaid the moneys that were loaned. She testified that Daniel Tarkanian manages JAMD and makes the financial decisions. Jodie was never told by Daniel Tarkanian that $220,000 would be drawn from her parents' life insurance policies and out of the Jerry and Lois Tarkanian Irrevocable Trust to loan to JAMD, which ultimately would be used to pay down the Debtors' mortgage. She was unaware of the transaction occurring until about a year ago and she knows nothing about nor was she aware of any loans between JAMD and Daniel Tarkanian. She has never discussed the transaction with her parents nor does she recall any conversations with her siblings about the transactions when they were taking place. Jodie testified that there is a family reunion every summer where an informal family meeting would take place. During the family meetings, Daniel Tarkanian would discuss the status of the various properties owned by the family. Only recently did she become aware of any loans the Debtors had made to JAMD.

Jodie testified that at the informal family meetings, Daniel Tarkanian would give them statements or something that she had no interest in. Her husband attended the meetings and thought everything was fine. Jodie has not reviewed any of the financial spreadsheets lately concerning the outstanding loans owed by JAMD.[8]

### 5.    Amy Tarkanian ("Amy").

Amy married Daniel Tarkanian in 2001 and they have four children. She testified that at some point in time she was an actress in Los Angeles and that she also worked in the theater as well.

Amy testified that she leaves all of her finances to her husband because she did not manage her personal finances at all well before they got married.[9] She has no idea about the

---

[8] The matters stated in the Jodie Declaration were consistent with Jodie's testimony in court.

[9] Amy was not asked to explain the personal financial difficulties that led her to this decision, nor was she asked about her educational background.

1    terms of the mortgage on the Residence and does not know if it was ever refinanced.  She does

2    not know the amount of tuition paid for one of her children in private school.  She does not recall

3    ever having a conversation with her husband about whether they could afford it.  Sometimes she

4    checks the mail, but she sets aside for her husband anything that does not have her name on it.

5    She does not open any credit card bills and gives no thought to whether any bills get paid or not.

6         Amy testified that she does not know if she has any bank or investment accounts for her

7    children.  She does not know if there are any investment accounts for herself or her husband.

8    She has never gone online to look at any bank or investment accounts for herself or her children.

9    Amy testified that Daniel Tarkanian runs the show at home and she just makes sure the kids get

10   fed.  She does not discuss household finances with her husband and does not know how bills

11   come in for basic living expenses like water, utilities, or garbage.  Her husband gives her cash or

12   credit cards to buy groceries, but she does not know which banks issue the credit cards.  She

13   does not know the amount of the monthly mortgage payment on her home and has never known.

14   She testified that she does not know how her husband makes the mortgage payments.  Amy

15   testified that she does not remember who her husband was working for in 2005 when they

16   bought the house.  She does not know how much money Daniel Tarkanian was making in 2005,

17   nor how much money he earns today.

18        Amy did acknowledge signing a check dated April 29, 2012, in the amount of $7,500

19   payable to John Hancock Freedom 529, but testified that she does not know what the account is.

20   She also acknowledged signing a check dated June 1, 2012, in the amount of $2,000 payable to

21   her daughter, Lois M. Tarkanian, which may have been a birthday gift in an amount to make up

22   for moneys previously given to the grandchildren by her husband's parents.

23        Amy testified that Daniel Tarkanian once mentioned the importance of keeping the

24   Residence after Jerry Tarkanian's heart attack and doing whatever it takes, probably through

25   refinancing, but nothing beyond that.  She testified that she has heard of the term underwater

26   with regard to a mortgage but does not know whether the Residence has been refinanced.  She

27   testified that she believes it to be important to stay in the Residence because her children attend

28   schools nearby, the Residence is close to the family, and her husband wants to remain near to

1   Jerry Tarkanian due to his declining health condition.

2          Amy testified that she is aware of the $17,000,000 judgment entered against her, as well
3   as her husband, but has no idea how the process of paying the judgment would work.  Although
4   she does not know her finances, she is pretty sure that she did not have $16.9 million dollars in
5   assets to pay the judgment when it was entered against her in May 2012.  She testified that she
6   was not interested in trying to figure out how to respond to the judgment because she left that up
7   to her husband.  She does not know if she had any equity in the Residence at the time the
8   judgment was entered and does not know if she has any equity in the Residence today.  Amy also
9   testified that she never went with her husband to discuss with any accountants or financial
10  advisors how to satisfy the judgment.  She also had no conversations with any family members
11  about the judgment, nor did she do an analysis of how to satisfy the judgment.  She discussed no
12  options with Daniel Tarkanian about satisfying the judgment or protecting her assets other than
13  filing for bankruptcy.  Amy recalls no discussion with her husband about taking $220,000 out of
14  Jerry and Lois Tarkanian's life insurance policies or paying $400,000 to the mortgage holder in
15  July and August 2012.  Amy testified that she knows that the entity JAMD exists, but has never
16  asked her husband about it.  She knows nothing about $400,000 having come from JAMD's
17  bank accounts into her account and then to Bank of America.

18         Amy testified that the Tarkanian family has meetings to discuss family business matters
19  but she does not attend them.  She is not aware of the large principal payment made on the
20  Residence in 2012 and never discussed it with her husband or participated in any way in making
21  the payment.

22         Amy testified that in January 2013, she started a job as a political pundit representing the
23  conservative agenda where she debates important political positions and topics.  She testified
24  that on a political show called "What's Your Point" she engages in almost daily discourse with
25  Rory Reid.  The televised show is on Channel 3 and she is paid an annual salary.

26         Amy testified that she has been selected as a member of the Silver State Excellence of
27  Women Program geared to recruit women to run for political office or to participate in the
28  political process.  She testified that she also served on the Clark County Republican Executive

16

1  Board and was once elected and re-elected as the Nevada Republican Party chairperson.  Amy

2  testified that she served as the leader of the Republican Party in Nevada after she was elected the

3  chairperson.  She testified that as party leader, she would raise funds and an executive director

4  and treasurer would take care of the money.  She testified that fund-raising only required talking

5  about obtaining money rather than about how much money is needed because the amount needed

6  is unlimited.  Amy testified that in her roles on the executive board and as party leader, the

7  executive director and treasurer would make the financial decisions, and she would go fund-

8  raise.  She testified that when Daniel Tarkanian ran for political office in 2012, she campaigned

9  for him going door to door.

10        Amy also testified that her job at Channel 3 is her first job making money personally

11  after she married in 2001, other than her job in real estate.  She testified that she once had a real

12  estate license, but does not recall whether she was involved in two or more transactions.  She

13  believes she may have been involved in the purchase of the Residence.  She testified that she was

14  involved in a transaction involving commercial property, but does not remember the property or

15  the persons involved in the transaction.  She testified that her husband Daniel Tarkanian was

16  involved in every transaction, and that someone would bring her documents and she would sign

17  them.  She does not recall who brought her the documents.

18        Amy testified that she does not remember how she used her real estate license in the

19  purchase of the Residence.  She does not recall whether she received a commission, who she

20  represented on the sale, or whether the home originally was purchased in her husband's name as

21  separate property.  She testified that she did not talk to her husband about whether they could

22  afford to purchase the home because she trusted him.  She also testified that she does not know

23  whether she is even on title to the house.

24        Amy testified that when the Residence was purchased in 2005, she intended that her

25  children be raised in the house as long as they needed it.  When shown a copy of the homestead

26  declaration for the Residence that she signed, Amy testified that she does not understand what it

27  is even though she once was a licensed realtor.  She testified that she signed the homestead

28  declaration in January 2013 but does not remember reading it.  When asked if she typically reads

1   documents before signing them, Amy testified that she just signs them.

2          Amy testified that she does not recall signing a personal financial statement in 2011,

3   although she recognized her signature on the copy shown to her.  She testified that she may have

4   read the document, but does not remember.  Because she does not remember reading the

5   document, Amy testified that she does not know if the statements made in the financial statement

6   were accurate as of December 22, 2011.  She testified that she does not know if the $12,000

7   monthly income figure for her husband was accurate and that her husband came up with that

8   figure.  She also did not do anything to follow up on the accuracy of the income figure because

9   she did not know where Daniel Tarkanian worked in 2011.  Amy testified that she did not

10  remember knowing the amount of the monthly mortgage payment when the personal financial

11  statement was filled out.  She also testified that she has no idea where a figure for $15,000 cash

12  on hand or a figure of $24,500 in other assets came from.  Amy testified that she did not

13  participate in the preparation of the personal financial statement nor did she provide any of the

14  information in it.  Additionally, she did not ask her husband whether the information was correct

15  before she signed it.

16         Amy testified her signature appears on an affidavit of financial condition.  She testified

17  that she does not remember if she did anything to confirm or verify any of the information

18  appearing in the affidavit.  She testified that she signs every document that is handed to her by

19  Daniel Tarkanian.  She does not remember if the investment account figures in the affidavit were

20  accurate when she signed the document.   Amy testified that she did not participate in the

21  preparation of the affidavit and assumes it was prepared by her husband.

22                     **6.    Daniel Tarkanian.**[10]

23         Daniel Tarkanian purchased the six bedroom, five bathroom Residence in his own name

24  in 2005, then transferred it to Amy and himself as husband and wife.  He testified that he initially

25  took title only in his name because his wife's credit was not very good and the interest rate

26

27         [10]  Daniel Tarkanian testified at length on two different days both as a witness for the

28  FDIC and as a witness for the Debtors.  This non-sequential summary of his testimony roughly
    follows the order in which his testimony was elicited at the hearing.

1    would be higher if she was on title.  Thereafter, it was transferred to him and his wife as

2    community property, and then to the Daniel and Amy Tarkanian Revocable Family Trust.  He

3    testified that title to the Residence remains in that family trust.  Daniel Tarkanian testified that

4    the purchase price was $810,000, with $162,000 as a down payment, requiring a loan of

5    $648,000 to complete the purchase.  He testified that the down payment was obtained from the

6    sale of their prior residence.  He testified that the purchase was financed through a 30-year,

7    adjustable rate mortgage, requiring interest-only payments.  The loan application provided for

8    initial monthly mortgage payments of around $3,400.  He testified that the original interest rate

9    was 5.75 percent and he was paying close to $3,800 a month.  He testified that he purchased the

10   Residence primarily because it was close to his parents' home.

11         Daniel Tarkanian testified that he has always taken care of the family finances during his

12   marriage to Amy.  His wife has no interest in the finances and had credit problems in the past.

13   He testified that he has taken complete control over payments being made and books being kept.

14   Amy has no involvement in the mortgage payments for the Residence and does not review the

15   monthly mortgage statements.  Daniel Tarkanian testified that Amy was not involved in the

16   transactions to pay down the mortgage in 2012.  She did not attend any of the meetings where

17   family business was involved and she had no interest in the meetings

18         He testified that the only principal payments on the loan were made in July and August

19   2012.  Until that time, he had only paid interest on the loan.  As a result of the principal payment,

20   the balance remaining on the loan was around $248,000.  Daniel Tarkanian testified that at the

21   time of the principal payments, he had not had an appraisal done on the Residence, but did have

22   a tax assessor's statement for that time period.

23         Daniel Tarkanian testified that part of the principal payment came from proceeds from

24   his parents' irrevocable trust that had insurance policies on his parents' lives.  He testified that he

25   and his siblings are the beneficiaries of the parents' trust, and that the trust is not a judgment

26   debtor on the FDIC judgment.  Two separate checks, each in the amount of $110,000, were

27   issued by the Phoenix Life Insurance Company.  Both checks are dated July 3, 2012.  He

28   testified that on July 2, 2012, he applied to open a bank account for his parents' trust at a nearby

1    branch of Wells Fargo Bank because it was located much closer than the only Ameritrade office

2    more than thirty minutes away.  He testified that on July 9, 2012, he deposited two checks that

3    he received from Phoenix Life Insurance Company into the account.

4        Danny Tarkanian testified that he withdrew the funds from the parents' trust account on

5    July 10, 2012, and the funds were immediately loaned by the parents' trust to JAMD.  Because

6    he had a close-knit family and the transaction was within family members, the loan was not

7    formalized by a promissory note, but was reported on an Excel spreadsheet provided to the

8    accountant who prepared the tax returns.  Daniel Tarkanian testified that he believed it would

9    raise fiduciary questions and possibly a breach of fiduciary duty if he had transferred the funds

10   directly to himself to pay down his mortgage.  He testified that JAMD had borrowed funds from

11   the trust on at least seven occasions over the past several years.  He testified that the decisions to

12   borrow funds from the life insurance policies to maintain JAMD's survival depended on the

13   interest charged by other sources and whether the insurance policies were the only source of

14   income.  Daniel Tarkanian testified that he never told the other beneficiaries of his parents' trust

15   that he was borrowing money to loan to JAMD in advance of doing so.  He did not do so before

16   the $220,000 was borrowed by JAMD to repay its loans to him, nor did he do so before any of

17   the other six times that JAMD borrowed money from the parents' trust.  He testified that he is

18   not the trustee of the Lois Tarkanian Irrevocable Trust and that Judy Steel is the trustee.  He is

19   the trustee of two of his parents' irrevocable trusts as well as the manager of all of the family

20   entities that he described.

21       Daniel Tarkanian testified that on July 12, 2012, JAMD used the $220,000 in funds

22   borrowed from the parents' trust to repay Daniel Tarkanian for loans that he previously had

23   made to JAMD.  He believed it was permissible to do so because his parents owned their

24   irrevocable trust and also owned an interest in JAMD, and therefore had a mutual interest.  As

25   the parents' trust also had an interest in JAMD, he testified that the trust had an interest in

26   ensuring that JAMD would be able to remain solvent and survive.  He never told his siblings in

27   advance of doing so and has never made any other loans from the trust to JAMD that were used

28

1  to pay down his mortgage.[11]  Daniel Tarkanian testified that he would have informed his siblings

2  of any transfers during their annual meetings.

3          Daniel Tarkanian testified that when he received the loan repayment from JAMD, he

4  deposited the funds into his personal account and then had a cashier's check made payable to

5  Bank of America as a principal reduction on the mortgage.  He testified that the amount of the

6  cashier's check was $300,000, consisting of $250,000 from JAMD and an additional $50,000

7  that was a repayment of a loan that he had made to the Daniel Tarkanian congressional account.

8  The same day he deposited $53,000 into his personal account that he received from the Daniel

9  Tarkanian congressional account.  He testified that he was running for Congress in 2012 and had

10  loaned his campaign money during the primary.  After he won the primary, campaign donations

11  were received from which he was repaid the money he had loaned the campaign.  He testified

12  that the $250,000 from JAMD included the $220,000 JAMD had borrowed from his parents'

13  trust plus $30,000 from JAMD's operational income.

14          Daniel Tarkanian testified that on August 3, 2012, a cashier's check in the amount of

15  $50,000 was made payable to Bank of America.  The source of the $50,000 was the Tarkanian

16  Basketball Academy, a non-profit entity that operates a sports facility, which had loaned the

17  funds to JAMD.  At the time, the Academy had excess cash because it received its biggest

18  revenues in June and July for the summer basketball tournaments.  Daniel Tarkanian testified

19  that after JAMD borrowed the $50,000 from the Tarkanian Basketball Academy, JAMD paid

20  back $50,000 that JAMD had borrowed from Daniel Tarkanian.  Daniel Tarkanian then obtained

21  the cashier's check payable to Bank of America.  He testified that Tarkanian Basketball

22  Academy could not have given $50,000 directly to him because he was not working for the

23  Academy at that time as he was involved in the last two months of his congressional campaign.

24  Daniel Tarkanian testified that the funds were loaned to JAMD but that no promissory note was

25  prepared.  He testified that the loan was documented on the Excel spreadsheets, ledger sheets,

26

27          [11]  In his declaration submitted along with the Debtors' Response to the Homestead
28  Objection, Daniel Tarkanian stated that the payments made to reduce the principal on his
   Residence were made "after consulting with family members."  Daniel Declaration at ¶ 8.

1    cancelled check, and bank account statements provided to the accountant.  He does not

2    remember whether he told Judith Flynn, who signed the check from the Academy payable to

3    JAMD, that the $50,000 was a loan.  He testified that he was the only person authorized to

4    decide whether or not the loan was a reasonable use of the Academy's cash.  He also testified

5    that if the Tarkanian Basketball Academy had excess cash ten months earlier, it could have

6    loaned $50,000 to JAMD at that time.  Daniel Tarkanian testified that neither JAMD nor the

7    Tarkanian Basketball Academy are debtors on the FDIC judgment.

8        Daniel Tarkanian testified that JAMD was opened in 2007 and owns a commercial

9    development project consisting of fifteen acres of land across from the San Martin Hospital.  He

10   made all management and operational decisions for JAMD in 2012, including how the money

11   would be spent.  He testified that JAMD's need to repay loans was based on whether the party

12   who loaned funds to JAMD needed to be paid back.  Daniel Tarkanian testified that he did have

13   a promissory note from JAMD in the early 2000s, but that he cannot find a copy of his note.  He

14   testified that he receives five percent interest on the loans he makes to JAMD.  He testified that

15   JAMD borrowed money from family members with a policy or understanding that if JAMD had

16   the ability to do so, it would repay the loans any time the lender needed the money back.  He

17   testified that the policy or understanding is not in writing because it is between family members.

18        Daniel Tarkanian testified that he is the sole person who decides whether it is necessary

19   for JAMD to repay the loans.  One such loan was for $450,000 that JAMD borrowed from Zafi

20   Diamant for the construction of a building which was paid back when Zafi needed to pay back

21   his line of credit.  He testified that there was another loan to JAMD from the Diamants, but that

22   it has not been paid off and has a balance of $73,005.  He testified that another example was

23   when he borrowed against his parents' life insurance and loaned the funds to JAMD, which then

24   repaid the $250,000 it had borrowed from his parents.   He testified that his parents needed to

25   retrofit their home after his father's illness.  Daniel Tarkanian testified that after he was repaid

26   the loans in 2012, JAMD also repaid loans to his parents, to the Tarkanian Family Limited

27   Partnership, to the Lois Tarkanian Revocable Trust, to the Jerry and Lois Tarkanian Irrevocable

28

Trust, and perhaps others.[12]

Daniel Tarkanian testified that at the time Tarkanian Basketball Academy loaned the $50,000 to JAMD, there were no promissory notes to Daniel Tarkanian coming due that needed to be paid. He testified that neither JAMD nor the Tarkanian Basketball Academy are debtors on the FDIC judgment, so that the FDIC could not pursue the Academy for the $50,000 loaned to JAMD. Daniel Tarkanian testified that the FDIC could only pursue JAMD for the moneys it owed to him.

Daniel Tarkanian testified that on August 22, 2012, JAMD repaid him another $50,000 by a check that he cashed and converted to a cashier's check payable to Bank of America. It was to be applied to reduce the principal owed on the mortgage. He testified that he usually made mortgage payments by personal checks and the use of cashier's checks was not typical.

Daniel Tarkanian testified that before the principal payments were made on his mortgage in 2012, he had been sued on a personal guaranty of a $14 million loan from La Jolla Bank. The loan had been guarantied by his wife, his parents, his sister Jodie and her husband, and his brother George. He testified that the FDIC judgment was entered on May 22, 2012, about six weeks before he started making principal payments on his mortgage. Daniel Tarkanian testified that he could not pay the $17 million FDIC judgment as he did not have that kind of money. He also testified that for that reason he had no intention of paying the judgment.

Daniel Tarkanian testified that he signed a personal financial statement dated December 22, 2011. He testified that he signed an affidavit of financial condition on December 22, 2011. On the affidavit he listed a receivable from JAMD in the amount of $670,379. He testified that the receivable would have been reduced by at least $350,000 due to the subsequent loan

---

[12] In his declaration, Daniel Tarkanian stated that "Over a period of twelve years, members of the Tarkanian family and its entities loaned JAMD over $2 million to pay for the construction. The loans were memorialized with promissory notes, and the loans and repayments of loans were kept as part of the records of JAMD...On September 29, 2006, I made my first loan to JAMD. Over the course of seven and a half years, I loaned JAMD $1,181,814.00 and was repaid $1,428,000. (The repayments included interest at 5%). Approximately $984,900.00 in payments were made to me prior to entry of the Judgment in California in favor of FDIC-R, and all of the repayments were made prior to the FDIC registering the Judgment in Nevada on April 17, 2013." Daniel Declaration at ¶ 15.

repayments in 2012.  Daniel Tarkanian testified that in July 2010, JAMD owed him $748,465.

Daniel Tarkanian testified that he personally guarantied a $14 million loan that Nevada State Bank had made to JAMD.   He testified that for six months in 2012 he was being paid a salary by JAMD.   He testified that Nevada State Bank objected to JAMD's payment of property management fees and legal fees to Daniel Tarkanian.  He testified that he received a letter from Nevada State Bank dated December 11, 2012, accusing him of manipulating accounting practices by claiming attorneys fees of $7,500 per month without substantiation of the amount. He testified that he did not disclose to Nevada State Bank the loan repayments made by JAMD to Daniel Tarkanian because those repayments were not an operating expense such as management and legal fees, and did not have to be disclosed under the bank's loan documents. He testified that from the time that Nevada State Bank had loaned money in 2005, it was not given notice of any of the 40 to 50 loan repayments that JAMD made to his siblings, himself and the trusts, because it was not relevant to the loan documents.

Daniel Tarkanian testified that he and his family members also formed a business called Tark, LLC, in 1999.  That entity owns a retail building located in Clovis, California.  He testified that he manages Tark, LLC, including review and approval of leases and working with leasing agents.  He also reviews and approves leases for JAMD.  Daniel Tarkanian testified that at the end of 2013, Tark, LLC, took out a loan of $822,000, by refinancing its property.  Daniel Tarkanian testified that the refinancing was a smart business decision because the loan was obtained at a four percent interest rate and the moneys received from the loan are nontaxable. He testified that part of the loan proceeds were used to repay a loan that Tark, LLC had received from the Tarkanian Basketball Academy.  He testified that another part of the loan proceeds were loaned to JAMD which in turn used the funds to repay the Jerry and Lois Tarkanian Irrevocable Trust for the $220,000 it had borrowed against the Phoenix Life Insurance policy.

Daniel Tarkanian testified that in 2010, his brother George ran the Tarkanian Basketball Academy because Daniel Tarkanian was running for the United States Senate.  He testified that due to a serious illness, George had to step down from running the facility.  George's wife was doing the bookkeeping and running the office while George ran the basketball programs.  At the

1   end of August 2010, Pete Zopolos came in to run the facility and Amy came in to help transition

2   from George to Pete.  He testified that his wife Amy was paid to help organize the office and

3   files, and do other things.

4          Daniel Tarkanian testified that he made the principal payments on the mortgage in 2012

5   because he was afraid that the payments would go up some time in the future and he would not

6   be able to afford them.  He testified that his mortgage payments in fact had been going down, but

7   that he believed that interest rates would start going up because interest rates were at historical

8   lows.  He testified that if the interest rate went back to the initial rate, his monthly mortgage

9   payment would go up by $2,300, and if the interest rate went up to 7.5 or 8.0 percent, he would

10  be paying $3,500 or $4,000 more per month.

11         Daniel Tarkanian testified that interest rates have not gone up, but if so, very little.  He

12  testified that in July 2010, the interest rate on his mortgage was about to change.  He testified

13  that even though JAMD owed him $748,465 at the time, he does not know if JAMD had the cash

14  flow to repay the amounts owed.  Daniel Tarkanian testified that JAMD could have borrowed

15  against his parents life insurance policies through his parents' trust, but that JAMD had already

16  borrowed $144,000 in April 2010.  He testified that Jerry Tarkanian's health had begun to fail in

17  2009, but he did not attempt to pay down or refinance his mortgage or engage in any transaction

18  similar to principal reductions he made in 2012.

19         Daniel Tarkanian testified that he did not record a homestead declaration in 2005 when

20  he purchased the Residence.  He testified that he and his wife filed the homestead declaration in

21  January 2013, but acknowledged that he had previously testified that he could not explain the

22  reason for delaying the filing of the homestead declaration because of the attorney-client

23  privilege.  He testified that as of July 2012, he was current on his mortgage payments and had

24  not received any notices of default.  He testified that the Residence was not in foreclosure and

25  that he could have made the payment the next month.  Daniel Tarkanian testified that he was

26  worried that the interest rate would rise and he would not be able to make the higher monthly

27  payment.

28         Daniel Tarkanian testified that he believed he had three options in July 2012.  He testified

1   that his first option was to remain in the home and wait for interest rates to increase from $1,500

2   currently to as high as $3,700.  He testified that the monthly interest-only payment on the loan

3   started at $3,105 for the first five years, then dropped to $1,552 in July 2010, then dropped to

4   $1,485 in February 2011, then dropped to $1,417.50 in August 2011, then remained at $1,417 in

5   November 2011, then increased to $1,552 in February 2012, and then dropped to $1,209 in July

6   2012.  He testified that Tarkanian Basketball Academy's lease with Station Casinos had expired

7   and the Academy's revenue could end if it is required to move.  He also testified that JAMD was

8   upside down several million dollars and would not be a source of income if it went under.  He

9   testified that his second option was to walk away from the Residence, let it be foreclosed or short

10  sold, and then purchase another home away from his father.  Daniel Tarkanian testified that his

11  third option was to obtain repayment of the funds loaned to JAMD and then pay down the

12  mortgage.  He testified that as a result of the principal reductions made in 2012, the monthly

13  interest-only payment had dropped to $869.00 in August 2012.  He testified that the $400,000 in

14  transfers during July and August 2012 were the first time he had ever made any payments of

15  principal on the mortgage.

16      Daniel Tarkanian testified that he graduated from the UNLV with a business finance

17  degree and then graduated from the University of San Diego School of Law.  He is admitted to

18  the Nevada bar and currently is a licensed attorney.  Daniel Tarkanian testified that he started a

19  law firm in January 2014, Tarkanian & Knight Law Group, but does not practice law except for

20  dealing with his family's various business entities.  He testified that he does not know if his law

21  firm website advertises him as a lawyer specializing in business law and consulting.  He testified

22  that he provides oversight to his partner who just passed the bar and he practices law for his

23  family's entities.  He could recall one instance where he made a collection call for a client, but

24  that he has never gone to court, prepared any documents, or any of that stuff.

25      Daniel Tarkanian testified that he is very close to his father, Jerry Tarkanian, as are all

26  eldest sons of Armenian ancestry with their fathers.   He testified that he named his only son,

27  Jerry, after his father.  Daniel Tarkanian testified that he was a ball boy for Jerry Tarkanian and

28  traveled with the basketball teams that his father coached.  He testified that Jerry Tarkanian

1    coached at San Joaquin Memorial High School, Redlands High School,  Antelope Valley High

2    School, Riverside City College, Pasadena City College, Long Beach State, UNLV, and Fresno

3    State.  He played basketball for his father for one year at a junior college and then for three years

4    at UNLV where his father coached a team that was ranked number one in the nation.  He

5    testified that his father won a national championship while coaching at UNLV, went to the Final

6    Four of the collegiate national basketball tournament four times, and had the highest winning

7    percentage of any coach when he left UNLV.  Daniel Tarkanian testified that after graduating

8    from law school, he practiced law for a few years and left practice to coach with his father at

9    Fresno State.  At the end of Jerry Tarkanian's employment at Fresno State, Daniel Tarkanian

10   testified that he acted as his father's attorney at a hearing before the NCAA infractions

11   committee.  He testified that during the course of his life, he has spent much of his time with his

12   father, working with his father, and defending his father.  Daniel Tarkanian testified that about a

13   month ago, he flew with Jerry Tarkanian to Dallas for a coaching convention where the Final

14   Four basketball tournament was held.

15          Daniel Tarkanian testified that his father's health had been declining since 2009 but his

16   father had not had another major problem until his heart attack and hospitalization in March

17   2012.  He testified that he had concerns about his father's condition after that hospitalization,

18   including Jerry Tarkanian's inability to walk, his risk of falling, his inability to go to the

19   restroom without assistance, and his limited speech.  Daniel Tarkanian testified that he would

20   assist his mother in lifting his father at times when he fell out of his chair or bed.  He testified

21   that he spent a lot of time with his father and also brought his children along to interact with their

22   grandfather.

23          Daniel Tarkanian testified that after his father's March 2012 heart attack, he decided it

24   was important to remain in the Residence by paying down the mortgage and refinancing it at a

25   low interest rate.  He testified that during 2012 he believed the fair market value of the

26   Residence was somewhere in the mid-$300s based on a county tax assessment. He testified that

27   prior to the principal reductions in 2012, he and his wife had no equity in the Residence and that

28   it was upside down several hundred thousand dollars.  Daniel Tarkanian testified that the actual

1   reduction in principal was $398,701.92, resulting in $93,596 in equity based on the county

2   assessor's valuation of the Residence.  He testified that the principal payment of $398,701.92

3   resulting in $93,596 of equity was a lousy investment but it was more important to remain in the

4   Residence after his father's heart attack.  He testified that he tried to refinance the Residence at

5   the end of 2012, but had to wait until after he filed his 2012 tax return.  Daniel Tarkanian

6   testified that when he tried to refinance in 2013 at Bank of the West, he could not do so because

7   of the FDIC judgment.

8          Daniel Tarkanian testified that a little over a month ago, Jerry Tarkanian suffered another

9   heart attack.  He was able to rush over from the Residence to his father's house and was the first

10  adult to arrive.  Jerry Tarkanian was taken to the hospital and was diagnosed with another heart

11  attack.  Daniel Tarkanian testified that his sister had arrived before him and placed a CPAP mask

12  on Jerry Tarkanian to force air into his lungs.

13                                          **DISCUSSION**

14         Under Section 541(a)(1), all property in which a debtor has a legal or equitable interest as

15  of the commencement of the bankruptcy case constitutes property of their bankruptcy estate.

16  Under Section 522(b)(1), an individual Chapter 7 debtor may exempt from property of the

17  bankruptcy estate property that may be claimed as exempt under applicable state law pursuant to

18  Section 522(b)(3).  Under Section 522(b)(3)(A), property claimed as exempt under state law is

19  subject to the provisions of Section 522(o).  Under Section 522(o)(4), "the value of an interest

20  in" real property that a debtor claims as a homestead "shall be reduced to the extent that such

21  value is attributable to any portion of any property that the debtor disposed of in the 10-year

22  period ending on the date of the filing of the petition with the intent to hinder, delay, or defraud a

23  creditor and that the debtor could not exempt, or that portion that the debtor could not exempt,

24  under subsection (b), if on such date the debtor had held the property so disposed of."

25  (Emphasis added.)

26         Under Section 522(b)(2), each State may elect not to allow its residents to claim the

27  federal bankruptcy exemptions set forth in Section 522(d).  Under NRS 21.090(3), Nevada has

28  "opted out" of the federal bankruptcy exemptions.  See Leavitt v. Alexander (In re Alexander),

1    472 B.R. 815, 821 (B.A.P. 9th Cir. 2012).

2         Subject to specific exceptions, the Nevada Constitution exempts from a forced sale the

3    homestead that is available to Nevada residents.  See Nev. Const. art. 4, § 30.  NRS 21.090(1)(l)

4    permits Nevada residents to claim the "homestead as provided for by law . . . "  NRS

5    115.005(2)(a) defines a homestead to mean property consisting of "a quantity of land, together

6    with the dwelling house thereon and its appurtenances."  Under NRS 115.020, a homestead is

7    claimed by recording a declaration of homestead at any time before an execution sale of the

8    property.  See Myers v. Matley, 318 U.S. 622, 627 (1943).  Under NRS 115.010(2), a homestead

9    claimed as exempt from execution "extends only to that amount of equity in the property held by

10   the claimant which does not exceed $550,000 in value . . . "[13]

11        The homestead provided for by Nevada law is limited by the Nevada Supreme Court's

12   decision in Maki v. Chong, 119 Nev. 390, 75 P.3d 376 (Nev. 2003).  In Maki, the court rejected

13   a homestead claim by a judgment debtor who had converted the creditor's funds to acquire a

14   residence.  In pertinent part, the court observed as follows:

15              There is a time-honored principal that states that he who keeps
                property that he knows belongs to another must restore that
16              property. This idea, manifested in the doctrine of equitable liens,
                permeates our entire system of justice regarding equity. "[O]ne
17              who has purchased real property with funds of another, under
                circumstances which ordinarily would entitle such other person to
18              enforce a constructive trust in, or equitable lien against, the
                property, cannot defeat the right to enforce such trust or lien on the
19              grounds that [the homestead exemption applies]."
                                        ***
20              Under equitable lien principals, the homestead exemption is
                inapplicable when the proceeds used to purchase real property can
21              be traced directly to funds obtained through fraud or similar
                tortious conduct.
22
     119 Nev. at 393, 75 P.3d at 378-79 (citations and footnotes omitted).
23
          There is no dispute that the Residence is property of the Debtors' bankruptcy estate and
24
     that the Debtors have claimed a homestead exemption under NRS 21.090(1)(l) and NRS
25

26   _____

27   [13]  As of 1995, the maximum amount of the Nevada homestead exemption was $125,000.
     Effective July 1, 2003, the amount was increased to $200,000.  Effective July 1, 2005, the
28   amount was increased to $350,000.  Effective July 1, 2007, the amount was increased to the
     current maximum of $550,000.

1    115.050.  There also is no dispute that the Homestead Objection was timely filed by the FDIC

2    under FRBP 4003(b)(1).

3          Although the FDIC initially asserted only that the Debtors had made fraudulent transfers

4    for which their Nevada homestead exemption would be denied under <u>Maki</u>, <u>see</u> Homestead

5    Objection at 8:2-27, it also argues that the Debtors' claim of exemption is limited by Section

6    522(o).  <u>See</u> Reply at 4:3 to 6:21; FDIC Brief at 6:16 to 9:7.  Debtors' opposition to the

7    Homestead Objection actually raised Section 522(o) in the first instance, <u>see</u> Debtors' Response

8    at 7:11 to 13:22, and they of course maintain that Section 522(o) does not apply.  <u>See</u> Daniel

9    Brief at 7:18 to 15:18; Amy Brief at 3:9 to 8:2.   Because the limitations under Section 522(o)

10   apply only if an exemption is available to begin with, the court will initially examine whether the

11   Debtors may even claim a Nevada homestead under <u>Maki</u>.

12   **I.      <u>Availability of the Nevada Homestead Exemption.</u>**

13          In <u>Maki</u>, the Nevada Supreme Court acknowledged the fundamental purpose of

14   the homestead exemption is to preserve "the family home despite financial distress, insolvency

15   or calamitous circumstances . . . "  75 P.3d at 378 & n.2, <u>citing</u> <u>Jackman v. Nance</u>, 109 Nev. 716,

16   718, 857 P.2d 7, 8 (Nev. 1993).   The protection provided by the homestead exemption, however,

17   is not absolute.  In addition to express statutory exceptions to a judgment creditor's execution

18   against a homestead, e.g., tax liens, mortgages, deeds of trust, and homeowners association liens,

19   the Nevada Supreme Court acknowledged its prior recognition of an additional exception for

20   payment of child support obligations.  75 P.3d at 378-79 & nn.5 & 6, <u>citing</u>, <u>e.g.</u>, <u>Breedlove v.</u>

21   <u>Breedlove</u>, 100 Nev. 606, 608, 691 P.2d 426, 427 (Nev. 1984).  With respect to parents who

22   owed child support arrearages, the court concluded that they are "not the type of debtor whom

23   the legislature sought to protect." 75 P.3d at 379.

24          The type of debtor before the court in <u>Maki</u> was the sister of a Nevada prison inmate.

25   While her brother was in prison, she misappropriated his state insurance disability settlement

26   funds and his monthly disability benefit checks.  She used the monies to purchase a residence

27   and then claimed a Nevada homestead exemption after her brother obtained a fraud judgment

28

against her.[14]  In rejecting her homestead claim, the Nevada Supreme Court observed:

> "The homestead exemption statute cannot be used as an instrument
> of fraud and imposition." **Public policy supports our application
> of an exception to homestead exemptions for victims of fraud
> or similar tortious conduct.** An individual using fraudulently
> obtained funds to purchase real property should not be protected
> by the homestead exemption because the exemption's purpose is to
> provide protection to individuals who file the homestead
> exemption in good faith.

75 P.3d at 379 (footnotes omitted) (Emphasis added).  Because the sister had obtained her

brother's funds by fraudulent means, the court concluded that her homestead exemption was

invalid and could not prevent an execution sale of the residence to enforce the judgment.  Id. at

379-80.

The Maki court relied primarily on a decision by the Washington Supreme Court in

Webster v. Rodrick, 394 P.2d 689 (Wash. 1964).  Webster involved a homestead claim by a

married couple where the wife had embezzled funds from her employer, and the funds may have

been used to purchase and improve the couple's residence.  The employer obtained a judgment

against the wife and the marital community based on misappropriation.  The embezzled funds

had been sufficiently traced to the residence to support the inclusion of an equitable lien against

the debtors' residence.  The Washington Supreme Court rejected the debtors' claim of a

homestead exemption, concluding that the Washington "homestead exemption statute cannot be

used as an instrument of fraud and imposition."  394 P.2d at 692 (citations omitted).[15]

---

[14]  At the time Maki was decided, the maximum amount of the Nevada homestead
exemption under then-NRS 115.010(2) was $125,000 of equity in the judgment debtor's
residence.  75 P.2d at 378.

[15]  All of the other decisions cited by the Nevada Supreme Court in Maki,119 Nev. at 393
& n.9, 75 P.3d at 379 & n.9, involved constructive trusts or equitable liens imposed on parties
that had acquired or improved their homestead properties through funds which had been
obtained through fraud, embezzlement or unjust enrichment.  See, e.g., Mack v. Marvin, 211
Ark. 715, 202 S.W.2d 590, 594 (1947) [constructive trust imposing a lien applied where
defendants defrauded plaintiff out of funds and spent on residence claimed as a homestead];
Duhart v. O'Rourke, 99 Cal.App.2d 277, 221 P.2d 767, 769 (1950) [sale of homestead to execute
a judgment proper where funds fraudulently obtained were traced to residence]; Jones v.
Carpenter, 90 Fla. 407, 106 So. 127, 130 (1925) [equitable lien imposed on homestead equal to
value of funds misappropriated from an insolvent corporation]; In re Munsell's Guardianship,
239 Iowa 307, 31 N.W.2d 360, 367 (Iowa 1948) [former guardian's homestead may be subject to

1    In both <u>Maki</u> and <u>Webster</u>, it is clear that the funds at issue originally belonged to the

2    judgment creditor.  In <u>Maki</u>, disability checks payable to the judgment creditor were

3    misappropriated and used to acquire the debtor's residence.  In <u>Webster</u>, funds embezzled from

4    the judgment creditor were used to acquire and improve the debtor's residence.  In each case,

5    there was tortious conduct by which the debtor acquired the funds belonging to the judgment

6    creditor that were traceable to the residence for which a homestead exemption was claimed.  In

7    each circumstance, the facts supported the imposition of an equitable lien or the recognition of a

8    constructive trust in favor of the judgment creditor notwithstanding the debtor's attempt to claim

9    a homestead.

10    In <u>Henry v. Rizzolo</u>, 2012 WL 4092604 (D. Nev. 2012), a Nevada debtor faced with

11    execution of a judgment asserted an exemption in certain annuity contracts pursuant to NRS

12    687B.290.1.  That statute included a specific exception with respect to "amounts paid for or as

13    premium on any such annuity with intent to defraud creditors . . . "  The federal court

14    interpreting Nevada law concluded that the exception to the annuity contracts exemption

15    required proof of intent to defraud creditors.  2012 WL at *5.  A judgment under NRS

16    112.180(1)(a) already had been entered in favor of the executing creditors, however, determining

17    that the same debtor had received a fraudulent transfer of funds owned by her stepson.  Applying

18    the statutory exception and "the equitable lien principals set forth in <u>Maki</u> . . . ," 2012 WL at *8,

19    the court rejected the claimed exemption of the annuity contracts as there was a sufficient basis

20

21    ―――――――――――

22    constructive trust for mortgage payment made from funds improperly paid from guardianship
      estate]; <u>Long v. Earle</u>, 277 Mich. 505, 269 N.W. 577, 582 (1936) [constructive trust imposed on

23    homestead acquired with funds embezzled by a trustee]; <u>American Ry. Express Co. v. Houle</u>,
      169 Minn. 209, 210 N.W. 889, 890 (1926)[constructive trust imposed on homestead dwelling

24    constructed using funds embezzled from husband's employer; wife's assertion of innocent
      spouse for value defense rejected]; <u>Wells Fargo Bank Intern. v. Binabdulaziz</u>, 124 Misc.2d 1072,

25    478 N.Y.S.2d 580, 582 (Sup.Ct.1984) [homestead exemption denied to defendants who used
      portion of funds misdeposited into their bank account to acquire residence]; <u>Curtis Sharp Custom</u>

26    <u>Homes, Inc. v. Glover</u>, 701 S.W.2d 24, 25–26 (Tex.App.1985) [foreclosure on equitable lien
      against homestead for portion of funds embezzled from plaintiff employer denied due to

27    constitutional protection in Texas for homestead]; <u>Warsco v. Oshkosh Savings & Trust Co.</u>, 190
      Wis. 87, 208 N.W. 886, 887 (1926) [trust funds improperly distributed to a beneficiary and used

28    to invest in a homestead may be impressed with a lien].

1   to conclude that the contracts had been purchased in whole or in part with funds owned and

2   fraudulently transferred by the judgment debtor's stepson.  Thus, as was the case in <u>Maki</u> and

3   <u>Webster</u>, in <u>Henry</u> there was no question that the funds used to acquire the claimed exemption

4   did not belong to the judgment debtor.[16]

5          But neither <u>Maki</u>, <u>Webster</u> nor <u>Henry</u> address whether a judgment debtor outside of

6   bankruptcy may engage in exemption planning in contemplation of a judgment being entered.

7   Most states have adopted statutes providing remedies for judgment debtors who fraudulently

8   transfer their assets to thwart the collection efforts of judgment creditors.  <u>See, e.g.</u>,

9   Nev.Rev.Stat. 112.140 to 112.250 (Uniform Fraudulent Transfer Act).  Even for individuals who

10  petition for bankruptcy protection, prebankruptcy exemption planning is permitted.  <u>See</u> <u>In re</u>

11  <u>Stern</u>, 345 F.3d 1036, 1043 (9th Cir. 2003).  In Nevada, it is well established that a judgment

12  debtor can record a homestead declaration at any time before the execution sale is completed.

13  <u>See</u> <u>Herndon v. Grilz</u>,112 Nev. 873, 878, 920 P.2d 998, 1001 (Nev. 1996).  Thus, Nevada law

14  contemplates that a judgment debtor can convert his or her otherwise non-exempt residence into

15  a fully exempt homestead even on the day of the execution sale.

16         In the present case, neither the FDIC nor the Debtors have cited an instance where the

17  equitable lien concepts articulated in <u>Maki</u> and <u>Webster</u> have been applied to bar debtors from

18  using their own assets for exemption planning.  In particular, the parties have cited no instance

19  where a judgment debtor has been barred under Nevada law from using his or her own assets to

20  acquire or increase the equity in a residence for purposes of the homestead exemption.  As

21  previously noted, individual debtors are allowed to engage in exemption planning prior to

22

23         [16]  Other than the unreported decision in <u>Henry</u>, Westlaw and Lexis list two reported
    cases that have cited <u>Maki</u>.  In <u>Coppler & Mannick, P.C. v. Wakeland</u>, 138 N.M. 108, 117 P.3d
24  914 (N.M. 2005), the judgment creditors judicially foreclosed on the debtor's residence.  In light
    of the foreclosure, the debtor trashed the residence. In a separate action, the same creditors
25  obtained a judgment against the debtor for damages based on waste of the property.  In light of
    the debtor's egregious conduct, the New Mexico Supreme Court imposed an equitable lien
26  against the debtor's New Mexico homestead to secure payment of the damages that the debtor
    had inflicted upon the creditors' property.  In <u>Rusheen v. Cohen</u>, 37 Cal.4th 1048, 1064, 128
27  P.3d 713, 724 (Cal. 2006), the California Supreme Court cited <u>Maki</u> only as an example of a
    State providing exemptions as an alternative remedy to asserting a claim for abuse of process.
28

1  bankruptcy, subject to judicially created limitations applicable in bankruptcy.  In a bankruptcy

2  context, such limitations serve a fundamental bankruptcy purpose of ensuring a ratable

3  distribution to creditors.  Outside of bankruptcy, however, individual states must determine the

4  degree of exemption planning permitted by their residents.[17]  The Nevada Supreme Court's

5  decision in Maki, like Webster, expressed the court's concern for debtors who fraudulently or

6  tortiously obtain property from others and invoke the homestead exemption as a shield to protect

7  their ill-gotten gains.  Because Nevada permits its residents to claim the homestead exemption at

8  any time before completion of an execution sale, the concerns expressed by the court in Maki do

9  not appear to be applicable here.

10         In the instant case, there is no dispute that the Debtors purchased the Residence in June,

11  2005 for $810,000 using a down payment of $162,000 from the sale of their prior residence.

12  There is no dispute that after the Debtors acquired the Residence in 2005, they owed a balance of

13  $648,000.  There is no dispute that after 2005, Debtors made only interest payments on their

14  mortgage. There is no dispute that the Debtors could have filed a homestead declaration at any

15  time after they purchased the Residence in 2005.  There is no dispute that the maximum amount

16  of the Nevada homestead exemption was $200,000 at the time the Debtors purchased the

17  Residence.  There is no dispute that the maximum amount of the Nevada homestead exemption

18  was $350,000 between July 1, 2005 and June 30, 2007.  There is no dispute that the maximum

19  amount of the Nevada homestead exemption after July 1, 2007, is $550,000.

20         There is no dispute that as of July 1, 2012, the Debtors had no equity in the Residence.

21  There is no dispute that the Debtors made no principal payments on their mortgage until July 12,

22  2012.  There is no dispute that the Debtors made additional principal payments on August 3,

23

24         [17]  Compare Havoco of America, Ltd. v. Hill, 790 So.2d 1018 (Fla. 2001)(under Florida
constitution, an individual's residence acquired by conversion of nonexempt assets with specific
25  intent to hinder, delay or defraud creditors remains protected by the homestead exemption).
Compare also Society of Lloyd's v. Collins, 284 F.3d 727 (7th Cir. 2002)(life insurance policies
26  exempt under Illinois law were not subject to garnishment under Illinois statute requiring proof
that policies were purchased with intent to convert nonexempt property or to defraud creditors);
27  Dona Sav. and Loan Ass'n, F.A. v. Dofflemeyer, 115 N.M. 590, 855 P.2d 1054 (N.M. 1993)
(conversion of certificate of deposit and real estate to annuity exempt under New Mexico law
28  was not fraudulent per se).

34

2012 and August 22, 2012.  There is no dispute that the principal payments made by the Debtors in July 2012 and August 2012 reduced their mortgage balance to approximately $248,000. There is no dispute that the reduction in the mortgage balance resulted in the Debtors having equity in their Residence.  There is no dispute that the amount of the Debtors' equity in the Residence is less than the $550,000 maximum allowed for a Nevada homestead.  There is no dispute that the Debtors did not record their homestead declaration until February 6, 2013.

Although other facts are established by the evidence and will be discussed below, the salient fact is that the assets which enabled the Debtors to claim a homestead exemption in the Residence were the Debtors' assets, not those of a third party.  Under these circumstances, the court concludes that the decision in <u>Maki</u> does not prohibit the Debtors from claiming a homestead in their Residence under Nevada law.  As to that basis, the Homestead Objection will be overruled.  The remaining inquiry is whether Section 522(o) limits the amount of the Debtors' homestead claim.

## II.    <u>Applicability of Section 522(o).</u>

In 2005, i.e., the year the Debtors purchased the Residence, Section 522(o) was enacted, along with Section 522(p) and Section 522(q), to limit an individual's ability to claim a homestead in bankruptcy.  Section 522(p) attempts to close the so-called "mansion loophole" by capping the amount of a homestead exemption to now-$155,675[18] for any residence acquired by the debtor within 1215 days before commencing bankruptcy.  <u>See</u> In re Greene, 583 F.3d 614, 619 (9th Cir. 2009).  This prevents well-heeled individuals from relocating to States that have more generous homesteads, e.g., Florida and Texas,[19] shortly before filing for bankruptcy

---

[18]  When Section 522(p) was enacted effective April 20, 2005, the cap was $125,000.  As a result of adjustments every three years, the cap was raised to $155,675 effective April 1, 2013.

[19]  Florida permits its residents to homestead 160 acres of contiguous land located outside of a municipality, or, one-half of an acre of contiguous land located within a municipality, without a dollar value limitation.  <u>See</u> Fla.Const. art. X, § 4; Fla.Stat.Ann. §§ 222.01, 222.02 & 222.05.  Texas permits its residents to homestead up to 100 acres of rural property for a single adult, up to 200 acres of rural property for a family, or up to ten acres of urban property for a residential and/or business homestead, with no dollar value limitation.  <u>See</u> Tex. Const. art. XVI, §§ 50, 51; Tex. Prop. Code §§ 41.001 to 41.002.

1   protection.  See In re Kane, 336 B.R. 477, 482 (Bankr.D.Nev. 2006).  Section 522(q) further

2   limits the exemption permitted by Section 522(p) for a debtor who is convicted of certain

3   felonies or if the debtor has a debt arising from certain types of wrongful conduct, e.g., securities

4   fraud, serious physical injury or death, and the like.  For individuals who do not relocate to

5   another state, Section 522(o) attempts to prevent individuals from increasing the value of their

6   homestead by disposing of non-exempt assets "with the intent to hinder, delay, or defraud a

7   creditor . . . "

8        In this district, a party objecting to a homestead exemption under Section 522(o) must

9   demonstrate: "(a) an increase in the value of the debtor's homestead; (b) that the increase was

10  'attributable' to the disposition of nonexempt assets; (c) that the disposition of the nonexempt

11  assets was made with the intent to hinder, delay, or defraud a creditor; and (d) that the

12  disposition occurred during the ten-year period ending on the date the debtor's bankruptcy

13  petition was filed."  In re Stanton, 457 B.R. 80, 91 (Bankr.D.Nev. 2011).  See also In re Halinga,

14  2013 WL 6199152 at *4 (Bankr.D.Idaho Nov. 27, 2013).[20]

15       In the instant case, the parties do not dispute that any increase in the value of the

16  Debtors' homestead is entirely attributable to the payments made on July 12, 2012, August 3,

17  2012, and August 22, 2012, because the Debtors had no equity whatsoever in the Residence prior

18  to those principal payments.  Additionally, there is no dispute that any challenged disposition of

19  assets in this case occurred within ten years prior to the filing of the Debtors' bankruptcy

20

---

21       [20]  Section 522(o) refers to property that the debtor "disposed of."  It does not use the
    word "transferred."  The term "transfer" is defined in Section 101(54) broadly and subsection
22  (D) includes "each mode...of disposing of or parting with - (i) property; or (ii) an interest in
    property."  The term transfer is used in many sections of the Bankruptcy Code, including the
23  provisions governing the recovery of avoidable transfers under Sections 544, 547, 548, 549, 550
    and 551, as well as the provision denying an individual debtor's discharge under Section
24  727(a)(2).  For purposes of the latter, the term "transfer" includes withdrawing money from a
    bank account as an exchange of debt for money.  See In re Bernard, 96 F.3d 1279, 1283 (9th Cir.
25  1996).  When a debtor parts with claims against a bank to hinder the collection efforts of a
    creditor, a transfer has occurred and the discharge may be denied under Section 727(a)(2)(A)
26  regardless of whether the funds are deposited into a separate account of the debtor.  See, e.g.,
    A&H Insurance, Inc. v. Huff, 2014 WL 904537 (B.A.P. 9th Cir. March 10, 2014) (reversing
27  bankruptcy court conclusion that transfer had not occurred based on Bernard, but affirming
    dismissal of creditor complaint).
28

36

1   petition.[21]  What remains in dispute are: (1) whether the Debtors' resulting homestead exemption

2   was attributable to a disposition of nonexempt assets, and (2) whether that disposition of assets

3   was made with intent to hinder, delay or defraud creditors.

4                    **A.    Disposition of Non-Exempt Assets.**

5                    The evidence adduced at trial established that the source of the funds for the July

6   12, 2012, payment to Bank of America was: (1) $220,000 from the life insurance policies of the

7   parents' irrevocable trust that were loaned to JAMD which then partially repaid prior loans made

8   to JAMD by the Debtors; (2) $30,000 from JAMD's available operational income which then

9   partially repaid prior loans made to JAMD by the Debtors; and (3) $50,000 from the Daniel

10  Tarkanian congressional campaign to repay a loan previously made by the Debtors to the

11  campaign.  The source of funds for the August 3, 2012, payment to Bank of America was from a

12  $50,000 loan made by the Tarkanian Basketball Academy to JAMD which then partially repaid

13  the prior loans to JAMD made by the Debtors.  The source of funds for the August 22, 2012,

14  payment to Bank of America was from JAMD's partial repayment of prior loans to JAMD made

15  by the Debtors.  Thus, according to Debtors' evidence, the direct source of all of the funds that

16  the Debtors used to make the principal payments on their mortgage were repayments of loans by

17  JAMD ($350,000) or the repayment of a loan by the Daniel Tarkanian congressional campaign

18  ($50,000).

19                   Debtors jointly argued that they did not dispose of non-exempt assets as required by

20  Section 522(o).  See Debtors' Response at 12:11-12.  As to the July 12, 2012 payment, Debtors

21  also argued that $220,000 of the $300,000 principal reduction originated from the life insurance

22  policies held by the parents' irrevocable trust.  Debtors then argue that the life insurance policies

23  _____

24          [21] Section 522(o) addresses a Chapter 7 debtor's act of disposing of non-exempt assets
     within ten years before the commencement of the case with intent to hinder, delay, or defraud a
25   creditor.  Because the "disposing of" assets constitutes a "transfer" within the meaning of
     Section 101(54)(D), see discussion at note 20, supra, the same conduct implicating a homestead
26   limitation under Section 522(o) may not result in a denial of discharge under Section 727(a)(2).
     The latter exception to discharge is based on impermissible transfers of assets that occur only
27   within one year before or any time after the commencement of the case.  In the instant
     proceeding, Debtors' last principal reduction occurred on August 22, 2012, more than 16 months
28   before the commencement of the case.

1   are exempt under NRS 21.090(1)(k).  See Debtors' Response at 12:14-18; Daniel Brief at 15:9-

2   12.  Debtors do not claim that the $30,000 in operational income of JAMD or the $50,000 in

3   funds from the Daniel Tarkanian campaign fund are exempt.  As to the August 3, 2012 payment,

4   Debtors do not identify an exemption that would encompass the $50,000 loaned by the

5   Tarkanian Basketball Academy to JAMD.  As to the August 22, 2012 payment, Debtors do not

6   identify an exemption that would encompass the $50,000 apparently made from the operational

7   income of JAMD.

8         Debtors' reliance on the insurance exemption under NRS 21.090(1)(k) is misplaced.

9   There is no dispute that the life insurance policies issued by Phoenix Life Insurance Company

10   are held by the parents' irrevocable trust rather than the Debtors.[22]  The Debtors jointly as well

11   as separately, have cited no authority explaining how NRS 21.090(1)(k) could be applied to

12   allow them to exempt an interest in life insurance policies in which they have neither an

13   ownership nor a beneficial interest.[23]  The few cases applying NRS 21.090(1)(k) involved

14   voluntary Chapter 7 proceedings where the debtors had purchased or received life insurance

15   policies and scheduled their interest in the policies in their bankruptcy schedules.  See In re

16   Bower, 234 B.R. 109 (Bankr.D.Nev. 1999); In re Dawson, 2004 Bankr. LEXIS 2039 (Bankr. D.

17   Nev. 2004).

18         In her own response to the Homestead Objection, Amy does not rely on NRS

19   21.090(1)(k), but separately argues that Section 522(o) somehow is meant to address the

20

21       [22]  Indeed, any ownership or beneficial interest in the parents' life insurance policies that

22   the Debtors' held on the petition date would have been listed at Items 9 or 20 of their personal

      property Schedule "B," but it was not.  Likewise, if the Debtors' held such an interest in July

23   2012 and later transferred that interest before filing their bankruptcy petition, the transfer would

24   have to be disclosed in Item 10 of their SOFA, but it was not.  (ECF Nos. 12 and 170).

      Additionally, the separate Personal Financial Statements of Daniel Tarkanian and Amy

25   Tarkanian, as well as the separate Affidavits of Financial Condition of Daniel Tarkanian and

      Amy Tarkanian, all dated December 22, 2011 (Exs. "14," "17," "16" and "18"), did not list or

26   disclose an ownership interest in the policies insuring the lives of the parents.

27       [23]  A copy of the parents' irrevocable trust was not introduced into evidence.  Because the

      Debtors have never disclosed or claimed that they are the named beneficiaries of the parents' life

28   insurance policies, the court assumes that the irrevocable trust is the named beneficiary of the

      insurance policies and that the parents are the named beneficiaries of the trust.

1    disposition of the debtor's residence rather than the disposition of separate non-exempt property.

2    In her written argument, Amy relies on the following language from a leading bankruptcy

3    treatise:

> There are two different time periods that apply to the limitation in
> section 522(o). The first time frame deals with the debtor's intent
> to hinder, delay or defraud a creditor, and it is measured at the time
> of disposition of the nonexempt property. Section 522(o) requires
> that the disposition must occur within the 10-year period ending on
> the filing date of the petition.
>
> The second time frame concerns the question of whether the debtor
> could exempt the converted assets. Although the time of
> disposition would seem to be the logical choice for determining the
> converted assets' nonexempt status, given the potential relevancy
> of this status to the debtor's fraudulent intent, the statute uses a
> different time frame. <u>The language of section 522(o) requires
> the court to look at whether the converted property could be exempted
> "if on such date the debtor had held the property so disposed of."
> Since the phrase "on such date" must refer to the only other date
> specified in section 522(o), which is the date of the filing of the
> petition, it is the petition date that controls in determining whether
> the converted property could be exempted.</u> Therefore, if the
> property converted within the 10-year period could be exempted
> under any applicable provision of section 522(b) at the time the
> petition is filed, the debtor's exemptible interest in the homestead
> should not be reduced under this provision.

16   <u>See</u> Amy Brief at 6:15-21, <u>citing</u> 4 COLLIER ON BANKRUPTCY ¶ 522.08[5] (Alan N. Resnick and

17   Henry J. Sommer, eds., 16th ed. 2014) (Emphasis added). Based on this language, Amy argues

18   that the "applicable exemption in question is undeniably the homestead exemption under Nevada

19   law, not whether 'loan repayments' are exempt as the FDIC-R attempts to recharacterize." Amy

20   Brief at 6:21-23. This argument is circular, however, inasmuch as the purpose of the statute is to

21   prevent a debtor from disposing of nonexempt assets to increase the value of the homestead

22   exemption. Contrary to Amy's position, the statute focuses on whether the assets disposed of by

23   the debtor, i.e., the "converted assets," could have been claimed as exempt on the petition date if

24   the debtor actually held the converted assets on the petition date. Thus, just as the Debtors

25   jointly have misplaced their reliance on NRS 21.090(1)(k) with respect to the $220,000

26   originally loaned by the parents' irrevocable trust to JAMD, Amy's separate focus on any

27   dispositions of the homestead rather than other nonexempt assets is equally misguided.

28        But the Debtors also jointly argued that the repayment of $350,000 of loans by JAMD to

1   Debtors is excluded by Section 522(o) because the FDIC could have enforced its judgment only

2   by seeking a charging order against the Debtors' interest in JAMD pursuant to NRS 86.401.  See

3   Debtors' Response at 12:20-22.[24]  This is a non-sequitur because Section 522(o) focuses on the

4   non-exempt asset that was disposed of rather than the mechanism by which the judgment

5   creditor attempts to reach an asset.  According to their personal property Schedule "B," the

6   Debtors have a 6.3 percent ownership interest in JAMD.[25]  According to the Debtors, Daniel

7   Tarkanian and perhaps Amy Tarkanian had a membership interest in JAMD and Daniel

8   Tarkanian separately loaned monies to JAMD.  According to his Personal Financial Statement

9   dated December 22, 2011 (Ex. "14"), JAMD owed Daniel Tarkanian $670,379.  According to

10  Item 16 of the Debtors' personal property Schedule "B" filed on January 3, 2014, there were no

11  accounts receivable owed to the Debtors, not even by JAMD, as of the date the Debtors filed

12  their bankruptcy petition, i.e, December 19, 2013.[26]

13          There is no apparent dispute that JAMD is a limited liability company under Nevada law.

14  There also is no apparent dispute that at least Daniel Tarkanian is a member of JAMD.  There

15  also is no dispute that the FDIC has a judgment against both Daniel Tarkanian and Amy

16  Tarkanian.  Under NRS 86.401(1), a judgment creditor of a member of a limited liability

17

18          _____

19          [24]  As previously noted, Daniel Tarkanian testified that because JAMD and the Tarkanian
    Basketball Academy are not judgment debtors, the FDIC could pursue JAMD only for the
20  moneys that JAMD owes to Daniel Tarkanian.

21          [25]  Even though the Debtors indicate the same percentage ownership interest in JAMD in
    their schedules as community property, the ownership interest in JAMD is reflected in the
22  Affidavit of Financial Condition of Daniel Tarkanian dated December 22, 2011 (Ex. "16"), but
    not in the Affidavit of Financial Condition of Amy Tarkanian of the same date.  (Ex. "18").
23  Similarly, the Personal Financial Statement for Daniel Tarkanian (Ex. "14") listed an accounts
    receivable owed by JAMD in the amount of $670,379, but no similar accounts receivable was
24  listed in the Personal Financial Statement of Amy Tarkanian (Ex. "17").

25          [26]  Daniel Tarkanian testified that the $670,379 receivable from JAMD listed in the
26  December 22, 2011, Personal Financial Statement would have been reduced by the $350,000 in
    loan repayments that were made by JAMD in July and August 2012.  Assuming that the Debtors
27  had made no additional loans to JAMD between the date of the Personal Financial Statement and
    the repayments by JAMD in 2012, the balance owed by JAMD to the Debtors would have been
28  approximately $320,379.

1    company may apply to a court for an order to "charge the member's interest with payment of the

2    unsatisfied amount of the judgment with interest."   The statute further provides that "To the

3    extent so charged, the judgment creditor has only the rights of an assignee of the member's

4    interest."

5         A party may, of course, be both a member of a limited liability company and a creditor of

6    a limited liability company.  No evidence has been provided as to whether JAMD is a member

7    managed or a manager managed limited liability company.  Members of a limited liability

8    company may have both economic and non-economic interests, see Nev.Rev.Stat. 86.293, and

9    the capital contributions of members may take the form of cash, property, services rendered,

10   promissory notes, or another binding obligation to contribute cash.  See Nev.Rev.Stat. 86.321.

11   The management of a limited liability company generally is vested in its members in proportion

12   to their capital contributions.  See Nev.Rev.Stat. 86.291(1).

13        Under NRS 86.401(1), a judgment creditor may obtain a charging order allowing access

14   to the member's economic interest in the share of the profits and distributions of the limited

15   liability company.  See Weddell v. H20, Inc., 271 P.3d 743, 750 (Nev. 2012).  If the member

16   files a Chapter 7 petition, both the member's economic and non-economic interests become

17   property of the bankruptcy estate, and the bankruptcy trustee may exercise the management

18   rights, if any, that the debtor has in the limited liability company.  See In re B&M Land and

19   Livestock, LLC, 498 B.R. 262, 268 (Bankr.D.Nev. 2013) (prior Chapter 7 filing by sole member

20   of limited liability company precluded subsequent filing of Chapter 11 by limited liability

21   company without participation or consent of Chapter 7 trustee).

22        In the instant case, the Trustee has control over whatever management rights, if any, that

23   Daniel Tarkanian has in JAMD in proportion to Daniel Tarkanian's capital contribution unless

24   otherwise provided in the articles of organization or operating agreement for JAMD.[27]  As to any

25

26        [27]  A copy of the articles of organization or a copy of the operating agreement for JAMD
     was not admitted into evidence.  Those documents would specify whether JAMD is member-
27   managed or manager-managed.  It appears that Daniel Tarkanian is the manager.  As previously
     discussed at 2-3, Debtors originally claimed an exemption of their interest in JAMD but
28   amended their schedules to eliminate that exemption claim after the Trustee objected.  (ECF

1  monies that Daniel Tarkanian previously loaned to JAMD, he no longer owned those funds and

2  he was paid back from other funds received by JAMD, e.g., loans from his parents' irrevocable

3  trust.  What Daniel Tarkanian owned in July and August 2012 were claims against JAMD for the

4  monies he had loaned.  Compare In re Bernard, 96 F.3d at 1283[28].  Those claims are separate

5  from Daniel Tarkanian's economic interests (profits, losses and distributions) as well as his non-

6  economic interests (management rights) in JAMD.[29]

7      Likewise, when Daniel Tarkanian loaned monies to his congressional campaign, he no

8  longer owned the funds, but instead held claims against his campaign fund.

9      In this case, the Debtors' factual and legal position is that JAMD and the Daniel

10 Tarkanian congressional campaign repaid claims that were owed to Daniel Tarkanian.  Debtors

11 do not dispute that the decision by JAMD and the congressional campaign to repay those claims

12 were made on behalf of JAMD and the campaign by Daniel Tarkanian.  Those claims against

13 JAMD and the congressional campaign were converted to money which the Debtors used to

14 make their principal payments to Bank of America.  As any mode of disposing of or parting with

15 property is considered to be a transfer under Section 101(54)(D), certainly the Debtors'

16 _____

17 Nos. 12, 38, 79, 80).

18   [28]  In Bernard, the debtors had deposited funds into a bank account and then withdrew the
funds when faced with a potential prejudgment attachment by a creditor. 96 F.3d at 1281. Under
19 California law, the relationship between a bank and a depositor is a debtor creditor relationship.
As a result, the debtors did not own the monies they had deposited, but instead had a claim to the
20 funds.  In Huff, the appellate panel observed that under Nevada law, the relationship between a
bank and a depositor also is a debtor creditor relationship that gives rise to a claim between the
21 parties. 2014 WL at *6.  In the present case, the Debtors have characterized the July and August
22 2012 payments to Daniel Tarkanian not as the return of capital contributions, but as the
repayment of loans.  The debtor-creditor relationship that the Debtors had with both JAMD and
23 the Daniel Tarkanian congressional campaign therefore resulted in claims that the Debtors had
24 against both entities.

25   [29]  Items 16, 18, 21 and 35 of the Debtors' personal property Schedule "B" directed them
to list any accounts receivable, liquidated debts owed to them, contingent and unliquidated
26 claims of every nature, and other personal property of any kind not already listed.  Those items
do not list any amounts owed by JAMD to either of the Debtors.  If Daniel Tarkanian had any
27 claims against JAMD for unpaid loans or receivables as of the petition date, those claims against
JAMD would have been property of the bankruptcy estate pursuant to Section 541(a)(1).  See
28 Sierra Switchboard Co. v. Westinghouse Electric Corp., 789 F.2d 705, 707 (9th Cir. 1986).

1   conversion of their claims against JAMD and the congressional campaign constituted a disposing

2   of a debtor's assets under Section 522(o).  Compare In re Bernard, 96 F.3d at 1283 ("Instead of

3   owning money sitting in their accounts, the Bernards owned claims against their bank.  When

4   they withdrew from their accounts, they exchanged debt for money (which, more than

5   incidentally, was more difficult to the Sheaffers to acquire).  Thus, when the Bernards made their

6   withdrawals they parted with property, satisfying the Code's definition of transfer.").

7          In this instance, neither the Debtors jointly, nor the Debtors separately, have pointed to

8   an exemption that would encompass their claims against JAMD or the Daniel Tarkanian

9   congressional campaign.  The only exemption they cite, e.g., NRS 21.090(1)(k), simply does not

10  apply as the Debtors are not the owners or beneficiaries of the parents' life insurance policies.

11  Thus, the court concludes that the increase in the Debtors' homestead exemption, in fact, the

12  very existence of the homestead exemption, is attributable to the disposition of non-exempt

13  assets.

14          **B.    Disposition With Intent to Hinder, Delay or Defraud.**

15          In determining whether a debtor disposed of nonexempt assets with intent to

16  hinder, with intent to delay, or with intent to defraud a creditor under Section 522(o), the

17  traditional "badges of fraud" employed in the fraudulent transfer context are often explored.  See

18  Stanton, 457 B.R. at 92-93, citing, e.g., Addison v. Seaver (In re Addison), 540 F.3d 805 (8th

19  Cir. 2008), and In re Maronde, 332 B.R. 593 (Bankr.D.Minn. 2005).  Only on rare occasions will

20  there be direct proof of the debtor's intent to hinder, delay or defraud, i.e., an admission.  A

21  debtor may simply deny that he or she acted with intent to hinder, delay or defraud, or may

22  testify to another purpose for disposing of property.  The trier of fact, of course, must assess the

23  credibility of such direct testimony.  In evaluating such testimony, the trier of fact must take into

24  consideration all of the circumstantial evidence presented, such as the traditional badges of

25  fraud.  See In re XYZ Options, Inc., 154 F.3d 1262, 1271 (11th Cir. 1998).

26          The nonexclusive list of badges indicating fraud include whether: (1) the transfer was to

27  an insider; (2) the debtor retained possession or control of the property transferred after the

28  transfer; (3) the transfer was disclosed or concealed; (4) the debtor was sued or threatened with

43

1   suit before the transfer; (5) the transfer was of substantially all of the debtor's assets; (6) the

2   debtor absconded; (7) the debtor removed or concealed assets; (8) the consideration received was

3   reasonably equivalent to the value of the asset transferred; (9) the debtor was insolvent or

4   became insolvent shortly after the transfer; (10) the transfer occurred shortly before or shortly

5   after a substantial debt was incurred; and (11) the debtor transferred the essential assets of a

6   business to a lienor who then transferred the assets to an insider.  See Stanton, 457 B.R. at 93,

7   citing UNIF. FRAUDULENT TRANSFER ACT § 4(b) (1984).  As one would expect, the opposing

8   parties in the present dispute cite cases favorable to their position where the intent of various

9   debtors was examined under the prism of badges of fraud.

10      For example, the FDIC relies primarily on the conclusions reached by a bankruptcy court

11  in this district in Stanton, as well the fraudulent transfer conclusions reached by the same court

12  in In re National Audit Defense Network, 367 B.R. 207 (Bankr.D.Nev. 2007).  Additionally, the

13  FDIC cites In re Thaw, 496 B.R. 842 (Bankr.E.D.Tex. 2013) and In re Maronde, where the

14  courts referenced the badges of fraud in sustaining the trustees' homestead objections under

15  Section 522(o).  See FDIC Brief at 5:25 to 6:9 and 8:17 to 9:7; Reply at 4:5 to 6:21.  Daniel

16  Tarkanian maintains that the cases referenced by the FDIC are distinguishable and cites In re

17  Chin, 492 B.R.117 (Bankr.E.D.N.Y. 2013) as an example where the absence of badges of fraud

18  constituted evidence of a lack of fraudulent intent in an action to avoid a fraudulent transfer

19  under state law.  See Daniel Brief at 13:15-17.  Amy Tarkanian primarily relies on the In re

20  Addison decision, as well as In re Arends, 506 B.R. 516 (Bankr.N.D. Iowa 2014), where the

21  courts found insufficient badges of fraud on which to infer fraudulent intent under Section

22  522(o).  See Amy Brief at 6:24 to 8:3.[30]

23      The Addison court discussed a conceptual trap in mechanically applying the badges of

24  fraud analysis to Section 522(o): fraudulent transfers implicated by the badges of fraud typically

25  involve the debtor's  movement of asset values to third parties, while the latter statute involves

26  the debtor's movement of asset values to another asset of the debtor.  Thus, the activity

27

28      [30] Amy Tarkanian's reference to the Arends case occurred in the opening and closing
    arguments of her counsel at the evidentiary hearing.

1    contemplated by Section 522(o) invariably implicates at least three of the badges of fraud: the

2    debtor's exempt asset is enhanced by the disposition of a non-exempt asset (transfer of value to

3    an insider); the debtor claims the enhanced asset as exempt (debtor has retained possession or

4    control); and the debtor disposed of non-exempt assets prior to filing bankruptcy (debtor was

5    insolvent or became insolvent shortly after the transfer).  540 F.3d at 814 n.12.  Because pre-

6    bankruptcy exemption planning is generally permitted, however, the Addison court required the

7    identification of "extrinsic evidence of fraud" beyond the conversion of non-exempt to exempt

8    assets to support a finding of fraudulent intent.  540 F.3 at 814.[31]

9          In Stanton, the trial court did not fall into the conceptual trap discussed in Addison.

10   Compare In re Chin, 492 B.R. at 131, citing Lippe v. Bairnco Corp., 249 F.Supp.2d 357, 375

11   (S.D.N.Y. 2003) (absence of badges of fraud constituting evidence of lack of intent to defraud).

12   Indeed, the court emphasized that the existence of any or all of the badges of fraud is not

13   dispositive of the issue of impermissible intent nor does it even create a presumption of such

14   intent.  457 B.R. at 93-94.   In Stanton, the court emphasized the timing and unusual nature of

15   the debtor's disposition of non-exempt assets.  457 B.R. at 94.[32]  The court also considered the

16   debtor's explanations for the transfers and found both the explanations and the debtor's

17   testimony not to be credible.  Id. at 95-96.  The court concluded that the debtor had disposed of

18   _____

19   [31]  The Arends case cited by Amy was decided by an outstanding Iowa bankruptcy court

20   judge who serves as a visiting judge in this court.  Beyond that connection, that decision is not
     particularly persuasive here because there is a substantial difference between the value of the

21   assets disposed of in that case compared to the instant case ($28,000 versus $400,000).  That
     disparity might imply a more than subtle difference in the motivations of the respective debtors.

22   Moreover, the Arends court determined that the assets disposed of were in fact exempt under
     Iowa law and the debtors' act of unnecessary exemption planning was due to incorrect advice of

23   their bankruptcy counsel.  506 B.R. at 519 and 522-23.  Finally, the trustee's objection under

24   Section 522(o) was primarily based on inaccuracies in the debtors' schedules and testimony
     attributable to the admittedly improper advice or other mishandling of the case by the debtors'

25   attorney.  Id. at 525.  This is far different from the factual and legal issues raised by the FDIC in
     the instant proceeding.

26

27   [32]  With respect to the "insolvency" badge of fraud, the court found the evidence to be
     inconclusive.  457 B.R. at 95-96 & no.13.  In the instant case, Daniel Tarkanian testified that he

28   did not have the kind of money to pay the FDIC Judgment and therefore had no intention of
     paying it.

1  numerous non-exempt assets with intent to hinder and delay the judgment creditor.  Id. at 96.

2  Accordingly, the Stanton court applied Section 522(o) and reduced the debtor's interest in the

3  residence by the amount her homestead was enhanced.  Id. at 97[33]

4         In the present case, the timing of the repayment of loans by JAMD and the Daniel

5  Tarkanian congressional campaign fund, and the use of the loan payments to pay down the

6  mortgage on the Residence, all commencing within six weeks after the FDIC Judgment was

7  entered, infers that the Debtors disposed on their claims against JAMD and the congressional

8  campaign fund with the intent to hinder or delay the FDIC's collection efforts.  Additionally,

9  because Daniel Tarkanian controlled both the repayment of the loans by JAMD and the

10  congressional campaign fund, and the use of the funds to pay the mortgage, the FDIC maintains

11  that the Debtors' intent to hinder or delay has been established.  Moreover, the FDIC argues that

12  the Debtors' explanations for their actions are not credible.

13         Debtors maintain that their principal payments in July and August 2012 were done out of

14  concern for the health of Daniel Tarkanian's parents.  They argue that after Jerry Tarkanian had

15  a heart attack in March 2012, it became more important to remain in the Residence located close

16  by.  To remain in the Residence, Daniel Tarkanian contends that a substantial reduction of the

17  principal balance was necessary to ensure that the Debtors could afford to make monthly

18  payments if the interest rate on their loan significantly increased.   Debtors maintain that they did

19  not intend to hinder, delay or defraud creditors, but instead disposed of their nonexempt assets to

20  remain nearby to Daniel Tarkanian's parents.

21         The FDIC rejects this explanation.  It maintains that Jerry Tarkanian's health deteriorated

22  sharply beginning with his fall that occurred in the summer of 2009, leading to Miller describing

23

24  [33]  The specific facts of Stanton were that the debtor had purchased her Nevada residence
    in 2002 for $252,000.  Of the purchase price, the debtor borrowed $175,000.  Through a variety
25  of lump sum payments, she quickly reduced the principal balance of the loan.  In 2008, after her
    sister obtained a $525,000 judgment against her, the debtor orchestrated various transactions that
26  resulted in the $89,945 balance of her residential mortgage being paid off.  457 B.R. at 84 and 91
    n.11.  Because there was no question that the entire value of her residence could be protected by
27  the $550,000 homestead available under Nevada law, the pay off enhanced her homestead claim
    by $89,000.  In other words, under Section 522(o), the amount of the homestead value
28  attributable to the challenged transactions was $89,945.

46

him as a walking time bomb in March 2010.  In spite of Daniel Tarkanian being informed of this description in 2010, the FDIC maintains that Daniel Tarkanian did nothing to reduce the principal on the mortgage until after the FDIC Judgment was entered on May 22, 2012. Similarly, the FDIC argues that Jerry Tarkanian had many other significant health problems between 2009 and 2012, and still the Debtors did nothing to retain the Residence until after the FDIC Judgement was entered.  In other words, the FDIC contends that Jerry Tarkanian's health had little to do with the Debtors' decision to reduce the principal balance of their mortgage.

The FDIC also argues that Daniel Tarkanian's concerns over the monthly interest only payments on the loan are illusory.  It refers to the reduction in the monthly payment from approximately $3,400 at the inception of the residential loan in 2005 to $1,552 at the first interest rate change in July 2010.  It also refers to subsequent interest rate changes where the monthly payments fluctuated but never exceeded $1,552, culminating in a monthly payment of $1,209 in July 2012.  Thus, the FDIC maintains that Daniel Tarkanian's purported concern over his ability to respond to interest rate fluctuations is belied by the actual history of the Debtors' loan. Coupled with the declines in Jerry Tarkanian's health for many years prior to entry of the FDIC Judgment, the FDIC argues that Daniel Tarkanian's sudden concern over possible interest rate increases simply lacks credibility.

The other witnesses who testified contributed only modestly, if at all, to the issue of credibility.  The accounting testimony from Main established only that Daniel Tarkanian characterizes the loan transactions and other financial activity of the entities for which Main prepares tax returns, including JAMD, the Tarkanian Basketball Academy, Tark, LLC, and certain trusts managed by Daniel Tarkanian.  Main testified that he received the information from Daniel Tarkanian in the form of a spreadsheet, and compared the information against bank statements and the like, but never saw any documentation memorializing loans between Daniel Tarkanian and JAMD.  As previously discussed, the medical testimony from Miller established that Jerry Tarkanian had significant health issues prior to 2009 and has had significant health setbacks since 2009.  Miller's testimony also established that Daniel Tarkanian as well as his sister Jodie keep abreast of their father's medical condition.  Miller's testimony further

47

1  established that Lois Tarkanian also has serious medical issues. Neither Main nor Miller were

2  consulted nor participated in the transactions resulting in the principal reductions for the

3  mortgage on the Residence.

4       The testimony from Lois Tarkanian confirmed an exceptionally close relationship

5  between Daniel Tarkanian and his father, Jerry Tarkanian, both in the past as well as in the

6  present.[34]  Her testimony established that she would have great difficulty caring for Jerry

7  Tarkanian by herself. Her testimony also established, however, that she was not consulted nor

8  did she authorize or participate in the transactions resulting in the principal reductions to Daniel

9  Tarkanian's mortgage, but that she would approve the transactions now.

10       The testimony from Jodie Tarkanian Diamant confirmed that Daniel Tarkanian spends

11 more time with Jerry Tarkanian than any of his other children. Her testimony confirmed that

12 Jerry Tarkanian suffered a major health incident in 2009 and that she and her siblings recently

13 have had meetings concerning the health of their parents. Her testimony established that Daniel

14 Tarkanian's close proximity to their parents' home was important in responding to a recent

15 additional heart attack suffered by Jerry Tarkanian. Her testimony also established, however,

16 that she was not consulted nor did she authorize or participate in the transactions resulting in the

17 principal reductions to Daniel Tarkanian's mortgage.

18       The testimony from Amy Tarkanian confirmed that her husband was concerned about

19 Jerry Tarkanian's health after the latter's heart attack in March 2012. She also testified,

20 however, that she did not discuss with Daniel Tarkanian, nor did she participate in, the

21 transactions resulting in the principal reductions to her mortgage.

22       The focus then, is on the credibility of Daniel Tarkanian's explanation that he disposed of

23 the claims against JAMD and the congressional campaign fund with the intent of living close to

24 _____

25       [34] Both Lois Tarkanian and Daniel Tarkanian testified that the strong bond between Jerry
   Tarkanian and Daniel Tarkanian is consistent with relationship between a father and the eldest
26 son in Armenian culture. As there is no evidence even offered by the FDIC to dispute the close
   relationship between Daniel Tarkanian and his father, it is not entirely clear why their ethnic
27 heritage or the notion of primogeniture was even raised. Certainly children can form
   exceptionally close bonds with their parents without regard to immutable characteristics or
28 events.

his parents, or whether he disposed of the claims with intent to hinder or delay collection of the FDIC Judgment. Based on the timing of his actions, the interrelationships between the entities, and the inconsistencies in the record, the court concludes that both intentions were present. As a result, Section 522(o) applies in this case.

The FDIC concedes and the credible testimony of the Debtors and their family members establish beyond question their love for Jerry Tarkanian as well as their concerns for his health. The evidence also establishes beyond question that the close proximity between the Residence and the parents' home is at least convenient and perhaps vitally important in assuring the presence of a family member available to assist in the care of Jerry Tarkanian and, if needed, Lois Tarkanian.[35] No one disputes that paying the mortgage down from $648,000 to $248,000 makes it far easier for the Debtors' to meet their monthly payments on the Residence even if the interest rate increases sharply. No one disputes that the end ultimately intended by Daniel Tarkanian - providing for the care of aging parents - was both common and permissible. The means he chose to achieve that end, however, were not permissible under Section 522(o).

As previously noted, Daniel Tarkanian testified in his declaration that non-exempt assets were not disposed of with intent to hinder, delay or defraud his creditors. The timing of Jerry Tarkanian's health concerns, however, infer that the intent was to hinder or delay creditors rather than only to address the needs of Daniel Tarkanian's parents.[36] As was the case in Stanton, the timing of the principal payments made by Daniel Tarkanian is critical.

On July 12, 2007, the Debtors personally guarantied a loan by La Jolla Bank to Vegas Diamond Properties in the amount of $14,568.750. By March 1, 2009, the loan was in default as

---

[35] Jerry Tarkanian did not testify at the hearing, but Lois Tarkanian did. Despite her serious health concerns, Lois Tarkanian remarkably displayed no ill effects during her courtroom appearance and testimony.

[36] Debtors were not asked at the hearing whether any consideration was given to having the parents simply move into the six bedroom, five bathroom Residence along with the Debtors. Instead, it appears that in 2011, JAMD repaid $242,000 in loans to the parents so they could repair and retrofit their residence for a handicap senior. See Daniel Declaration at ¶ 22.

1  default interest already was being charged on the loan.[37]  During 2009, Jerry Tarkanian was

2  being treated for a variety of ailments, including thyroid, back, blood pressure, cholesterol, eye,

3  and balance issues.  He already had more than six stents placed into his heart. In the summer of

4  2009, Jerry Tarkanian suffered a fall while in San Diego.  His internist, Miller, saw him in

5  August and thought Jerry Tarkanian was in far worse condition than in prior visits.  Jodie

6  Tarkanian Diamant characterized her father's fall as the first major incident involving his health.

7      By the spring of 2010, Miller described Jerry Tarkanian as a "walking time bomb" and

8  conveyed that description to Daniel Tarkanian and other members of his family.  Despite these

9  red flags concerning his father's health, no steps were taken by Daniel Tarkanian to reduce the

10  principal owed on the Residence or to refinance the Residence in order to lock in a lower

11  monthly payment.

12      On May 6, 2010, the FDIC as receiver for La Jolla Bank commenced suit in the federal

13  district court in San Diego on the Debtors' personal guaranty of the $14,568,750 loan.  The

14  Debtors' parents, Jerry and Lois Tarkanian, as well as Jodie Tarkanian Diamant and her

15  husband, and George Tarkanian, also were named defendants.  On or about July 1, 2010, the

16  interest-only payment on the Debtors' mortgage decreased from $3,105.00 per month to

17  $1,552.50 per month, while the principal balance, of course, remained at $647,999.99.[38]  By

18  December 2010, Miller believed that Jerry Tarkanian's cognitive abilities had decreased

19  considerably.

20      In 2011, Miller believed that Jerry Tarkanian's health continued a downward spiral.  On

21  or about February 1, 2011, the interest-only payment on the Debtors' mortgage decreased from

22  $1,552.50 per month to $1,485.00 per month.  In the middle of 2011, Jerry Tarkanian suffered

23  another fall.  It required Miller to drain his elbow.  Despite these additional red flags concerning

24

25      [37]  Attached as Exhibit "A" to the FDIC Judgment is an Estimated Statement of Account
on which the $16,995,005.17 judgment was determined.  Included in the statement is a figure for
26  default interest from March 1, 2009 to May 21, 2012.  Thus, some time prior to March 1, 2009,
27  the borrower presumably had defaulted on the loan.

28      [38]  Portions of a Bank of America statement showing the payment history on the Debtors'
mortgage was admitted as Exhibit "6."

his father's health, in addition to the pronounced fluctuation in the interest rate charged on the mortgage, no steps were taken by Daniel Tarkanian to reduce the principal owed on the Residence or to refinance the Residence in order to lock in a predictable monthly payment.

On or about August 1, 2011, the interest-only payment on the Debtors' mortgage decreased from $1,485.00 per month to $1,417.50 per month.  On November 21, 2011, in the FDIC Collection Action, the FDIC filed its motion for summary judgment with respect to its claims on the personal guaranties.  On or about February 1, 2012, the interest-only payment on the Debtors' mortgage increased from $1,417.50 per month to $1,552.50 per month.  In March 2012, Jerry Tarkanian suffered a heart attack while at a dermatologist appointment and was admitted to a hospital.  Despite these additional red flags concerning his father's health, plus two opposite fluctuations in the interest rate charged on the mortgage, no immediate steps were taken by Daniel Tarkanian to reduce the principal owed on the Residence or to refinance the Residence in order to lock in a stable monthly payment.

On May 4, 2012, however, the FDIC's summary judgment motion was granted.  On May 22, 2012, judgment was entered in the FDIC Collection Action against the Debtors and the other named defendants in the amount of $16,995,005.  On June 3, 2012, Daniel Tarkanian requested Phoenix Home Life to loan $110,000 of the cash value from each of the insurance policies on the lives of Jerry Tarkanian and Lois Tarkanian.  On July 2, 2012, Daniel Tarkanian opened an account at Wells Fargo Bank for the parents' irrevocable trust.  On July 3, 2012, two separate checks in the amount of $110,000 were issued by Phoenix Life Insurance Company payable to the parents' irrevocable trust of a loan against his parents' life insurance policies.  On July 9, 2012, Daniel Tarkanian deposited the insurance company checks into the new account at Wells Fargo Bank.  On July 10, 2012, the funds borrowed by the parents' irrevocable trust were loaned to JAMD.  On July 11, 2012, the Daniel Tarkanian congressional campaign repaid Daniel Tarkanian $53,755.83 that he previously loaned to his U.S. Senate campaign.  On July 12, 2012, JAMD used the $220,000 borrowed from the parents' irrevocable trust plus an additional $30,000 of operational funds to repay Daniel Tarkanian $250,000 that Daniel Tarkanian had previously loaned to JAMD.  On July 12, 2012, Daniel Tarkanian obtained from his Wells Fargo

1   Bank account a cashier's check payable to Bank of America in the amount of $300,000, using

2   the loan repayments from JAMD and the congressional campaign, which is delivered as a

3   principal payment on his mortgage.

4          Daniel Tarkanian testified that all of these transactions that were set into motion eleven

5   days after the FDIC Judgment was entered, i.e., borrowing on his parents' life insurance policies,

6   opening the new bank account at Wells Fargo, JAMD borrowing and the irrevocable trust

7   loaning $220,000, JAMD  using $30,000 of operating funds, JAMD's repayment out of its

8   checking account the funds borrowed from Daniel Tarkanian, and Wells Fargo Bank's issuance

9   of a cashier's check payable to Bank of America, were all determined and carried out by the

10  same person: Daniel Tarkanian.  Neither his wife Amy, nor any of Daniel Tarkanian's family

11  members were consulted in advance or were even aware of the transactions.

12         On July 27, 2012, the Tarkanian Basketball Academy loaned and JAMD borrowed,

13  $50,000.  On or about August 1, 2012, the interest-only payment on the Debtors' mortgage

14  decreased from $1,552.50 per month to $869.00 per month due to the July principal reduction.

15  On August 3, 2012, JAMD used the $50,000 borrowed from the Tarkanian Basketball Academy

16  to repay Daniel Tarkanian $50,000 that Daniel Tarkanian had previously loaned to JAMD.  On

17  August 3, 2012, Daniel Tarkanian obtained from his Wells Fargo Bank account a cashier's check

18  payable to Bank of America in the amount of $50,000, which is delivered as a further principal

19  payment on his mortgage.  Daniel Tarkanian testified that all of these transactions, i.e., JAMD

20  borrowing and the Tarkanian Basketball Academy loaning $50,000, JAMD's repayment out of

21  its checking account of funds borrowed from Daniel Tarkanian, and Wells Fargo Bank's

22  issuance of a cashier's check payable to Bank of America, were all determined and carried out

23  by Daniel Tarkanian.  As with the prior principal payment, neither his wife Amy nor any of his

24  family members were consulted in advance or were even aware of these transactions.

25         On August 22, 2012, JAMD used $50,000 from its operating funds to repay Daniel

26  Tarkanian another $50,000 that Daniel Tarkanian had previously loaned to JAMD.  On the same

27  date, Daniel Tarkanian obtained from his Wells Fargo Bank account a cashier's check payable to

28  Bank of America in the amount of $50,000, which is delivered as another principal payment on

his mortgage. Daniel Tarkanian testified that all of these transactions, i.e., JAMD using the operating funds in its checking account to repay funds borrowed from Daniel Tarkanian, and Wells Fargo Bank issuing a cashier's check payable to Bank of America, were all determined and carried out by Daniel Tarkanian. As with the two prior principal payments, neither his wife Amy nor any of his family members were consulted in advance or were even aware of these transactions.[39]

Daniel Tarkanian testified that he had never previously used cashier's checks to make any mortgage payments to Bank of America. All of the cashier's checks were signed by a representative of Wells Fargo Bank because they were written on the bank's funds rather than Daniel Tarkanian's funds. As such, neither the FDIC nor any other creditor could reach those funds by post-judgment levy or pre-judgment attachment of the Debtors' bank accounts.[40] Because the principal reductions commenced with urgency only after the FDIC Judgment was entered, and the practice of using only cashier's checks for principal payments occurred only after the FDIC Judgment was entered, the court can and does conclude that these steps were undertaken to both hinder and delay the collection efforts of creditors as well as to reduce the principal balance of the mortgage.

This conclusion is bolstered by the fact that at the time the FDIC was actively pursuing a multi-million dollar judgment on its claim, it was not the only creditor holding or perhaps

---

[39] As a result of the two additional principal payments in August 2012, on or about September 1, 2012, the interest-only payment on the Debtors' mortgage further decreased from $869.00 per month to $621.63 per month. On or about February 1, 2013, the interest-only payment further decreased to $589.82 per month. On or about August 1, 2013, the interest-only payment on the Debtors' mortgage decreased to $543.92 per month.

[40] A cashier's check is written on a bank's own funds, see Nev.Rev.Stat. 104.3104(7), and under NRS 104.3412(1)(a) must be honored even if there is a levy upon the purchasing customer's bank account. See Pelton v. Meeks, 993 F.Supp. 804, 808 (D.Nev. 1998)("In this case, Mr. Meeks withdrew the $27,000 via bank draft, purchased the cashier's check, and gave it to his wife; such a cashier's check is not subject to revocation or stop-payment and all Ms. Meeks had to do to take possession of the money was present it to the bank."). In other words, delivery of a cashier's check is the equivalent of delivering cash and is subject to collection only through possession. Levying upon the judgment debtor's bank account would be too late. Moreover, attempting to physically obtain cash or a cashier's check in the possession of a third party requires the judgment creditor to know who has it.

pursuing multi-million dollar claims against the Debtors. When they commenced their

bankruptcy proceeding on December 19, 2013, Debtors scheduled possible claims against them

exceeding $17,000,000 by creditors NSB and Stancorp, based on personal guaranties of JAMD's

indebtedness. Thus, not only does it appear that the Debtors were confronted with the FDIC

Judgment which they admittedly did not have the funds to pay, their primary source of funds for

payment of the principal on their mortgage, JAMD, also had other debt obligations exceeding the

amount of the FDIC Judgment. Daniel Tarkanian testified that JAMD was upside down several

million dollars at the time he was considering the option of making the principal reductions on

his mortgage. Moreover, NSB, which apparently extended loans totaling approximately

$14,800,000 to JAMD starting in 2005, was actively monitoring Daniel Tarkanian's

management of JAMD during 2012.[41] His use of JAMD's apparently limited and closely

monitored resources to repay loans to JAMD's interest-holders, all while never disclosing those

loan repayments to NSB, infers an intent to hinder or delay those additional creditors.[42]

       The interrelationship between the various family entities also suggests the type of

intention forbidden by Section 522(o). An individual who has unfettered control over the

finances of multiple entities can determine who, when, where, why, and how obligations

between the entities will be incurred and repaid. Daniel Tarkanian testified, and both Lois

Tarkanian and Jodie Tarkanian Diamant confirmed, that he manages the affairs of JAMD, the

Tarkanian Basketball Academy, Tark, LLC, the parents' irrevocable trust, and other family

---

       [41] Daniel Tarkanian testified that he never disclosed to NSB any of JAMD's loan repayments to him in 2012, nor has he disclosed to NSB any loan repayments by JAMD to family members since 2005. He explained that the NSB loan documents do not require such disclosures. The NSB loan documents were not offered into evidence by the FDIC nor the Debtors.

       [42] It must be remembered that the FDIC Judgment did not include JAMD, the Tarkanian Basketball Academy, or Tark, LLC, as none of them were borrowers under or guarantors of the original loan by La Jolla Bank to Vegas Diamond Properties, LLC. Those entities are neither judgment debtors nor bankruptcy debtors, and claims under the Nevada fraudulent transfer statutes, see Nev.Rev.Stat. 112.140, et seq., have not been brought against them. As previously noted, however, the Debtors have scheduled themselves as co-obligors with JAMD as to the claims of both NSB and Stancorp, aggregating in excess of $17,000,000.

entities.  All three testified that Daniel Tarkanian does not consult and is not required to consult with his family before making decisions for the family business entities, including inter-entity loans.  Only after he takes action does Daniel Tarkanian report his activities to his family members and then only in the form of spreadsheets that he prepares.[43]

The FDIC does not dispute that the actions taken by Daniel Tarkanian without prior notice or prior consent of his family members can be ratified.  It appears from the testimony of Lois Tarkanian and Jodie Tarkanian Diamant that they have either ratified, consented to, or do not object to Daniel Tarkanian's decisions to have JAMD borrow funds from the life insurance policies or from the Tarkanian Basketball Academy so that JAMD could repay prior loans made by Daniel Tarkanian.  Among members of a close family, this is hardly surprising.  The problem, however, is that Daniel Tarkanian's family has placed him in, or allowed him to assume, a hopelessly conflicted position where the best interests of his extended family may not match the best financial interests of the entities he manages.  Even he testified that the roughly $400,000 principal reduction on the Residence was a bad financial decision because it did not produce an equivalent amount of equity in the property.  Additionally, while the action served the common family objective of keeping Daniel Tarkanian nearby to assist in the care of his parents, it may not have been the best business decision at the time for JAMD to repay the loans previously made by Daniel Tarkanian.[44]  This interrelationship gave Daniel Tarkanian the unchecked ability to dispose of non-exempt assets to hinder or delay his creditors, which the court concludes that he did in this case.

Finally, Daniel Tarkanian's testimony regarding his purported intentions was

---

[43]  As previously noted, Main testified that the tax returns he prepares for the various entities are based on the spreadsheet information provided by Daniel Tarkanian.  Main testified that he compares any reported loan activity against the bank statements, mortgage statements, and checkbooks, but does not audit the information and has never seen any loan documentation.  He also prepares the Debtors' personal tax returns and has never audited whether funds received by Daniel Tarkanian from JAMD are compensation or loan repayments.

[44]  Daniel Tarkanian testified that there is an unwritten policy for JAMD to repay any loans made by family members whenever the family member needed the money back.  Repayment could be accomplished by JAMD borrowing money from other family members or family-related entities.

1   contradictory.  In his declaration, Daniel Tarkanian attested that at the time the principal

2   payments were made, " . . . the home was underwater" because he "owed approximately

3   $648,701.92 and the property was valued at $342,369 by the Clark County Assessor's office for

4   the 2011-2012 tax year."  Daniel Declaration at ¶ 10.  He also stated that the amount of the

5   principal reduction "was calculated to provide an estimated 80/20 loan to value ratio on the

6   residence so that we could refinance the home and remain there to care for my parents."  Daniel

7   Declaration at ¶ 8.[45]  Daniel Tarkanian also attested that "The Payments were in no way made to

8   hinder, delay, or defraud my creditors.  We knew when we made the Payments that we would not

9   receive a dollar for dollar increase in equity in our home.  We did not make the Payments to

10  acquire or increase equity in our home; we made the Payments to enable us to remain, with our

11  children, in the home in order to care for my parents."  Id. (Emphasis added).

12      A "loan to value ratio" typically reflects the amount of the secured debt in proportion to

13  the value of the collateral.  An owner's "equity" in its collateral typically represents the

14  difference between the amount of the debt and the collateral's value.  The loan to value ratio can

15  be reduced and the amount of equity can be increased either by reducing the amount of the debt

16  or increasing the value of the collateral.  Obviously, a principal reduction intended to provide an

17  80 percent loan to value ratio either increases the existing equity in the subject collateral or

18  creates equity in the collateral where none previously existed.  It is not readily apparent how one

19  can seek to improve the loan to value ratio on encumbered property without also seeking to

20  acquire or increase the equity in the same property.  On its face, Daniel Tarkanian's testimony

21  that the principal payments were not made with intent to acquire or increase the equity in the

22  Residence is contradicted by his own testimony that there was no previous equity in the

23  Residence and that he calculated the payments to provide an 80/20 loan to value ratio.  In this

24  respect, Daniel Tarkanian's characterization of his intention is not credible.

25      In summary, the Debtors clearly intended to keep the Residence so they could remain

26  living close to Jerry Tarkanian and Lois Tarkanian, both of whom they love.  To achieve that

27

28      [45] If that was the calculation, then reducing the principal balance to roughly $248,000 on a property value of $342,369 resulted in a debt to value ratio of approximately 72/28.

1   end, however, they disposed of their claims against JAMD and the Daniel Tarkanian

2   congressional campaign with the intent to hinder or delay their creditors, particularly the FDIC.

3   Because the proceeds of those non-exempt assets were used to create the equity in their

4   Residence for which they now claim their homestead exemption, Section 522(o) applies in this

5   case.  This aspect of the Homestead Objection will be sustained.  Thus, an order will be entered

6   reducing the value of the Debtors' interest in their homestead by $202,000, i.e., the amount of

7   equity in their Residence on the petition date that is attributable to the disposition of the non-

8   exempt assets.

9            **III.    The Innocent Spouse Doctrine.**

10                  Amy maintains that she had no knowledge of or participation in any of the

11  measures taken by Daniel Tarkanian.  Amy testified to only one mention by her husband of the

12  importance of retaining the Residence after Jerry Tarkanian suffered a heart attack in March

13  2012.  She insists that she had no involvement in the financial affairs of the household nor the

14  financial affairs of her husband or his family, and that she had no discussions with her husband

15  as to how the mortgage would be paid or the FDIC Judgment would be satisfied.  She argues that

16  she is an "innocent spouse" who should not lose her homestead protection for one-half of the

17  exempt value of the Residence.  See Amy Brief at 12:24-27, citing Matter of American Business

18  Machines, Inc., 6 B.R. 166 (Bankr.D.Nev. 1980).[46]

19       Daniel Tarkanian testified that he makes all financial decisions in his marriage to Amy

20  due to undescribed financial difficulties that Amy had before their marriage.  He confirmed that

21  his wife had no involvement in the decision to have loans be repaid by JAMD as well as the

22  congressional campaign fund, and then using the funds to pay down the mortgage.

23  _____

24      [46]  In American Business Machines, a joint liquidation petition was filed under the
    Bankruptcy Act by a married couple whose bankruptcy trustee consensually sold the debtors'
25  residence.  The debtors then claimed a homestead interest in the proceeds.  The Internal Revenue
    Service ("IRS") asserted a tax lien claim against only the husband for his failure to withhold
26  payroll taxes.  6 B.R. at 167 & n.3.  While acknowledging that a federal tax lien may have
    priority over the interests of a defaulting taypayer spouse in his homestead, 6 B.R. at 170-71, the
27  court applied its equitable powers to allow the non-taxpayer spouse to retain one-half of the
    proceeds of the sale of the homestead, while the IRS received the other half of the proceeds in
28  view of its superior tax lien.  6 B.R. at 172.

1    Amy also disclaimed knowledge of even the most basic economic elements of her

2   family's household, e.g., the amount expended on utilities, the amount of private school tuition

3   for her children, the amount of the monthly mortgage payment, the existence of any bank

4   accounts, or the amount earned by her husband.  She testified that she signed any documents that

5   her husband gave to her, including the Personal Financial Statement and Affidavit of Financial

6   Condition in December 2011, without verifying any information.  Moreover, Amy testified that

7   even though she was a licensed real estate agent early in her relationship with her husband, she

8   has no understanding of a homestead declaration, no idea of whether she is on title to the

9   Residence, and no idea whether she has any equity in the Residence.

10    Amy's portrayal of herself as a virtual "Stepford" wife as to her marital finances[47]

11   contrasted sharply with the FDIC's portrayal of Amy as a statewide political party leader,

12   successful political fundraiser, effective political campaigner for her husband, and savvy

13   political pundit paid to appear on local television.  Although it is not unheard of or perhaps not

14   even unusual for competent individuals to compartmentalize their personal and professional

15   lives, or to define complementary roles in a marriage, reconciling perhaps diametrically opposite

16   versions of the same person is unusual at best.

17    Based on her testimony as well as that of Daniel Tarkanian, it might be easy to conclude

18   that Amy is truly an innocent spouse for whom the protection of the homestead is appropriate

19   regardless of any inappropriate conduct of her spouse.  Unlike the situation in American

20   Business Machines, however, Amy is jointly and severally liable on the FDIC Judgment.  Unlike

21   the situation in American Business Machines, the FDIC debt is not a specific penalty imposed

22   only on the "responsible persons" of an employing entity.  See 26 U.S.C. §§ 6671(b) and

23   6672(a).  Unlike the situation in American Business Machines, the liability to the FDIC is not a

24

25    [47]  The term "Stepford Wife" has been defined as "a woman who does not behave or
     think in an independent way, always following the accepted rules of society and obeying her
26   husband without thinking."  Oxford Learner's Dictionaries (2014 Oxford University Press)
     (online). The term is based on a 1972 novel written by author Ira Levin in which married women
27   in the fictional community of Stepford, Connecticut, are depicted as entirely submissive to the
     demands of their husbands.  In a 2004 film adaptation, the term was expanded to apply to
28   spouses or partners of either gender.

federal tax obligation for which relief to an "innocent spouse" might be available even outside of the equitable jurisdiction of a federal court.  See, e.g., 26 U.S.C. § 6015 (relief from understatement of personal incomes taxes in joint return).  Under these circumstances, the decision in American Business Machines does not support recognition of an equitable "innocent spouse" exception to Section 522(o) in this case.[48]  Thus, it is unnecessary to reach a factual conclusion that reconciles the apparently competing portrayals of Amy's knowledge of or participation in the disposition of her interest in the Debtors' non-exempt assets.[49]

## IV.    The Relief Provided by Section 522(o).

As previously recited, the language of Section 522(o) specifies that "**the value of an interest** in real . . . property that the debtor . . . claims as a homestead . . . **shall be reduced** to the extent that such value is attributable to any portion of any property that the debtor disposed of . . . with the intent to hinder, delay, or defraud a creditor and that the debtor could not exempt . . . "  11 U.S.C. § 522(o)(4) (Emphasis added).

In Stanton, the court found that the debtor had disposed of non-exempt property with intent to hinder or delay the objecting creditor, and therefore granted the relief provided by the language of Section 522(o): it reduced the value in the debtor's interest in her homestead by the $89,945 she had paid off on her mortgage.  457 B.R. at 97.  In view of that determination, the

_____

[48]  In Namow Corp. v. Egger, 99 Nev. 590, 668 P.2d 265 (Nev. 1983), the Nevada Supreme Court rejected an "innocent spouse" defense to the imposition of a constructive trust on a condominium purchased with funds embezzled by the other spouse.  Despite the spouse's lack of knowledge or participation in the embezzlement, the court concluded that a constructive trust on the condominium was appropriate while allowing the non-culpable spouse to obtain only reimbursement for mortgage payments, improvements, taxes paid, and other charges.  Compare Crawford v. Silette, 608 F.3d 275 (5th Cir. 2010) (condominium paid off by innocent owner with funds obtained through Ponzi scheme subject to equitable lien in favor of receiver).

[49]  There actually may be nothing to reconcile.  Amy testified that even in the significant positions she has held in political organizations, the financial decisions were left to others.  The FDIC offered no evidence to the contrary.  Amy's asserted financial role in those organizations appears to be consistent with her limited involvement in the financial decisions in her marriage.  Thus, it may well be that Amy simply admits that the management of finances, both personally and professionally, is not one of her strengths and so she delegates or concedes those responsibilities to others.  Of course, the risks occasioned by doing so may be substantial, but that appears to be her choice.

1    bankruptcy trustee stepped in to sell the debtor's homestead and sought an order authorizing him

2    to market the property. (Stanton ECF No. 144)[50].  At a subsequent hearing on April 3, 2012, the

3    court referred to its prior ruling as authorizing a "surcharge" of the debtor's homestead for the

4    amount of the loan payoff, consistent with the circuit decision in Latman v. Burdette, 366 F.3d

5    774 (9th Cir. 2004).  The term "surcharge" was included in the subsequent order. (Stanton ECF

6    No. 158). The trustee then obtained authorization to employ a real estate agent. (Stanton ECF

7    No. 170).  The residence was thereafter sold with court approval (Stanton ECF No. 208) and the

8    Trustee received the mortgage payoff amount. (Stanton ECF No.212).  The debtor did not

9    appeal the original order reducing the value of her interest in the homestead under Section

10    522(o), nor the subsequent orders that resulted in the sale of the residence.

11          In Law v. Siegel, __ U.S. __, 134 S.Ct. 1188 (2014), a Chapter 7 trustee sought to

12    surcharge a recalcitrant debtor's homestead exemption in order to pay allowed administrative

13    expenses of the estate that far exceeded the amount of the homestead.  The net effect of the

14    surcharge was to deny to the debtor any funds from his homestead. After canvassing the

15    exceptions and limitations on exemptions imposed by the Bankruptcy Code, including Section

16    522(o), the Court observed: "The Code's meticulous - not to say mind-numbingly detailed -

17    enumeration of exemptions and exceptions to those exemptions confirms that courts are not

18    authorized to create additional exceptions." 134 S.Ct. at 1196.  The Court concluded that the

19    bankruptcy court had neither statutory authority under Section 105(a)[51], nor inherent authority to

20    deny an exemption on a ground not specified in Section 522.  134 S.Ct. at 1198.

21          In the instant case, the express language of Section 522(o) requires this court to reduce

22    the value of the Debtors' homestead.  However, Section 522(o) does not permit the court to

23

24          [50]  All references to "Stanton ECF No." are to the numbers assigned to the documents
25    filed in the Stanton bankruptcy proceeding, Case No. 10-33338-LED, which remains pending in
      this judicial district.  The court takes judicial notice of those documents pursuant to FRE 201(b).
26    See Gree v. Williams, 2012 WL 3962458 at *1 n.1 (D.Nev. Sep 07, 2012); Braunstein v. Cox,
27    2012 WL 3638772 at *1 n.1 (D.Nev. Aug 22, 2012).

28          [51]  Section 105(a) permits the court to issue "any order, process, or judgment that is
      necessary or appropriate to carry out the provisions" of the Bankruptcy Code.

surcharge the homestead. Likewise, it does not appear that either Section 105(a) or the court's inherent authority permits it to impress an equitable lien on the Debtors' homestead as a predicate to a forced sale.[52] Such a remedy would deny the Debtors the homestead available under Nevada law on a basis not expressly permitted by Section 522.[53] Thus, the net result of the instant objection may be that the Debtors can remain in their Residence so long as they maintain their monthly mortgage payments.[54] No other relief will be ordered at this time.

**CONCLUSION**

Based on the foregoing, the Homestead Objection will be <u>overruled</u> with respect to the Debtors' entitlement to claim a homestead exemption under Nevada law. The Homestead Objection will be <u>sustained</u> with respect to the application of Section 522(o). A separate order has been entered concurrently with the Memorandum Decision.

Notice and Copies sent through:

   CM/ECF ELECTRONIC NOTICING AND/OR
   BNC MAILING MATRIX

and sent via FIRST CLASS MAIL BY THE COURT AND/OR BNC to:

DUANE H. GILLMAN
DURHAM JONES & PINEGAR
111 EAST BROADWAY, SUITE 900
SALT LAKE CITY, UT 84110

---

[52] As the Nevada homestead exemption is $550,000 under NRS 115.010(2), it appears that a forced sale of the Residence would produce no proceeds for creditors of the estate unless it is sold for at least $798,000 ($248,000 owed on the mortgage, $202,000 of homesteaded equity attributable to principal payments, and $348,000 remaining from the maximum available homestead exemption).

[53] Likewise, the language of Section 522(o) does not include an "innocent spouse" exception to the homestead limitations imposed by Congress.

[54] Moreover, at this juncture, the Debtors have not sought to avoid the FDIC's judicial lien under Section 522(f)(1) to facilitate a refinance of the existing loan.

61

1   TIMOTHY S. CORY
    DURHAM JONES & PINEGAR
2   10785 W. TWAIN, SUITE 200
    LAS VEGAS, NV 89135
3
    MATTHEW ZIRZOW
4   LARSON & ZIRZOW, LLC
    810 S. CASINO CENTER BLVD., #101
5   LAS VEGAS, NV 89101

6   JANICE MOCK
    NOSSAMAN LLP
7   50 CALIFORNIA STREET, 34TH FLOOR
    SAN FRANCISCO, CA 94111
8
    CHARLES KENNON
9   THE COOPER CASTLE LAW FIRM, LLP
    5275 SOUTH DURANGO DRIVE
10  LAS VEGAS, NV 89113

11                                         # # #

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28